COCA–COLA BOTTLING COMPANY
OF SHREVEPORT, INC., et al.,
Plaintiffs,

v.

The COCA–COLA COMPANY,
a Delaware Corporation,
Defendant.

ALEXANDRIA COCA–COLA
BOTTLING COMPANY,
LTD., et al., Plaintiffs,

v.

The COCA–COLA COMPANY,
A Delaware Corporation,
Defendant.

Civ. A. Nos. 83–95 JJF, 83–120 JJF.

United States District Court,
D. Delaware.

June 28, 1991.

673

Edmund N. Carpenter, II, Charles F. Richards and Jesse A. Finkelstein of Richards, Layton & Finger, Wilmington, Del. (Emmet J. Bondurant, Jane F. Vehko and Jeffrey D. Horst of Bondurant, Mixson & Elmore, Atlanta, Ga., of counsel), for plaintiffs.

Richard D. Allen of Morris, Nichols, Arsht & Tunnell, Wilmington, Del. (Michael C. Russ, George S. Branch and William F. Lummus, Jr. of King & Spalding, Atlanta, Ga., of counsel), for defendant.

FARNAN, District Judge.

## OPINION

These actions are two consolidated cases brought against The Coca–Cola Company, a Delaware corporation (hereinafter "the Company") by certain independently-owned Coca–Cola bottlers (referred to collectively

hereinafter as "plaintiffs" or "the bottlers"). These actions, which for ease of reference will be referred to as the *"diet Coke* cases," were originally filed in 1983 and have thus far resulted in eight years of litigation, six published opinions, one bench trial, and numerous unpublished opinions and orders. The bench trial was conducted before the Hon. Murray M. Schwartz in December 1988—January 1989. Before he could render decision, Judge Schwartz became too ill to continue with this litigation. The cases were reassigned to me. Offered the option of my deciding the cases based upon the record developed before Judge Schwartz or a retrial, the parties chose to retry the cases.

A nine-day bench trial was conducted before me on various dates during October–November, 1990. This Opinion constitutes the Court's Findings of Fact and Conclusions of Law pursuant to Fed.R.Civ.P. 52(a) in both C.A. No. 83–95 and C.A. No. 83–120.

INTRODUCTION

These are two of three related actions involving the contracts which govern the relationship between The Coca–Cola Company and its bottlers. The *diet Coke* cases arise out of contractual disputes between the Company and certain of its bottlers over whether the syrup for diet Coca–Cola (referred to interchangeably as "diet Coca–Cola" and "diet Coke") is covered under the terms of the bottlers' contracts with the Company. A related case, *Coca–Cola Bottling Co. of Elizabethtown, Inc. v. The Coca–Cola Company,* 769 F.Supp. 599 (referred to hereinafter as the *"Elizabethtown* litigation"), involves contractual disputes over the supply of syrup for the product Coca–Cola.[1]

The long and tortured history of this litigation has been recited elsewhere, including most recently in this Court's opinion issued this date in the related *Elizabethtown* case (referred to hereinafter as the *"Elizabethtown* opinion"), and the Court refers the reader to these recountings for a detailed recital of the events leading to this and the related *Elizabethtown* litigation. *See, e.g., Coca–Cola Bottling Co. of Shreveport, Inc. v. The Coca–Cola Co.,* 696 F.Supp. 97 (D.Del.1988); *Coca–Cola Bottling Co. of Elizabethtown, Inc. v. The Coca–Cola Co.,* 696 F.Supp. 57 (D.Del.1988). Because an understanding of the contractual relationships and history of the parties is necessary to an understanding of the issues in these cases, the Court will briefly outline the background facts once again here. The following narrative is intended to provide the necessary background for the reader uninitiated to this litigation and is drawn from various sources, including the prior published opinions and evidence in the record. Those factual findings necessary to the Court's holdings in these matters will be treated in greater detail in the Findings of Fact.

---

**1.** Prior to this Opinion and the *Elizabethtown* opinion issued this date, the three related cases had yielded a total of twelve published opinions by Judge Schwartz. For ease of reference, Judge Schwartz' twelve previous opinions will be cited as follows:

*Coca–Cola Bottling Co. of Shreveport v. Coca–Cola Co.,* 563 F.Supp. 1122 (D.Del.1983) ("*diet Coke I* at ____").

*Alexandria Coca–Cola Bottling Co. v. Coca–Cola Co.,* 637 F.Supp. 1220 (D.Del.1984) ("*diet Coke II* at ____").

*Coca–Cola Bottling Co. of Shreveport v. Coca–Cola Co.,* 107 F.R.D. 288 (D.Del.1985) ("*diet Coke III* at ____").

*Coca–Cola Bottling Co. of Shreveport v. Coca–Cola Co.,* 110 F.R.D. 363 (D.Del.1986) ("*diet Coke IV* at ____").

*Coca–Cola Bottling Co. of Shreveport v. Coca–Cola Co.,* 696 F.Supp. 97 (D.Del.1988) ("*diet Coke V* at ____").

*Coca–Cola Bottling Co. of Shreveport v. Coca–Cola Co.,* 123 F.R.D. 97 (D.Del.1988) ("*diet Coke VI* at ____").

*Coca–Cola Bottling Co. of Elizabethtown v. Coca–Cola Co.,* 95 F.R.D. 168 (D.Del.1982) ("*Coke I* at ____").

*Coca–Cola Bottling Co. of Elizabethtown v. Coca–Cola Co.,* 98 F.R.D. 254 (D.Del.1983) ("*Coke II* at ____").

*Coca–Cola Bottling Co. of Elizabethtown v. Coca–Cola Co.,* 654 F.Supp. 1388 (D.Del.1986) ("*Coke III* at ____").

*Coca–Cola Bottling Co. of Elizabethtown v. Coca–Cola Co.,* 654 F.Supp. 1419 (D.Del.1987) ("*Coke IV* at ____").

*Coca–Cola Bottling Co. of Elizabethtown v. Coca–Cola Co.,* 668 F.Supp. 906 (D.Del.1987) ("*Coke V* at ____").

*Coca–Cola Bottling Co. of Elizabethtown v. Coca–Cola Co.,* 696 F.Supp. 57 (D.Del.1988) ("*Coke VI* at ____").

In 1886, Dr. John Smyth Pemberton, an Atlanta pharmacist developed the formula for Coca–Cola syrup, which could be mixed with carbonated water to produce the beverage Coca–Cola. On June 6, 1887, he registered the name "Coca–Cola" written in Spencerian script as a trademark "for soda water and other beverages." Between 1888 and 1891 Asa G. Candler, another Atlanta pharmacist, acquired ownership of the Coca–Cola trademark and formula. In 1892, Candler formed the Coca–Cola Company, a Georgia corporation (the "Georgia corporation"), to manufacture and market Coca–Cola syrup for sale in soda fountains.

On July 21, 1899, the Georgia corporation entered into a contract with B.F. Thomas and J.B. Whitehead, granting to Thomas and Whitehead the exclusive right to sell Coca–Cola in bottles throughout the United States, except in six New England States, Mississippi, and Texas (the "1899 contract"). The 1899 contract also gave Whitehead and Thomas the exclusive right to use the trademark "Coca–Cola" on bottles containing the Coca–Cola beverage in the territories covered by the contract. The 1899 contract contemplated the formation by Whitehead and Thomas of a corporation to be known as "Coca–Cola Bottling Company" to which the rights to sell Coca–Cola in bottles would be assigned. The contract contemplated construction and operation at the expense of Whitehead and Thomas of a bottling facility in Atlanta and any additional facilities that would be necessary to meet demand.

The 1899 contract obligated the Company to sell to Whitehead and Thomas their requirements of Coca–Cola syrup at a fixed price. By an undated amendment, the 1899 contract was amended to fix the syrup price at $1.00 per gallon, less a 10¢ per gallon rebate to pay for "labels and advertising matter" to be provided by the Company at its actual cost. The syrup was to be bottled under pressure of one atmosphere in proportions of not less than one ounce of syrup to eight ounces of water.

The bottling facilities constructed in Atlanta and Chattanooga, Tennessee by Coca–Cola Bottling Company were soon unable to meet the demand for bottled Coca–Cola. Beginning in 1900, Coca–Cola Bottling Company entered into contracts by which Coca–Cola Bottling Company assigned certain of the rights acquired by Whitehead and Thomas under 1899 contract and provided the syrup it acquired from the Company pursuant to the 1899 contract to individuals, partnerships, and corporations who in turn built bottling plants and promoted and sold bottled Coca–Cola in exclusive geographic territories. Under this arrangement, Coca–Cola Bottling Company is referred to as a "parent bottler" and the entities to which it provided the syrup are referred to as "actual bottlers."[2]

A dispute arose between Whitehead and Thomas over the desirable contract period with the actual bottlers. Whereas Thomas favored a two-year term, Whitehead favored perpetual contracts. With the Georgia corporation's permission, Whitehead and Thomas divided the rights granted to them under the 1899 contract. Thomas retained ownership of Coca–Cola Bottling Company (for ease of reference referred to hereinafter as the "Thomas Company"). The Thomas Company conveyed to Whitehead and his new business associate, J.T. Lupton, its rights under the 1899 contract for all territories except the District of Columbia and the states of New York, New Jersey, Pennsylvania, Delaware, Maryland, Virginia, West Virginia, North Carolina, Tennessee, Kentucky, Indiana, Ohio, Washington, Oregon, California, and small portions of Georgia and Alabama. Whitehead and Lupton then formed a Tennessee corporation called Dixie Coca–Cola Bottling Company, the name of which was thereafter changed to *The* Coca–Cola Bottling Company (for ease of reference, referred to hereinafter as "Whitehead–Lupton Company"). The Georgia corporation, Thomas Company, and Whitehead–Lupton Company joined in amending the 1899 agreement to

---

**2.** The term "first-line bottler" has been used in reference to both parent bottlers and actual bottlers in the various opinions and documents.

To avoid confusion, the Court will avoid the term altogether.

reflect the division. The Thomas Company and the Whitehead–Lupton Company both continued to operate as "parent bottlers."

The Whitehead–Lupton Company and the Thomas Company further divided their territories among other parent and "subparent bottlers." Subparent bottlers of the Whitehead–Lupton Company included Western Coca–Cola Bottling Company and The Coca–Cola Bottling Company (1903). Subparent bottlers of the Thomas Company were Coca–Cola Bottling Works, Coca–Cola Bottling Works the 3d, and Pacific Coca–Cola Bottling. The two bottling plants built by Whitehead and Thomas in Atlanta and Chattanooga were sold to the actual bottlers to whom the rights for those territories were assigned. Thereafter the parent bottlers did not own any Coca–Cola bottling plants, nor were they engaged in the actual bottling or sale of Coca–Cola beverage, which was left entirely to the actual bottlers.

The 1899 contract was modified in 1915 in response to passage of the Clayton Act in 1914. In addition to the modifications relevant to the Clayton Act, the 1915 Amendment formally incorporated an increase in the price of the syrup from 90¢ to 92¢ per gallon, an increase which was offset by a reduction from 10¢ to 8¢ in the amount of advertising material per gallon of syrup the parents were required to purchase from the Georgia corporation. This pricing change had been informally agreed upon by the Georgia corporation and the parent bottlers in 1907. The 1915 Amendment was the first instance in which the phrase "Bottler's Syrup" appears in a contract between the Georgia corporation and the parent bottlers.

In 1919, the property, good will, and business of the Georgia corporation founded by Candler was acquired by a Delaware corporation also called "The Coca–Cola Company" ("the Company"), which also assumed the Georgia corporation's outstanding contracts and liabilities. Thereafter, the Georgia corporation surrendered its charter.[3]

In 1920, a dispute arose between the Company and the parent bottlers as to the duration of the 1899 contract and the syrup pricing provisions thereunder. The Company sought relief from the fixed price contract and proposed a fluctuating price tied to the cost of manufacture of the syrup. The parent bottlers refused to enter into negotiations to amend the contract until the Company provided itemized information concerning the cost of manufacturing the syrup. The Company refused to disclose cost information in sufficient detail, and the parent bottlers rejected the Company's flexible pricing proposal. The Company responded by declaring its contracts with the parent bottlers terminated as of May 1, 1920. Asserting that the 1899 contract was perpetual, the Thomas and Whitehead–Lupton Companies filed suit in Georgia state court to enjoin termination of their contracts. Six actual bottlers intervened in the litigation in support of the parent bottlers. A temporary restraining order was entered which prohibited the Company from selling Coca–Cola syrup to anyone other than the parent bottlers.

The parent bottlers voluntarily dismissed the Georgia state court suit on May 20, 1920, and refiled suit in the United States District Court for the District of Delaware on June 1, 1920. On November 8, 1920, the Delaware District Court, per Judge Morris, granted the parent bottlers' motions for a preliminary injunction preventing the Company from terminating the 1899 contract. *The Coca–Cola Bottling Co. v. The Coca–Cola Co.*, 269 F. 796 (D.Del.1920) (cited hereinafter as *"Coke 1920* at ____"). Judge Morris found that the 1899 contract was perpetual and that effect of the 1899 contract was conveyance to the parent bottlers of property rights necessary to the business of bottling Coca–Cola beverage. *Id.*

While the Company's appeal from the preliminary injunction grant was pending before the Third Circuit Court of Appeals, the Company and the parent bottlers entered into settlement agreements which the

---

**3.** For ease of reference the Georgia corporation and the successor Delaware corporation will

hereinafter be referred to interchangeably as "the Company."

Delaware District Court formally incorporated as final judgments on October 4, 1921 (the "Consent Decrees"). The 1921 Consent Decrees superseded the 1899 contract and governed the relationship between the Company and the parent bottlers.

The settlement agreement between the Company and the Whitehead–Lupton Company was contingent upon the agreement of the actual bottlers in the Whitehead–Lupton territory because the bottle contracts between the Whitehead–Lupton Company and its bottlers were perpetual. The contracts between the Thomas Company and its bottlers were two-year contracts, most of which had expired during the pendency of the 1920 litigation. Therefore, the settlement agreement between the Company and the Thomas Company was not contingent upon the consent of the bottlers in the Thomas territories. In 1921, the bottlers' contracts in the Whitehead–Lupton territories were amended to conform to the Consent Decrees. At the same time, the Thomas Company entered into perpetual contracts conforming with the Consent Decrees with its bottlers. Between 1921 and 1975, the Company acquired and dissolved all of the parent and subparent bottlers and assumed their obligations under the 1921 contracts to the actual bottlers. The 1921 contracts and those later bottling contracts also based upon the Consent Decrees will be referred to hereinafter as the "unamended contracts." The plaintiffs in C.A. No. 83–95 continue to operate under these unamended contracts and will be referred to as the "unamenders" or the "unamended bottlers." It is the scope of the unamended contracts which is at issue in the C.A. No. 83–95.

In 1978, the Company proposed an amendment to the contracts of the actual bottlers which, among other changes, would substitute a new pricing formula for the syrup using a "Sugar Element," a "Base Element," and the Consumer Price Index. The proposal also provided that the savings resulting from use of a sweetener other than sugar in the syrup would be passed through to the actual bottlers. The Company's proposed amendment will be referred to hereinafter as the "1978 Amendment." From 1978 until 1987, when the Company withdrew the proposed amendment, bottlers constituting 97% of the volume of the Coca–Cola bottling business signed the 1978 Amendment. Those bottlers who signed the 1978 Amendment will be referred to hereinafter as the "amenders" or "amended bottlers." The Company withdrew the 1978 Amendment on May 1, 1987 after giving the remaining unamended bottlers four months' prior notice of its intention to do so. The plaintiffs in C.A. No. 83–95 did not sign the 1978 Amendment. The plaintiffs in C.A. No. 83–120 are amended bottlers who signed the 1978 Amendment prior to its withdrawal.

In January 1980, the Company started using high-fructose corn syrup ("HFCS" or "HFCS–55") in place of granulated sugar made from cane or beets to sweeten the Coca–Cola syrup it sold to the bottlers. Originally HFCS constituted 50% of the sweetener used in the syrup. Eventually, the Company stopped using sugar altogether and HFCS constituted 100% of the sweetener. From 1980–1987 the Company supplied HFCS-sweetened syrup both to the amenders and the unamenders. The amenders received a "pass through" of the Company's savings from using the cheaper HFCS sweetener pursuant to the 1978 Amendment. The Company continued to charge the unamenders a syrup price based upon the price of more expensive sugar pursuant to a formula set out in the pricing provisions of their unamended contracts. This action on the part of the Company prompted the *Elizabethtown* litigation, which was filed by the unamenders in 1981.

On July 8, 1982, the Company introduced diet Coke, a beverage then sweetened with saccharin and currently sweetened with aspartame. The Company took the position that the syrup for diet Coke was not a syrup covered by the unamended contracts or the 1978 Amendment, and it charged all bottlers the same price for diet Coke that it charged for syrup for TaB, another saccharine-sweetened soft drink, provision of which was governed by a separate contract. The Company's refusal to provide diet Coke syrup under the unamended con-

tracts and the 1978 Amendment prompted the filings of C.A. Nos. 83–95 and 83–120.

In response to the vociferous protests of the bottlers, the Company proposed a two-part negotiation process for determining how it would price diet Coke syrup. The first phase consisted of execution of a Temporary Amendment to the bottlers' contracts which would govern the pricing of diet Coke pending a final agreement on a permanent arrangement. Paragraph 9 of the Temporary Amendment stipulates that "during the period this Agreement is in effect, the price of diet Coca–Cola shall be determined solely under this Agreement." Both parties read this language as a waiver of damages in the event the Court finds that plaintiffs were entitled to receive diet Coke syrup pursuant to the unamended contracts and 1978 Amendment. When the Temporary Amendment was first introduced, plaintiffs refused to sign it. Following the failure of the plaintiffs' motion for a preliminary injunction which would essentially have stricken the waiver provision from the Temporary Amendment, the plaintiffs began bottling and selling diet Coke under the Temporary Amendment.

The second phase of the negotiation process resulted in the 1983 Amendment, which significantly changed the bottlers' contracts. It covers the sale and pricing of sugar-free colas, caffeine-free versions of Coke, diet Coke, TaB, and other cola syrups, and existing and unknown future bottle syrups sold under the Coca–Cola trademark. The Company agreed to relinquish flexible pricing for TaB and diet Coke and to price all diet colas under a fixed formula in perpetuity. The Company withdrew the 1983 Amendment on May 1, 1987 after giving the bottlers four months' prior notice of its intention to do so. Some, but not all, of the plaintiffs in this litigation have signed the 1983 Amendment. Those who have signed the 1983 Amendment seek past damages only.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW RELATED TO CIVIL ACTION NO. 83–95

#### FINDINGS OF FACT

1. Civil Action No. 83–95 involves the claims of the unamended bottlers that they are entitled to diet Coca–Cola syrup pursuant to the terms of their unamended contracts.

2. The unamenders originally sought relief for the Company's alleged breach of their unamended contracts (Count One) and the 1921 Consent Decrees (Count Two), alleged trademark infringement and dilution (Counts Three and Four), and alleged antitrust violations (Count Five). In *diet Coke V*, Judge Schwartz granted the Company's motion for summary judgment on Counts Three, Four, and Five. Consequently, the only remaining issues before the Court are whether the Company has violated its obligations under the Consent Decrees as incorporated by the unamended contracts.

3. The following actual bottlers are plaintiffs in C.A. No. 83–95:

| COMPANY | PRINCIPAL PLACE OF BUSINESS AND STATE OF INCORPORATION |
| --- | --- |
| Arkansas–Georgia Co., Inc. | Nashville, Ark. |
| Central Coca–Cola Bottling Co., Inc. | Charlottesville, Va. |
| Coca–Cola Bottling Co. of Dickinson | Dickinson, N.D. |
| Coca–Cola Bottling Co. of Elizabethtown, Inc. | Elizabethtown, Ky. |
| Coca–Cola Bottling Co. of Jamestown | Jamestown, N.D. |
| Kelford Coca–Cola Bottling Co., Inc. | Kelford, N.C. |
| Coca–Cola Bottling Co. of LaCrosse, Inc. | LaCrosse, Wisc. |
| Las Cruces Coca–Cola Bottling Co. | Las Cruces, N.M. |
| Love Coca–Cola Bottling Co. | Muskogee, Okla. |
| Magnolia Coca–Cola Bottling Co., Inc. | Magnolia, Ark. |
| Marshall Coca–Cola Bottling Co. | Marshall, Tex. |
| Natchez Coca–Cola Bottling Co., Inc. | Natchez, Miss. |
| Plymouth Coca–Cola Bottling Co., Inc. | Plymouth, N.C. |

| COMPANY | PRINCIPAL PLACE OF BUSINESS AND STATE OF INCORPORATION |
|---|---|
| Sacramento Coca–Cola Bottling Co., Inc. | Sacramento, Cal. |
| Coca–Cola Bottling Co. (San Angelo) | San Angelo, Tex. |
| Coca–Cola Bottling Co. of Shelbyville, Inc. | Shelbyville, Ky. |
| The Coca–Cola Bottling Co. of Tuscon, Inc. | Tucson, Ariz. |
| Coca–Cola Bottling Co. of Tulsa, Inc. | Tulsa, Okla. |
| Coca–Cola Bottling Co. of Williston | Williston, N.D. |
| Wilmington Coca–Cola Bottling Works, Inc. | Wilmington, N.C. |

Consolidated Pretrial Order at 16–17 (Dkt. 461).[4]

### The Language of the Unamended Contracts

4. The unamender's claim is based upon the language of paragraph FIRST of the unamended contracts:

That the party of the first part [the parent bottler, now the Company] hereby assigns to the party of the second part [the actual bottler] the sole and exclusive right and license ... to use and vend bottled Coca–Cola, the trademark name Coca–Cola, and all labels and designs pertaining thereto, in connection with the product "Bottled Coca–Cola" in the territory hereinbefore described, and party of the first part agrees not to assign or transfer the right of usage of said name in said territory to any other party whatsoever; and said party of the first part agrees to obtain and furnish to party of the second part, and to obtain for the territory herein referred to, sufficient syrup for bottling purposes to meet the requirements of party of the second part in the territory herein described.... Nothing herein, however, shall give party of the second part any interest in the name Coca–Cola, labels, etc., except the right of usage in connection with Bottled Coca–Cola, nor shall this contract in any way interfere with the use of said name Coca–Cola, labels, etc., in connection with the fountain product of The Coca–Cola Company, it being understood and agreed that the use herewith given shall be confined to the bottled product, the names, labels, etc., in connection with the fountain product having been reserved by The Coca–Cola Company.

5. The Court must decide whether diet Coca–Cola falls within the scope of "Bottled Coca–Cola" as that term is used in paragraph FIRST.

6. The term "Bottled Coca–Cola" is not defined in the unamended contracts.

7. Paragraph 10 of the 1921 Consent Decrees states that the syrup which the Company was required to provide to the parent bottlers "is to be high grade standard Bottlers Coca–Cola Syrup and shall contain not less than five and thirty two one-hundredths (5.32) pounds of sugar to each gallon of syrup."

8. The syrup the actual bottlers contracted to receive from the parent bottlers is obviously the same syrup the parent bottlers contracted to receive from the Company. *See Elizabethtown* Opinion issued this date at Count I, ¶ 16. Consequently, the description of Bottlers Coca–Cola Syrup found in paragraph 10 of the Consent Decrees is incorporated into paragraph FIRST as the syrup to which plaintiffs are entitled. Consequently, the syrup which the Company must provide to the actual bottlers pursuant to the unamended contracts "is to be high grade standard Bottlers Coca–Cola Syrup and shall contain not less than five and thirty two one-hundredths (5.32) pounds of sugar to each gallon of syrup" as described by paragraph 10 of the 1921 Consent Decrees.

9. The issue of coverage under the unamended contracts, therefore, is whether

---

**4.** The Las Cruces, Marshall, Natchez, San Angelo, Tuscon, and Tulsa bottlers have each signed the 1983 Amendment and consequently seek past damages only.

diet Coke is "high grade standard Bottlers Coca–Cola Syrup [that] contain[s] not less than five and thirty two one-hundredths (5.32) pounds of sugar to each gallon of syrup."[5]

10. 5.32 pounds of sugar per gallon is the only ingredient of Coca–Cola Bottlers' Syrup specified in either the unamended contracts or the Consent Decrees.

11. Paragraphs 6 and 7 of the Consent Decrees and paragraph FOURTH(d) of the unamended contracts set forth the pricing formula for the syrup to be provided pursuant to paragraph 10 of the Consent Decrees and paragraph FIRST of the unamended contracts (the "pricing provisions"). According to the pricing provisions, the unamended bottlers pay a base price of $1.30 per gallon when the price of sugar is less than or equal to 7¢ per pound. When the price of syrup is greater than 7¢ per pound, the unamended bottlers pay an additional 6¢ for every 1¢ increase in the price of sugar over 7¢ per pound.

12. Paragraph 10 serves a quality control function as well as a price protective function. See Coke III at 1402. In addition to describing the syrup covered, paragraph 10 prevents the Company from using less sugar or a cheaper sweetener to evade the sugar-based pricing provisions.

13. Because it is the only named ingredient and because it forms the basis of the pricing provisions, use of 5.32 pounds of sugar per gallon to sweeten the syrup is a fundamental assumption of the unamended contracts and the Consent Decrees.

14. In Coke III, Judge Schwartz defined the term "sugar" as it is used in paragraph 10 of the Consent Decrees to be "granulated sugar from cane or beet." Coke III at 1391. This definition is binding on the Court and the parties in the diet Coke cases. Moreover, this was a ruling sought by the plaintiffs in the bench trial which resulted in the Coke III opinion. Although this Court informed both parties prior to the start of the 1990 bench trial in the diet

Coke cases that it would be willing to reconsider Judge Schwartz' ruling on the definition of sugar or to certify the Coke III ruling for immediate appeal, neither party took up the Court's offer. See Transcript of Conference on October 31, 1989, Coca–Cola Bottling Co. of Elizabethtown, Inc. v. The Coca–Cola Co., C.A. Nos. 81–48/87–398 JJF (Consolidated) (Dkt. 882).

15. Judge Schwartz also ruled in Coke III that high fructose corn syrup (HFCS) is not "sugar" for purposes of paragraph 10.

16. Diet Coke has always been sweetened with saccharin or aspartame.

17. Neither saccharin nor aspartame is "granulated sugar from cane or beet." Consequently, neither saccharin nor aspartame may be considered "sugar" for purposes of paragraph 10 of the Consent Decrees.

18. Diet Coke has never been sweetened with "five and thirty two one-hundredths (5.32) pounds of sugar to each gallon of syrup."

19. Diet Coke does not, therefore, contain the only ingredient of Coca–Cola Bottlers' Syrup specified by either the Consent Decrees or the unamended contracts.

20. Plaintiffs argue that the term "Bottled Coca–Cola" is a "functional" term requiring the Company to provide plaintiffs with their requirements of syrup for any beverage denominated a "Coca–Cola." They derive their argument from the language in paragraph FIRST conveying to them exclusive right of usage of the trademark on Bottled Coca–Cola within their respective geographic territories and from Judge Morris' ruling in Coke 1920 that the Company in the 1899 contract conveyed to the parent bottlers all rights necessary to operate the bottling business, including good will and use of the trademark.

21. Plaintiffs interpret the language of paragraph FIRST and Coke 1920 to mean that they along with the Company are joint owners of the trademark "Coca–Cola"

---

**5.** The 1921 Consent Decrees, the unamended contracts, Judge Schwartz' previous opinions, and the parties themselves refer to "Bottle Syrup," "Coca–Cola Bottlers' Syrup," "syrup for Bot-tled Coca–Cola," etc. Each of these terms refers to the syrup which the Company is obligated to provide the unamended bottlers pursuant to the unamended contracts.

within their respective territories. Plaintiffs contend that this joint trademark ownership entitles them to purchase from the Company any beverage bearing the "Coca–Cola" trademark pursuant to the pricing terms of their unamended contracts.

22. The Company, on the other hand, strenuously argues that, as the sole registrant and as the only party entitled to enforce infringement and other trademark rights, it is the sole owner of the trademark. The Company interprets plaintiffs' rights as limited to those of a user or licensee.

23. Plaintiffs contend that "as a result of their ownership interest in the Coca–Cola trademark, if the Company manufactures and sells a syrup to the bottlers that the bottlers are to sell using the Coca–Cola or Coke name, plaintiffs are entitled to purchase that syrup from the Company under the terms of their existing contracts." Plaintiffs' Proposed Findings of Fact and Conclusions of Law ¶ 573 at 140. Plaintiffs' trademark-based rights are triggered by and limited to the use of the trademark on "Bottled Coca–Cola," the product named by paragraph FIRST and defined by paragraph 10 of the Consent Decrees as incorporated by paragraph FIRST as "high grade standard Bottlers Coca–Cola Syrup [that] contain[s] not less than five and thirty two one-hundredths (5.32) pounds of sugar to each gallon of syrup." Consequently, plaintiffs' right to receive and sell "Bottled Coca–Cola" defines the scope of their trademark rights and not vice-versa. Given this dependence, plaintiffs' trademark-based rights do not define the scope of their right to bottle and sell "Bottled Coca–Cola."

24. Plaintiffs go too far when they assert: "Plaintiffs['] trademark rights supplement, *and are independent of,* plaintiffs' perpetual contract rights to receive any syrup using the Coca–Cola name." Plaintiffs' Proposed Findings of Fact and Conclusions of Law ¶ 571 at 139 (emphasis added).

25. The plain language of paragraph FIRST, the very language relied upon by plaintiffs, supports the proposition that plaintiffs' trademark rights—whatever they may be—are part and parcel of their right to receive syrup and sell the beverage "Bottled Coca–Cola" in their territories:

> That the party of the first part [the parent bottler, now the Company] hereby assigns to the party of the second part [the actual bottler] the sole and exclusive right and license ... to use and vend bottled Coca–Cola, the trademark name Coca–Cola, and all labels and designs pertaining thereto, *in connection with the product "Bottled Coca–Cola" in the territory hereinbefore described, and party of the first part agrees not to assign or transfer the right of usage of said name in said territory to any other party whatsoever;* .... Nothing herein, however, shall give party of the second part any interest in the name Coca–Cola, labels, etc., *except the right of usage in connection with Bottled Coca–Cola,....*

(emphasis added).

26. Whatever the trademark interest of the bottlers may be or may one day be determined to be, the Court is convinced that it is substantially less than the plaintiffs assert, it is not a proprietary interest, and it is more in the nature of a beneficial interest attached to plaintiffs' contractual right to bottle and sell "Bottled Coca–Cola" syrup. The plaintiffs' trademark-based rights, therefore, do not define their rights concerning "Bottled Coca–Cola" and do not shed light on whether diet Coke is "Bottled Coca–Cola" for purposes of the unamended contracts.

*Course of Performance*
Formula Changes: 1921–1980

27. The Company changed the formulation of the syrup provided to the bottlers pursuant to the terms of the unamended contracts a number of times between 1921 and 1980. These formula changes did not result in multiple syrups offered simultaneously under the terms of the unamended contracts. Instead, each time the Company changed the syrup, the reformulated syrup was offered in place of the previous version.

28. At some point after 1921 (the exact date is unknown), the amount of sugar in the syrup offered the bottlers under the unamended contracts was increased from approximately 5.32 pounds to 5.6534 pounds per gallon of syrup. PX1581 at 6; *See diet Coke I* at 1131 n. 31.

29. In 1941, the Company began to sweeten the syrup with sucrose from beets as well as sucrose from cane. DX641; *Coke III* at 1403 & 1406. The bottlers were aware of but did not object to the Company's use of beet sugar. *Coke III* at 1403. Judge Schwartz ruled in *Coke III*, a ruling which plaintiffs have not contested, that use of beet sugar was not contemplated by the Consent Decrees, and as a consequence, the bottlers had a right to object to its use. *Id.* Judge Schwartz held that the bottlers waived their right to object to the use of beet sugar when they failed to object. This waiver resulted in an expansion of the definition of sugar in paragraph 10 to include sugar from beets as well as from cane. *Id.* The beet sugar waiver did not open the door to use in the syrup of sweeteners other than sugar from cane or beet. *Id.*

30. After World War II, there were small changes in the quantity of caffeine in the syrup. *See diet Coke I* at 1131 n. 31.

31. In 1974, the amount of caffeine in the syrup was decreased from 3.15 to 2.36 grams. *See diet Coke I* at 1131 n. 31.

### Introduction of TaB

32. As stated above, the formula changes prior to 1980 did not result in multiple syrups and were instead reformulations intended to replace previous versions of the syrup sold to the bottlers pursuant to their unamended contracts. In 1963, however, the Company introduced TaB, an additional cola syrup. PX1212; PX1213. TaB was sweetened with saccharin. Besides the sweetener, other material differences in ingredients existed between TaB and the syrup then sold to the bottlers pursuant to their unamended contracts. PX1213 at 841793.

33. While TaB may be a diet cola, it was never called a "Coca–Cola" and has not been sold under the Coca–Cola trademark. Tr. 1615–16 (Dyson).

34. When TaB was introduced, the Thomas Company parent bottler (which remained in existence until 1975) took the position that TaB was a form of Coca–Cola. PX1211 at 841798; PX1210 at 841759.

35. The Thomas Company and The Coca–Cola Company resolved the dispute by agreeing that the Company would supply TaB syrup under a separate ten-year term contract. The TaB contract contained an explicit reservation of rights clause precluding reliance on the contractual treatment of TaB as a basis for interpreting the unamended contracts:

> Neither the execution or the performance of this contract ... shall (a) affect in any manner either Party's rights, or responsibilities to or covenants with the other Party, under [the unamended contracts and 1921 Consent Decrees], (b) be construed as an interpretation or to alter, amend or change the Contracts outstanding regarding the bottling and sale of Coca–Cola; (c) be used to support or dispute any contention that any other product, whether like "TaB" or not, is or is not a form of "Coca–Cola"....

DX55; *see also* PX1660 (the bottlers' TaB contracts with the Thomas Company).

### Use of HFCS–55 in Place of Sugar

36. In January 1980, the Company once again reformulated the syrup received by the bottlers pursuant to their unamended contracts. Like the syrup formula changes from 1921–1980 described *supra,* this syrup reformulation was intended by the Company to replace the previous version of the syrup. Unlike the previous syrup changes, however, this reformulation touched upon the requirement in the unamended contracts that the syrup contain not less than 5.32 pounds of sugar per gallon. In January 1980, the Company began to substitute HFCS–55, a high fructose corn sweetener which contains no sugar from cane or beet, for 50% of the sugar in the syrup received by the bottler. This reduced the amount of sugar in the syrup to less than 5.32 pounds

per gallon. Admitted Facts ¶ 171 at 89.[6] The Company stipulated in response to plaintiffs' Second Requests For Admissions No. 61(a) that this syrup was Coca–Cola Bottler's syrup covered by the unamended contract and the 1978 Amendment. *diet Coke VI* at 99.

37. The percentage of HFCS–55 to sugar in the syrup was increased to 75%–25% in February 1984. PX1807. The Company stipulated in response to plaintiffs' Second Requests For Admissions No. 61(b) that this syrup was Coca–Cola Bottler's syrup covered by the unamended contract and the 1978 Amendment. *diet Coke VI* at 99.

38. In November 1984, the Company began sweetening the syrup with 100% HFCS–55 and no "sugar." The Company stipulated in response to plaintiffs' Second Requests For Admissions No. 61(c) that this syrup was Coca–Cola Bottler's syrup covered by the unamended contract and the 1978 Amendment. *diet Coke VI* at 99.

39. From 1980–1987 the Company provided the unamended bottlers a syrup sweetened with HFCS–55 but charged them a price based upon the market price of sugar pursuant to the pricing provisions of their unamended contracts. *See* the Opinion issued this date in *Coca–Cola Bottling Co. of Elizabethtown, Inc. v. The Coca–Cola Company,* C.A. Nos. 81–48/87–398–JJF Consolidated.

40. Unlike their acquiescence to the use of beet sugar, the unamended bottlers protested the use of HFCS–55 in the syrup. In February 1981, the unamended bottlers, including the plaintiffs in this action, filed suit against the Company as a direct result of the Company's formula changes. In their complaint, the unamended bottlers in part demanded:

> that The Coca–Cola Company supply the plaintiff and other Unamended Bottlers Coca–Cola Bottlers' Syrup containing

with not less than the 5.32 pounds of granulated sugar required in paragraph 10 of the Final Decrees, and not syrup made with HFCS 55, or, alternatively, that The Coca–Cola Company refund and pass on to the Unamended Bottlers the savings achieved by The Coca–Cola Company from the substitution of HFCS 55 for … sugar in the syrup.

*Coca–Cola Bottling Co. of Elizabethtown, Inc. v. The Coca–Cola Company,* C.A. Nos. 81–48/87–398–JJF Consolidated, Dkt. 1 at ¶ 45.

41. In *Coke III,* Judge Schwartz agreed with plaintiffs' assertions regarding the use of sweeteners other than sugar in the syrup:

> Now that a fully acceptable substitute [sweetener] has been developed, and is being used in competing brands, it is in the interest of both the Company and the bottlers to see that substitute in place of sugar. The effect of paragraph 10's sugar requirement is to require the Company to secure the consent of the bottlers before that change is made.

*Coke III* at 1403. Following Judge Schwartz' ruling in *Coke III* and his denial of its motion to amend the ruling in *Coke IV,* the Company began supplying the unamended bottlers who refused to sign the 1978 or 1983 Amendments and who refused to waive their right to potential damages for overcharge during pendency of the *Elizabethtown* litigation with syrup sweetened 100% with sugar.

42. Judge Schwartz' finding that the effect of the requirement of 5.32 pounds of sugar per gallon of syrup in paragraph 10 of the Consent Decrees was to require the Company to obtain the permission of the unamended bottlers [7] prior to using a sweetener other than 5.32 pounds of sugar reconciled the treatment of beet sugar un-

---

**6.** Citation to "Admitted Facts," refers to the facts agreed by the parties as admitted in the Pretrial Order (Dkt. 461).

**7.** Technically, Judge Schwartz' opinion in *Coke III* interpreted the Consent Decrees and applied only to the parent bottlers. However, this Court held in *Elizabethtown* that the Company's acquisition of the parent bottlers did not leave it free

to use any sweetener in the syrup because the actual bottlers' right to receive the same syrup received by the parent bottlers means that the Company was required to obtain the actual bottlers' consent to any sweetener change. *Elizabethtown* Opinion issued this date at Count I ¶ 93.

der the unamended contracts with the treatment of HFCS–55. By failing to object to the use of beet sugar, plaintiffs had tacitly consented to its use and the definition of "sugar" in paragraph 10 was accordingly modified to include sugar from beets. No such tacit consent or modification of paragraph 10 had been given for the use of HFCS–55.

### Introducing diet Coke

43. The Company introduced diet Coke on July 8, 1982.

44. Diet Coke was sweetened with saccharin when it was introduced. When aspartame was approved for use in soft drinks, the Company began to sweeten diet Coke with aspartame.

45. Neither aspartame nor saccharin is sugar within the meaning of paragraph 10.

46. In *diet Coke IV*, Judge Schwartz ruled on sanctions against the Company for its refusal to produce in discovery the secret formulae for Coca–Cola and diet Coke. Judge Schwartz entered a Preclusion Order which gives plaintiffs the benefit of every inference favorable to their position which production of the formulae might have yielded. Pursuant to the Preclusion Order entered by Judge Schwartz in *diet Coke IV*, the Court must find that the formula for diet Coke, except for the sweetener, is identical to the formulae for both the syrup offered to the bottlers pursuant to their unamended contracts prior to April 1985 (which is now marketed as "Coca–Cola Classic") and to the syrup currently offered under their unamended contracts as Bottled Coca–Cola ("new Coke"). Preclusion Order, *diet Coke IV* at 374 ¶ 2(c) ("the formula for diet Coke is significantly more like the formula for old Coke than the formula for any other version of Coca–Cola, including new Coke and caffeine-free Coke is like the formula for old Coke"); *id.* at 374 ¶ 2(f) ("99% of the total number of ingredients in diet Coke and old Coke, and in diet Coke and new Coke, are the same"); *id.* at 374 P 2(i) ("the ingredient differences between diet Coke syrup and Coca–Cola Classic syrup are less significant between the two syrups as a whole, involve fewer ingredients and less significant ingredients

from the standpoint of the ingredient composition, chemical composition, and formulae than the ingredient differences which exist between the syrup for Coca–Cola Classic and the syrup for new Coca–Cola, which was introduced by defendant on August 25, 1985, and has been sold by defendant as 'Coca–Cola Bottler's Syrup' within the meaning of its contracts with plaintiffs since that date"); *id.* at 375 ¶ 2(i)(1) ("diet Coca–Cola syrup contains the identical quantities of Merchandise 7X, Merchandise No. 5, extract of vanilla, and caffeine as the syrup which defendant formulated and sold to plaintiffs and other bottlers as 'Coca–Cola Bottler's Syrup' during the period from January 27, 1980 through the end of April 1985 (which is the same syrup that defendant is now selling to plaintiffs under the name "Coca–Cola Classic" syrup) and that defendant used these ingredients in diet Coke to match the taste, aroma, mouthfeel, and all other organoleptic properties of the bottled Coca–Cola as it existed during that period"); *id.* at 375 ¶ 2(1)(3) ("differences in formula, chemical composition, ingredient composition, taste, and other physical organoleptic properties between diet Coke syrup and the syrup which defendant sold as Coca–Cola Bottler's Syrup between 1980 and April 1985 (and which defendant is now selling as Coca–Cola Classic syrup) are much less significant, much fewer in number, and much less noticeable to the consumer than: (i) those differences between Coca–Cola Classic syrup and the earlier versions of 'Coca–Cola Bottler's Syrup' that the defendant had formulated and sold to bottlers under their contracts between 1899 and the current date; (ii) those differences between the syrup for new Coca–Cola which was introduced by defendant in April 1985 and all previous syrups which the defendant has sold to bottlers as 'Coca–Cola Bottler's Syrup' under their contracts; (iii) those differences (except taste and physical organoleptic properties) between the syrup for caffeine-free Coca–Cola and the syrup for Coca–Cola Classic; and (iv) those differences between some of the versions of Coca–Cola Bottler's syrup manufactured and sold by defendant between 1899 and 1980, and other versions of

Coca–Cola Bottler's Syrup sold by defendant to bottlers as 'Coca–Cola Bottler's Syrup' during that period"); *id.* at 376 ¶ 2(n) ("except for the different sweeteners, the bottle syrup sold by defendant to the bottlers in the United States for the production of bottled diet Coke contains precisely the same ingredients, in identity, number, and quantity, as the bottle syrup sold by defendant to the bottlers in the United States for the production of: (1) Coca–Cola (made according to the new formula introduced in April, 1985); *and/or* (2) Coca–Cola Classic (made according to the original formula); *and/or* (3) caffeine-free Coca–Cola"); *id.* at 376 ¶ 2(p) ("the secret ingredients in Coca–Cola *and/or* Coca–Cola Classic are identical to the secret ingredients in diet Coke and are used in the same relative quantities").

47. Unlike the reformulation of the syrup to use HFCS–55 in place of sugar, the Company intended to offer diet Coke as an additional syrup. The Company did not offer diet Coke to the bottlers under the terms of their unamended contracts. Rather, the Company offered diet Coke under terms similar to the flexibly-priced TaB. Admitted Summary Judgment Facts ¶ 132 at 151.[8] Tr. 1462–65; Tr. 1199; Tr. 1205–06.

48. The Bottlers Association, of which all plaintiffs were members, formed an Ad Hoc Committee to negotiate the contractual issues related to diet Coke. Tr. 659; Tr. 1200; DX1623 at 1–2. The Ad Hoc Committee included large and small bottlers, urban and rural bottlers, and unamended and amended bottlers. DX1623 at 1–2; Tr. 1202; Tr. 745.

49. Although the Ad Hoc Committee negotiated on behalf of the bottlers, both the Company and the bottlers recognized that each bottler individually would have to reach agreement with the Company as to the terms under which he would receive diet Coke. DX2416 at SH000706; Tr. 658; Tr. 749–50.

50. The Company offered to negotiate diet Coke pricing terms in two phases. Phase I involved a so-called "Temporary Amendment" which would govern until a permanent pricing scheme could be negotiated. The Temporary Amendment established a formula pricing mechanism for diet Coke tied to the existing "base element" of TaB plus sweetener costs and an escalator based on the Consumer Price Index. DX166(b).

51. The Temporary Amendment contains the following language:

9. It being the intent and purpose of the Bottler and the Company that this Agreement shall in no way prejudice nor otherwise affect their respective rights and obligations under the Bottle Contract or from any other source nor their respective legal or equitable claims, the Bottler and the Company expressly stipulate that this Agreement shall have no such effect. It is further agreed, however, that during the period this Agreement is in effect, the price of diet Coca–Cola shall be determined solely under this agreement.

DX166(b).

52. Plaintiffs at first refused to sign the Temporary Amendment, Admitted Summary Judgment Facts ¶ 51 at 150, and filed suit in this Court in February 1983 in part seeking a preliminary injunction allowing them to receive diet Coke under an amended version of the Temporary Amendment deleting paragraph 9 quoted above.

53. Judge Schwartz denied the motion for a preliminary injunction in *diet Coke I.*

54. After Judge Schwartz denied the preliminary injunction motion, plaintiffs signed the Temporary Amendment. Admitted Summary Judgment Facts ¶ 54 at 140.

55. Phase II of the negotiations resulted in the "1983 Amendment," which covers the sale and pricing of sugar-free colas, caffeine-free Coca–Cola, diet Coke and TaB, other cola syrups, and existing and unknown future bottle syrups sold under

---

**8.** Citation to "Admitted Summary Judgment Facts" refers to facts the parties agree were established for purposes of this litigation by the previous summary judgment rulings. These are found in the Pretrial Order (Dkt. 461).

the Coca–Cola trademark. Admitted Summary Judgment Facts ¶ 50 at 140.

56. The 1983 Amendment was withdrawn in 1987 after the Company gave the bottlers four months' notice that it intended to withdraw the amendment. Those bottlers who have not signed the 1983 Amendment continue to receive diet Coke syrup under the terms of the Temporary Amendment.

### Introduction of Caffeine–Free Coca–Cola and Caffeine–Free diet Coca–Cola

57. The Company introduced caffeine-free Coca–Cola and caffeine-free diet Coke in April 1983. Admitted Facts ¶ 186 at 92. Neither product was foreseen in 1921 or in 1978. Admitted Facts ¶¶ 187–88 at 92. Caffeine-free Coca–Cola and caffeine-free diet Coke were not intended to replace the existing versions of Coca–Cola and diet Coke. Rather, the Company offered them as additional syrups.

58. The syrups for both caffeine-free Coca–Cola and caffeine-free diet Coke have always contained less than 5.32 pounds of sugar per gallon.

59. Pursuant to the Preclusion Order, the Court must find that the formula for diet Coke is more like the formula for the syrup being sold to plaintiffs under the unamended contracts in April 1983 (now sold as "Classic Coca–Cola") and the formula for new Coke (sold to plaintiffs as Bottled Coca–Cola since 1985) than is the formula for caffeine-free Coca–Cola. Preclusion Order *Diet Coke IV* at 374 ¶ 2(c) & (d).

60. "[C]affeine-free Coca–Cola syrup is the same from the standpoint of chemical composition, ingredient composition, and formulae as the syrup which the defendant was selling as 'Coca–Cola Bottler's Syrup' during the period 1980 through April 1985 (and which defendant is now selling as Coca–Cola Classic syrup), notwithstanding the fact that the caffeine-free Coca–Cola syrup does not contain (1) kola nut extract, (2) caffeine, (3) extract of vanilla, all of which have been ingredients in every previous version of 'Coca–Cola Bottler's syrup' manufactured and sold by defendant to the bottlers under

their contracts from 1899 to the current date, and (4) that caffeine-free Coke uses a modified form of Merchandise 7X." *Id.* at 375 ¶ 2(k).

61. Except for different sweeteners, diet Coke is exactly the same as caffeine-free Coca–Cola. *Id.* at 376 ¶ 2(n)(3). diet Coke was intended to duplicate the taste and appearance of caffeine-free Coca–Cola. *Id.* at 376 ¶ 2(o)(3).

62. The Company entered into letter agreements with the bottlers providing that:

> The terms of the BOTTLER'S BOTTLE CONTRACT [either the unamended contracts of the 1978 Amendment] … shall be applicable to the sale by the Company to the Bottler of syrup for the manufacture of Caffeine Free Coca–Cola, and the bottler and the Company will be entitled to all the rights and subject to all the obligations contained in the Bottler's Contract, as hereby amended, as if Caffeine Free Coca–Cola were included in the Bottler's Contract.

CX35C.

63. The letter agreement applies to caffeine-free Coca–Cola, but not to caffeine-free diet Coke.

64. The letter agreement also contains a waiver clause similar to that in the TaB contract:

> It being the intent and purpose of the Bottler and the Company that this letter and the agreement set out herein shall in no way prejudice or otherwise affect their respective rights and obligations under the Bottler's Contract … or from any other source, or the respective legal or equitable claims, the Bottler and the Company expressly stipulate that this letter and the agreement contained herein shall have no such effect.

CX35C

65. In response to plaintiffs' Second Requests for Admissions No. 24 served on defendant November 19, 1986, the Company replied:

> [T]he Company is willing to stipulate solely for purposes of this litigation if the plaintiffs so desire, that the bottle

syrup for caffeine-free Coca–Cola is Coca–Cola Bottle Syrup within the meaning of the unamended Coca–Cola Bottle Contract and the 1978 Amendment. *diet Coke VI* at 100.

### Introduction of Cherry Coke

66. The Company introduced Cherry Coca–Cola and diet Cherry Coke in 1985. Additional Admitted Facts ¶ 70 at 129. These products were not foreseen in 1921 or 1978. Additional Admitted Facts ¶ 41 at 125.

67. The syrups for both Cherry Coke and diet Cherry Coke have always contained less than 5.32 pounds of sugar per gallon.

68. As with caffeine-free Coca–Cola, the parties entered into separate letter agreements governing Cherry Coke, but not diet Cherry Coke. The letter agreements for Cherry Coke likewise provided that Cherry Coke would be supplied pursuant to the unamended contract or 1978 Amendment (whichever the particular bottler operated under) and contained the same reservation of rights paragraph quoted above in association with the caffeine-free Coca–Cola letter agreements. CX35E.

69. In response to plaintiffs' Second Requests for Admissions No. 25 served on defendant November 19, 1986, the Company replied:

[T]he Company is willing to stipulate solely for the purposes of this litigation, if the plaintiffs so desire, that the bottle syrup for Cherry Coke is Coca–Cola Bottle Syrup within the meaning of the unamended Coca–Cola Bottle Contract and the 1978 Amendment.

*diet Coke VI* at 100.

### Introduction of new Coke

70. The Company introduced new Coke in April 1985. Like the pre–1980 formula changes and the substitution of HFCS–55 for sugar in the syrup, new Coke was not originally intended as an additional syrup, but rather was intended to replace the previous version of Bottled Coca–Cola syrup sold to plaintiffs pursuant to the unamended contracts and the 1978 Amendment.

Additional Admitted Facts ¶ 70 at 129; Admitted Summary Judgment Facts ¶¶ 234–35 at 172.

71. New Coke has always been sweetened with HFCS and has always contained less than 5.32 pounds of sugar.

72. Pursuant to the Preclusion Order, the Court must find:

[T]he syrup for "new Coca–Cola," which was introduced by the defendant in April, 1985, is "Coca–Cola Bottler's Syrup" and is encompassed by plaintiffs' contracts with the defendant, despite the fact that the syrup for new Coca–Cola is produced by an entirely new and different formula, with materially different ingredients (including secret ingredients), a materially different flavor profile, and a materially different taste than the version of "Coca–Cola Bottler's Syrup" that was being produced by the defendant and supplied to the plaintiffs under their contracts immediately prior to the introduction of new Coca–Cola syrup; and that the syrup for new Coca–Cola also materially differs in all of the respects enumerated above from any earlier version of "Coca–Cola bottler's Syrup" which defendant has ever produced and is materially different from an ingredient standpoint from any of those earlier syrups. The ingredient differences between new Coca–Cola syrup and the version of Coca–Cola bottler's syrup which the defendant was selling to plaintiffs as "Coca–Cola Bottler's Syrup" from 1980 through April 1985, and which was replaced by new Coca–Cola, are major and material and include the following:

(1) new Coca–Cola syrup is produced according to a new formula that is not a modification, extension, or improvement of the original Coca–Cola formula;

(2) new Coca–Cola does not use Merchandise 7X, the emulsion of secret ingredients which is the core of and the most significant part of the original Coca–Cola formula, and which was used without change by defendant in every previous syrup produced by defendant that has used the Coca–Cola or Coke trademarks since the formula for Coca–Cola was

first developed in 1886, including diet Coca–Cola, but excluding caffeine-free Coca–Cola, which contains a modified form of Merchandise 7X;

(3) none of the secret ingredients in new Coca–Cola are common with the secret ingredients in Merchandise 7X or Merchandise No. 5; and

(4) the use of different secret ingredients in new Coca–Cola gives new Coca–Cola a flavor complex, "flavor profile," and taste that is materially different from the flavor complex, profile and taste of the version of Coca–Cola Bottler's Syrup" which [was] sold to bottlers from 1980 through April 1985 (and now sells as the syrup for "Coca–Cola Classic"), and all of which are major, significant, and give new Coke a significantly different taste.

*diet Coke IV* at 376 ¶ 2(m).

73. Because of unfavorable market reaction to the formula change, the Company reintroduced the previous version of the formula under the name "Coca–Cola Classic" or "Classic Coke." Admitted Summary Judgment Facts ¶ 234 at 172. Admitted Summary Judgment Facts ¶ 234 at 172.

74. Coca–Cola Classic did not replace the version of syrup (new Coke) then being sold to the bottlers pursuant to their contracts as syrup for Bottled Coca–Cola. Rather, the syrup for Coca–Cola Classic was offered as an additional syrup.

75. The Company by letter informed the bottlers that it would make syrup for Coca–Cola Classic available to them pursuant to the terms of their unamended contracts or the 1978 Amendment (whichever they operated under). The Company did so with the understanding that the contract rights of all parties would be reserved:

[T]he Company will fill orders for Coca–Cola [C]lassic · from any Coca–Cola Bottler without additional contractual agreement or exchange of correspondence at this time. We may well take the position in the future that some clarification of our respective rights and obligations is appropriate. Your purchase of syrup from us under this letter, however, will not be claimed by us to have prejudiced in any way your right to assert any contractual position you think is appropriate in the future, nor do we intend to be prejudiced by such sales in our right to assert any contractual position we think appropriate.

DX651.

76. In response to plaintiffs' Second Requests for Admissions No. 23 and 61(d), the Company admitted that the syrup for new Coke was Coca–Cola Bottler's Syrup covered by the unamended contracts even though it was sweetened 100% with HFCS and contained no "sugar." The Company also admitted that the syrup for new Coke was covered by the 1978 Amendment. *diet Coke VI* at 99.

77. In response to plaintiffs' Second Requests for Admissions No. 61(e), the Company admitted that the syrup for Coca–Cola Classic was Coca–Cola Bottler's Syrup covered by the unamended contracts even though it was sweetened 100% with HFCS and contained no "sugar." *Id.*

Plaintiffs' Course of Performance

78. Plaintiffs assert that the syrups for new Coke, Coca–Cola Classic, caffeine-free Coca–Cola, Cherry Coke, diet Coke, caffeine-free diet Coke, and diet Cherry Coke comprise a "family" of Coca–Cola syrups which the Company is required to provide to plaintiffs under the terms of their unamended contracts.

79. Plaintiffs assert that the Company's responses to their Second Requests for Admissions that the HFCS-sweetened versions of the syrup and the syrups for new Coke, Coca–Cola Classic, caffeine-free Coca–Cola and Cherry Coke are all Coca–Cola Bottler's Syrup covered by the unamended contracts establish that the scope of the unamended contracts includes more than a single syrup and syrups sweetened with sweeteners other than 5.32 pounds of sugar per gallon.

80. In support of their contention that the syrup for diet Coke should be included within the "family," plaintiffs point to the formulaic similarity established by the Preclusion Order and to references in the in-

ternal Company literature referring to diet Coke as a "son" of Coca–Cola. CX120 at 842137 & 842139; PX1353 at 845583; PX1608 at 862989.

81. Plaintiffs' construction of their unamended contracts taken to its logical conclusion would mean that the seven syrups currently bearing the Coca–Cola trademark—new Coke, Coca–Cola Classic, caffeine-free Coca–Cola, Cherry Coke, diet Coke, caffeine-free diet Coke, and diet Cherry Coke—as well as any other syrups which may be developed in the future and which may bear the trademark, for example, "Coca–Cola Root Beer" or "Orange Coke," would be syrup for Bottled Coca–Cola and covered by the terms of the unamended contracts.

82. Plaintiffs' course of performance, however, reveals that many of the plaintiffs do not treat the seven syrups currently bearing the trademark as subject to *all* of the terms of the unamended contracts.

83. Paragraph SIXTH of the unamended contracts provides:

> Failure of the party of the second part [the actual bottler] to properly and vigorously push the sale of bottled Coca–Cola shall be deemed a violation of this contract, and party of the first part [the parent bottler, now the Company] shall have the option to terminate same, by written notice, addressed to the last known place of business of party of the second part.

84. Plaintiffs appear to view the Company's obligation to supply syrup for Bottled Coca–Cola pursuant to paragraph FIRST much more broadly than they view their own obligation "to properly and vigorously push" the sale of Bottled Coca–Cola pursuant to paragraph SIXTH. While the plaintiffs assert the Company is required to make available to them pursuant to the pricing terms of the unamended contracts any syrup sold under the "Coca–Cola" trademark, many of the plaintiffs assert that they are not required to purchase from the Company and sell in their territories every syrup bearing the trademark and offered by the Company. *E.g.*, DX2428 at 55–62 (Deposition of Walker Lee Christian, representative of the Central bottler) (the Company must make available all products bearing the trademark, but bottler has the right to refuse to introduce a product bearing the trademark and may choose which products it markets); DX2429 at 101 (Deposition of Edward R. Cody, representative of the Williston bottler) (bottler has no obligation to take on a new product bearing the trademark); DX2434 at 16–20 (Deposition of Todd J. Herauf, representative of the Dickinson bottler) (the Company must make available all trademark-bearing products, but the bottler is not obligated to take them all and can decide which products are sufficiently profitable to offer in the territory); DX2443 at 50–53 (Deposition of William L. Mayo, representative of the Plymouth bottler) (bottler has the option to choose among the products bearing the trademark which sells best in his area, for example, this bottler does not carry caffeine-free Coca–Cola); DX2447 at 47 (Deposition of Robert E. Patterson, representative of the Tulsa bottler) (bottler has the option of dropping a trademark-bearing product); DX2456 at 27 (Deposition of Kenneth R. Wilson, representative of the Arkansas–Georgia bottler) (bottlers' assessment of the demand for a trademark-bearing product in his territory is the sole determinant of whether the Company is obligated to supply and the bottler is obligated to sell that product).

85. The Jamestown bottler stated that the bottlers are not required to push vigorously six of the seven alleged members of the "family" of Coca–Cola which the bottlers assert the Company must supply pursuant to paragraph FIRST and the bottlers can satisfy their obligations under paragraph SIXTH by carrying only Coca–Cola Classic. DX2479 at 140 (Deposition of John R. Bernabucci, Jr., representative of the Jamestown bottler); *see also* DX2438 at 64–69 (Deposition of William B. Love, representative of the Love bottler) (although bottler is contractually obligated to sell "Coke," the bottler can discontinue marketing and selling a product bearing the trademark if in the bottler's judgment demand is insufficient); DX2440 at 14–15

(Deposition of Richard W. Maly, representative of the Sacramento bottler) (same); DX2455 at 55–61 (Deposition of Charles K. Williams, representative of the Magnolia bottler) (same).

86. One bottler stated that the terms of his unamended contract would not require him "to properly and vigorously push" a hypothetical product called "Coca–Cola Root Beer." DX2458 at 39 (Deposition of J.W. Wolslager, representative of the San Angelo, Tuscon, and Las Cruces bottlers).

87. William B. Schmidt, the Elizabethtown bottler and the only bottler to testify at trial, stated that under the terms of the unamended contracts the bottlers are free to make economic decisions as to the feasibility of carrying a particular product in their territories even if the product bears the "Coca–Cola" trademark. Tr. 547–49 (Schmidt); generally, Tr. 545–565 (Schmidt).

88. In fact, several bottlers do not carry one or more of the seven products they claim are members of the so-called "family" of Coca–Cola.

89. For example, the Jamestown and Bunkie bottlers do not sell new Coke in their territories. DX2462; DX2463; DX2465; DX2479 at 60 (Bernabucci dep.).

90. The Plymouth, Dickinson, Jamestown, and Williston bottlers do not sell caffeine-free Coca–Cola. DX2462; DX2463; DX2464; DX2443 at 56 (Mayo dep.).

91. The Plymouth and Kelford bottlers do not sell Cherry Coke. DX2462; DX2463; DX2466.

92. The Magnolia, Arkansas–Georgia, Shelbyville, Kelford, Plymouth, and Wilmington bottlers do not sell diet Cherry Coke. DX2462; DX2463. The Magnolia, Kelford, and Wilmington bottlers have never sold diet Cherry Coke in their territories. DX2462; DX2463; DX2467.

93. Plaintiffs have asserted little if any evidence of the level of demand in their territories for the products which they do not carry.

94. Absent countervailing evidence of lack of even a very tiny demand for a product in a given territory, it may be inferred that failure to carry a particular product amounts to failure "to properly and vigorously push" it. This is especially true of those bottlers who have never carried a product.

*Course of Dealing and Negotiations Leading to the 1921 Consent Decrees and Unamended Contracts*

95. The parties' course of dealing prior to entry of the Consent Decrees and the negotiations leading to the Consent Decrees is evidence of the parties' intent with respect to the language of the Consent Decrees and the unamended contracts based thereon. The evidence in this section may be categorized as (i) evidence of the use of sugar and substitute sweeteners in the syrup and other formula changes prior to entry of the Consent Decrees; (ii) use of the Root bottle; and (iii) the negotiations leading to the pricing formula in the Consent Decrees. The Court begins with the evidence for formula changes and the use of sweeteners prior to 1921.

96. At the time it entered into the 1899 contract with Whitehead and Thomas, the Company manufactured only one version of Coca–Cola syrup and sold the same syrup for use in both the soda fountain and bottling businesses. R. 1244, 1714; Admitted Facts from the First Elizabethtown Trial ¶ 30 at 30;[9] Additional Admitted Facts ¶ 11 at 116–17.

97. Neither the sweetener nor any of the other ingredients in Coca–Cola syrup were specified in the 1899 contract or in any of the pre–1921 amendments between the parent bottlers and the Company, or in the contracts between the parent bottlers and the actual bottlers. Additional Admitted Facts ¶ 34 at 124.

98. "Coca–Cola" was described in the 1899 contract simply as "a carbonated

---

9. Citation to "Admitted Facts from the First Elizabethtown Trial" refers to facts the parties agree were established for purposes of this litigation by Judge Schwartz' opinion in *Coke III*. These may be found in the Pretrial Order (Dkt. 461).

drink containing a mixture of the Coca–Cola syrup and water charged with carbonic acid gas under a pressure of more than one atmosphere...." CX10; *Coke 1920* at 800.

99. The Company made numerous changes in the formula of the syrup sold to the bottlers under the 1899 contract from 1899 until the bottlers filed suit in 1920. These changes were listed by Judge Schwartz in two prior opinions:

> (1) in 1900, the manufacturing process was changed to eliminate $1/400\%$ of cocaine in Coke; (2) in 1903, a very slight change of an unknown nature was made; (3) in 1906, confectioners sugar was replaced by granulated sugar; (4) after passage in 1906 of the Pure Food and Drug Act which prohibited the use of saccharin, the saccharin in Bottler's Syrup was removed; (5) in 1906–07 the level of caffeine was reduced slightly; (7) in 1917, the level of caffeine was reduced from 1.19 to .62 grams per bottle; [and] (8) during World War I, beet, invert and plantation sugars were used....

*diet Coke I* at 1131 n. 31 (citations omitted); *see also diet Coke II* at 1228–29 n. 40.

100. All changes in the formula prior to 1921 created new versions of the formula which were intended to replace the prior version. The Company at all times prior to 1921 offered only one version of syrup for sale to the bottlers at any given time.

101. Whitehead and Thomas, as well as some of the actual bottlers, soon discovered that the bottled product was not as sweet as the fountain product. Admitted Facts ¶ 117 at 73; Additional Admitted Facts ¶ 13 at 117.

102. To eliminate the difference in taste, the bottlers experimented with different syrup to water ratios. Thomas was permitted to add "a simple syrup" to the product sold by his first line bottlers. This simple syrup contained the artificial sweetener saccharin, as well as "Coca–Cola coloring" and "Coca–Cola acid." Admitted Facts ¶ 118 at 73.

103. Thus, prior to the passage of the Pure Food and Drug Act, the syrup used in bottling contained some saccharin. PX1 (R. 1814).

104. The Pure Food and Drug Act, which was adopted in 1906, was interpreted by the USDA to prohibit the use of saccharin in soft drinks. Admitted Facts from the First *Elizabethtown* Trial ¶ 34 at 31. Passage of the Pure Food and Drug Act forced the Company to change the formula for the syrup supplied to the bottlers, and the Company in conjunction with the parent bottlers developed a new syrup, which had not existed in 1899 and did not contain saccharin, for sale exclusively to the bottlers under the 1899 contract. As a consequence, the Company after 1907 produced two syrups—one for fountains and one for bottlers. Admitted Facts from the First *Elizabethtown* Trial ¶¶ 35–3 at 32–33. The new formula altered slightly the taste of bottled Coca–Cola. *See* PX102.

105. Prior to 1906, the syrup also contained a soft sugar known as "Confectioner's A." PX711 at AR2303; *Coke VI* at 63. This was eventually found unsatisfactory, and the Company switched to granulated sugar. PX711 at AR2303.

106. Between the beginning of World War I in 1914 and 1920, the Company reduced the quantity of sugar in a gallon of Coca–Cola Bottler's Syrup from 6.36 pounds per gallon before World War I, PX766 at AZ0609, to 5.97 pounds per gallon during 1916–1918, PX220, and to 5.32 pounds per gallon by the time of the 1920 litigation. Additional Admitted Facts ¶ 18 at 118.

107. Prior to the imposition of sugar quotas and price controls in 1917, cane sugar was the primary sweetener used in soft drinks. Admitted Facts ¶ 124 at 74; Additional Admitted Facts ¶ 23 at 119. Sucrose, especially sucrose from cane, was the preferred sweetener in the soft drink bottling industry. Admitted Facts ¶ 126 at 74.

108. The onset of World War I disrupted the sugar market, bringing with it price controls and rationing. Admitted Summary Judgment Facts ¶ 86 at 145.

109. The Company was unable to purchase sufficient quantities of sugar and

consequently experimented with a number of cheaper sweeteners as substitutes for cane sugar in Coca–Cola bottlers' syrup. The Company used corn syrup, glucose, beet sugar, and invert sugar as substitutes for cane sugar in Coca–Cola Bottler's Syrup. Additional Admitted Facts ¶ 19 at 118; Additional Admitted Facts ¶ 25 at 119–20; Admitted Summary Judgment Facts ¶ 87 at 145. Thus, the parties were familiar with the use of sweeteners other than sugar prior to entry of the Consent Decrees.

110. Substitute sweeteners used by the Company during the World War I period proved unsatisfactory. PX189; PX287; PX708; Admitted Facts from the First Elizabethtown Trial ¶ 52 at 36–37; Admitted Summary Judgment Facts ¶ 89 at 145; ¶ 160 at 155.

111. The parties' familiarity with substitute sweeteners at the time of the 1920 litigation is further evidenced by the distribution by the USDA of a pamphlet entitled "Formulas for Sugar Saving Sirups." PX152. Copies of this pamphlet as published by USDA were widely publicized and reprinted by the Georgia Department of Agriculture (PX144, PX232), in trade journals directed at bottlers, including the *National Bottlers' Gazette* (PX172, PX208), and *The American Bottler* (PX147), and by suppliers to the soft drink industry (PX190). Discussion of the use of substitute sweeteners in newspapers was apparently noted by at least one bottler. PX226.

112. Many Coca–Cola bottlers purchased concentrates from other manufacturers to bottle beverages other than Coca–Cola, such as ginger ale or various fruit-flavored drinks. These bottlers would add sweetener to the concentrate. Many Coca–Cola bottlers who were faced with a curtailment of the bottling of ginger ale and fruit-flavored drinks from concentrates as a result of sugar shortages due to World War I requested copies of "Formulas for Sugar Saving Sirups" directly from the USDA. *E.g.,* PX179; PX182–184; PX186; PX188; PX195; PX197–200; PX207; PX210; PX213–218; PX220; PX223–224; PX226; PX234; PX243; PX247–248; PX254; PX256; PX265. These bottlers included the Birmingham Coca–Cola Bottling Company, whose president, Crawford Johnson, was Chairman of the Special Committee of the Coca–Cola Bottlers' Association and an intervenor in the 1920 litigation. PX185, PX198.

113. In 1922, one Coca–Cola bottler wrote that he was familiar with the USDA's "Formula for Sugar Saving Sirups" and that, in his opinion, substitute sweeteners were inadequate replacements for sugar. PX708; Additional Admitted Facts ¶ 26 at 120.

114. Thus the parties to the 1920 litigation and 1921 Consent Decrees were aware of the availability of substitute sweeteners and could have provided in the Consent Decrees or unamended contract for the use of substitute sweeteners, if the parties so chose. Although use of a sweetener other than sugar was a possibility of which the parties were aware in 1920 and 1921, sugar was the only sweetener identified as an ingredient of Coca–Cola Bottlers' Syrup in the Consent Decrees or unamended contracts.

115. Neither the 1899 contract nor any pre–1921 amendment thereto specified the sweetener or any other ingredient in the syrup. Additional Admitted Facts ¶ 34 at 124. The 1921 Consent Decrees represent the first and only time an ingredient—5.32 pounds of sugar per gallon—has been expressly identified in the bottling contracts between the Company and these bottlers.

116. The evidence in the record indicates that Bottled Coca–Cola was to be sold in a specific container referred to as the "root bottle" or the "standard Coca–Cola bottle." Alexander Samuelson obtained a patent for a 6–½ oz. bottle on November 16, 1915. Samuelson subsequently assigned the patent to the Root Glass Company. Admitted Facts from the First *Elizabethtown* Trial ¶ 44 at 34.

117. A Coca–Cola bottlers convention held in Atlanta in 1916 chose the Samuelson design to be the standard Coca–Cola bottle. *Id.*

118. On July 8, 1916, The Coca–Cola Company and the parent bottlers executed an agreement with the Root Glass Compa-

ny under which the patent for the Samuelson design was assigned to The Coca–Cola Company. The parent bottlers agreed to adopt the Root bottle as the standard bottle for use by all bottlers of Coca–Cola. Admitted Facts from the First *Elizabethtown* Trial ¶ 45 at 34–35.

119. The 1916 revision of the actual bottlers' contracts necessitated by the 1915 Amendment to the 1899 contract required the bottlers to use the Root bottle as the standard Coca–Cola bottle "using one ounce of Bottlers' Coca–Cola Syrup in a standard Coca–Cola bottle." PX32; PX41; Admitted Facts from the First *Elizabethtown* Trial ¶ 46 at 35.

120. The pricing provisions of the Consent Decrees and unamended contracts and the events surrounding the negotiation of these pricing provisions indicate an intent on the part of the parties in 1921 that 5.32 pounds of sugar per gallon be used to sweeten the syrup. Paragraph 6 of the Consent Decrees describes a "sliding scale" pricing formula for the syrup described in paragraph 10 and sold by the Company to the parent bottlers as follows:

6. In order to promote the sale of Coca–Cola and enable the actual bottlers to compete with other beverages, the [Company] hereby agrees to sell such syrup to the bottlers purchasing from it at not exceeding one dollar and thirty cents ($1.30) per gallon, ... and an additional six cents (6¢) per gallon for such syrup for each advance of one cent (1¢) per pound in sugar above seven cents (7¢) per pound....

121. Paragraph FOURTH(d) of the unamended contracts describes the same base price and sliding scale pricing formula for the syrup sold by the parent bottlers to the actual bottlers:

[The first line bottler] agrees:

(d) To buy of or through [the parent bottler] all the Coca–Cola syrup required or used by [the first line bottler] in the preparation for market of its bottled goods aforesaid, and to pay for said Coca–Cola syrup on the following scale of prices:

One Dollar and Thirty ($1.30) cents per gallon delivered to any point in the above described territory where a plant may be established by the [first line bottler]; and an additional six cents (6¢) per gallon for such syrup for each advance of one cent (1¢) per pound in sugar above seven cents (7¢) per pound,....

122. Paragraph 7 of the Consent Decrees and paragraph FOURTH(d) of the unamended contracts describe the mechanism for determining the market price of sugar upon which the sliding scale is based:

[T]he price of sugar is to be determined quarterly, January, April, July and October in each year, by averaging the market price of standard granulated sugar during the first week in such quarter, as quoted at the refineries by the ten refineries operating in the United States of America at the time, having the largest capacity and output.

Consent Decrees ¶ 7; see also Bottle Contract ¶ FOURTH(d).

123. The sliding scale was the product of negotiations among the Company, the parent bottlers, and the actual bottlers which led to the entry of the Consent Decrees in 1921.

124. During the 1920 litigation, the bottlers paid a price for the syrup tied to the Company's actual cost of manufacture.

125. Prior to the 1920 litigation, the parent bottlers paid the Company a fixed price per gallon which was not based upon the cost of any ingredient. The 1899 contract between the Company and Whitehead and Thomas obligated the Company to sell to the bottlers their requirements of Coca–Cola syrup at a fixed price and required that the syrup be bottled under pressure of one atmosphere in proportions of not less than one ounce of syrup to eight ounces of water. The price of the Coca–Cola syrup supplied to Whitehead and Thomas was as shown on the wholesale price list of fountain syrup in effect at the time, which was attached as an exhibit to the 1899 contract. PX10; Admitted Facts from the First *Elizabethtown* Trial ¶ 12 at 23.

126. By an undated amendment, the 1899 contract was amended to fix the syrup

price at $1.00 per gallon, less a ten cent per gallon rebate to pay for labels and advertising matter to be provided by the Company at its actual cost. R. 42–44; PX11; Admitted Facts from the First *Elizabethtown* Trial ¶ 13 at 23.

127. When the syrup was reformulated in response to passage of the Pure Food and Drug Act, the parent bottlers agreed to pay an additional two cents per gallon as the new syrup price, which two cents was offset by a reduction in the amount of advertising materials for which they were required to pay pursuant to the 1899 contract from ten cents to eight cents. Admitted Facts from the First *Elizabethtown* Trial ¶ 35 at 32.

128. In 1915, the Company and the parent bottlers modified their 1899 contract as a result of passage of the 1914 Clayton Act. Admitted Facts from the First *Elizabethtown* Trial ¶¶ 41–42 at 33–34. The 1915 Amendment formally incorporated the increase in the price of the syrup from the ninety cents stipulated in the 1899 contract to ninety-two cents per gallon and the reduction from ten cents to eight cents of the advertising material the parent bottlers were obligated to purchase for the syrup. *Id.* The 1915 Amendment was the first instance in which the phrase "Bottler's Syrup" was used in the contracts.

129. The 1915 Amendment necessitated corresponding amendments in the contracts between the parent and first-line bottlers. Admitted Facts from the First *Elizabethtown* Trial ¶ 43 at 34. The actual bottlers' contracts were amended in 1916 to require the actual bottlers to pay $1.20 per gallon for their syrup (a twenty-eight cent profit for the parent bottlers). *E.g.*, PX38 (Star/Shreveport); Admitted Facts from the First *Elizabethtown* Trial ¶ 46 at 35. The actual bottlers' contracts as amended refer to syrup in the same manner as did the 1915 Amendments to the parent bottlers' contracts.

130. Refined granulated sugar was the principal and most expensive ingredient used in the manufacture of the syrup. PX766 (AZ0605, AZ0609, AZ0610, AZ0611). The price per pound of sugar had ranged between roughly 4.9 cents when the 1899 contract was executed and 4.65 cents when the fixed price of syrup was last amended in 1907. PX312; Admitted Facts ¶ 127 at 74.

131. World War I severely affected the price and supply of sugar. Only the imposition of rigid price controls held the price of refined sugar at nine cents per pound. *See* Admitted Facts from the First *Elizabethtown* Trial ¶ 49 at 35–36. In 1917 the parent bottlers voluntarily agreed to a temporary price increase whereby they would pay the Company an additional five cents per gallon for Coca–Cola syrup because of the increased cost of sugar and the corresponding increased cost of manufacturing the syrup caused by the War. The temporary price increase was to be limited to the duration of the circumstances occasioned by the War. It was also conditioned on the parent bottlers being relieved from the obligation of purchasing eight cents of advertising matter with each gallon of syrup. The parent bottlers paid ninety-seven cents per gallon for the duration of the agreement. Admitted Facts from the First *Elizabethtown* Trial ¶ 51 at 36.

132. After termination of federal price controls of sugar in September 1919, sugar prices rose rapidly until they exceeded twenty-three cents per pound in May–June 1920. Admitted Facts from the First *Elizabethtown* Trial ¶ 54 at 37.

133. At the request of the Company the parent and actual bottlers agreed to "temporary amendments" which would expire February 1, 1920. The temporary amendments allowed the Company to pass on to the parent bottlers the full cost of sugar above nine cents per pound, the price that had existed under the federal price controls and upon which the previous temporary price increase had been predicated. It was understood that the parent bottlers would not be required to purchase advertising materials, and that the actual bottlers would allow the parent bottlers to pass on the added cost of syrup to a ceiling of $1.50 per gallon. *See* Admitted Facts from the First *Elizabethtown* Trial ¶ 57 at 35. At the Company's request, the arrangement

was extended until March 1, 1920. This agreement represented the first time the parties established a fluctuating price for the syrup based upon the actual cost of any ingredient. *See* Admitted Facts from the First *Elizabethtown* Trial ¶ 61 at 41.

134. At about the same time the Company sought permanent relief from the fixed price contract. The Company proposed an amendment to the 1899 contract that would eliminate the limitations on the Company's power to raise syrup prices that existed by virtue of the ninety-two cent fixed price specified in the 1915 Amendment, grant the Company the right to pass on to the actual bottlers all increases in its total manufacturing costs, and guarantee the Company two-thirds of the profits and the parent bottlers one-third of the profits from the sale of Coca–Cola syrup to the actual bottlers. *See* Admitted Facts from the First *Elizabethtown* Trial ¶ 57 at 35.

135. The parent bottlers advised Harold Hirsch, counsel for the Company, that they would not enter into negotiations to amend their contracts with the Company unless the Company provided itemized information concerning the cost of manufacturing the syrup so they could verify the Company's manufacturing costs. Admitted Facts from the First *Elizabethtown* Trial ¶ 58 at 39.

136. Beyond offering cost statements prepared by its accountants, which were rejected by the parent bottlers as insufficient, PX323, the Company refused to disclose the cost information, offering only "the integrity and good faith of The Coca–Cola Company." PX1 at 1580. The parents then rejected the Company's flexible pricing proposal.

137. The Company responded by announcing that it considered its contracts with the parent bottlers to be contracts at will which could be terminated by the Company on reasonable notice. Admitted Facts from the First *Elizabethtown* Trial ¶ 59 at 40.

138. On February 27, 1920, after the exchange of a series of proposals and counterproposals, the parent bottlers notified the Company that all negotiations were terminated, and that all temporary pricing arrangements were cancelled as of March 1, 1920. The parent bottlers demanded that the Company comply with all aspects of the 1899 contract and 1915 Amendment as of March 1. PX341; Admitted Facts from the First *Elizabethtown* Trial ¶ 65 at 43.

139. On March 2, 1920, the Company notified the parent bottlers that their contracts would be terminated on May 1, 1920. PX343; PX344. The Company then submitted a final settlement proposal on April 1, 1920, offering to appoint the parents as agents and distributors entitled to a royalty on each gallon of syrup distributed. The proposal also included a cost-plus pricing arrangement with the price to be adjusted semi-annually based upon a sworn statement from the Treasurer of the Company itemizing specific elements of the Company's costs. PX364; Admitted Facts from the First *Elizabethtown* Trial ¶ 68 at 44.

140. The Whitehead–Lupton Company rejected the proposal. PX368; PX369; Admitted Facts from the First *Elizabethtown* Trial ¶ 69 at 44.

141. On April 13, 1920, the two principal parent bottlers filed suit in the Fulton County, Georgia Superior Court to enjoin the Company from terminating their contracts. Admitted Facts from the First *Elizabethtown* Trial ¶ 71 at 45.

142. A temporary restraining order was entered which prohibited the Company from selling Coca–Cola syrup to anyone other than the parent bottlers. PX6; Admitted Facts from the First *Elizabethtown* Trial ¶ 71 at 45.

143. The Bottlers' Association, an organization of the actual bottlers, employed J.B. Sizer, a Chattanooga lawyer, to represent the interests of the actual bottlers in the litigation. Admitted Facts from the First *Elizabethtown* Trial ¶ 72 at 45. Sizer reported to a special committee appointed by the Bottlers' Association, and his fees were paid by the Association, PX385; PX391, and by assessments of bottlers in the Whitehead–Lupton and Thomas territories based on the gallonage of Bottlers'

Coca–Cola Syrup used by each bottler. PX689–95; PX697–98; PX701; PX704–706; Admitted Facts from the First *Elizabethtown* Trial ¶ 72 at 45.

144. Six actual bottlers intervened in support of the parent bottlers. PX6; Admitted Facts from the First *Elizabethtown* Trial ¶ 73 at 45.

145. The Fulton County suit was voluntarily dismissed by the parent bottlers on May 30, 1920, and it was refiled on June 1, 1920 in the United States District Court for the District of Delaware.

146. On June 10, 1920, the parties agreed to the entry of an order that required the Company to supply the bottlers' requirements of Coca–Cola syrup during the pendency of the litigation. The order fixed the price paid by the actual bottlers to the parent bottlers at $1.72 per gallon until November 1, 1920. In the event the Court had not reached a decision on the application for interlocutory injunctions by November 1, the order provided that after that date the syrup price would be increased or decreased from the fixed $1.72 price based upon increases or decreases in the Company's actual costs of manufacture of the syrup. Admitted Facts from the First *Elizabethtown* Trial ¶ 76 at 46.

147. Prior to the entry of this order, the Company had purchased a year's supply of refined cane sugar at about twenty cents per pound, a price near the top of the market. Admitted Facts from the First *Elizabethtown* Trial ¶ 77 at 47. During negotiations leading to the June 10 order, the Company failed to disclose fully that it had entered in long-term sugar contracts at prices near the top of the market. The bottlers were lead to understand that the Company had in fact entered into favorable long-term sugar contracts at a price lower than the current market price. PX1 (R. 1608); PX474 (letter from parent bottlers to Company dated October 30, 1920) ("[W]hen the working agreement was entered into the methods employed by The Coca–Cola Company in purchasing sugar were discussed with you [Charles Candler, President of the Company], you represented to us that The Coca–Cola Company had

a contract with one of the largest refiners in the Country for a sufficient quantity of sugar to meet your requirements for the year 1920, the price to be determined by the market price every Monday morning.").

148. Beginning in June 1920, the market price of sugar began declining. By November 1920 it had fallen to eleven cents per pound. PX311; PX492. The price to the actual bottlers remained fixed at $1.72, however, causing them to suffer a substantial loss in sales volume. The Chairman of The Coca–Cola Company reported the Company's total sales volume of syrup (including both bottle and fountain syrup) declined 53% in September 1920 and 50% in October 1920 because of the high price of the syrup. *Coke III* at 1394.

149. The bottlers expected price relief on November 1, based upon their understanding of the Company's sugar contracts. Instead, the Company, in order to recoup the cost of its inventories of high priced sugar, announced a price increase for its syrup in November 1920, December 1920 and January 1921.

150. The Company represented that its costs of manufacture had increased because of long term sugar purchases at high prices. The parent bottlers, in disbelief, demanded verification of the Company's figures. The bottlers' audit showed discrepancies, and the parties were unable to reconcile their figures or even agree on items to be included in the cost calculation. *Coke III* at 1394.

151. In November 1920, Crawford Johnson, the Birmingham bottler, President of the Bottlers' Association, and an intervenor in the lawsuit, met with W.C. Bradley, Chairman of the Board of the Company. Admitted Facts from the First *Elizabethtown* Trial ¶ 80 at 48. Bradley told Johnson that in March 1920 the Company had purchased a year's supply of sugar at twenty cents per pound. Because of the decrease in volume, the Company would be unable to get rid of its inventories of this high priced sugar until April 1, 1921. He also informed Johnson that the Company could not afford to absorb the loss from

the sugar without destroying its credit and going into bankruptcy. PX485.

152. Thus the bottlers discovered that by tying the price they paid for syrup to the Company's actual cost, they exposed themselves and insulated the Company from the hazards of the marketplace and the Company's own poor judgment in sugar purchases.

153. After Judge Morris granted the bottlers' motion for a preliminary injunction and while Judge Morris' ruling was on appeal, the parties agreed to the sliding scale pricing mechanism set forth in paragraphs 6 and 7 of the Consent Decrees and paragraph FOURTH(d) of the unamended contracts.

154. The sliding scale pricing mechanism was designed to prevent the type of situation which occurred under the June 10 order. By tying the price of syrup to the market price of sugar, rather than the Company's actual cost, the bottlers were protected from future bad judgment on the part of the Company in its long-term sugar purchasing. In addition, tying the price of the syrup to the market price of sugar created a pricing mechanism based upon an objective factor and gave the bottlers a way to independently verify the price charged by the Company.

155. From the Company's point of view, the sliding scale pricing mechanism was preferable to the fixed price in the 1899 contract because it provided a way for the Company to recoup its increased costs when the price of the most expensive ingredient in the syrup—sugar—increased.

156. The pricing scheme and the events leading to its creation show that the term "sugar" as it is used in paragraphs 6 and 7 of the Consent Decrees and paragraph FOURTH(d) of the unamended contracts has the same meaning as "sugar" as that term is used in paragraph 10 of the Consent Decrees.

157. Consequently, Paragraph 10 of the Consent Decrees serves a dual function as both a quality-control and a price-protecting provision. *See Coke III* at 1402. The requirement of "high grade standard Bottlers Coca–Cola Syrup" and the require-

ment of at least 5.32 pounds of sugar per gallon address the quality of the syrup. *Id.* at 1401. The requirement that the syrup contain not less than 5.32 pounds of sugar per gallon also addresses price by ensuring the Company cannot evade the pricing provisions of paragraphs 5, 6 and 7 of the Consent Decrees by reducing the amount of sugar used or using cheaper substitutes. *Id.* at 1402.

158. Moreover, the great majority of settlement proposals from the bottlers in 1920–1921 were predicated upon the use of 5.32 pounds of sugar per gallon to sweeten the syrup. *E.g.*, PX557 ("The basic cost of syrup per gallon ... based on ten cent sugar is $1.04 per gallon and that the future price shall be on a sliding scale of the price of sugar ... figured on the basis of 5.32 pounds of standard granulated sugar to the gallon of syrup"); *see also* PX504; PX583; PX607. These show that the parties assumed that the Company would continue to use at least 5.32 pounds of sugar as the sweetener indefinitely. The base price of $1.175 per gallon paid by the parents under paragraph 5 of the Consent Decrees was calculated on the cost of 5.32 pounds of sugar per gallon. PX1 (R. 1605–06).

159. Thus, as the Court found in *Elizabethtown*, the sliding scale pricing mechanism of paragraphs 6 and 7 of the Consent Decrees and paragraph FOURTH(d) of the unamended contracts is inextricably linked to the use of 5.32 pounds of sugar per gallon of syrup as required by paragraph 10 of the Consent Decrees.

160. This linkage is a fundamental assumption of both the Consent Decrees and the unamended bottle contracts.

161. Plaintiffs point to a statement made by the attorney for the actual bottlers in a letter explaining the Consent Decrees to the effect that "the only change [made by the Consent Decrees] which is in any degree *to the disadvantage* of the bottlers, is that the price of the syrup has been increased," PX640 (emphasis added), as evidence that it was not the intention of the parent and actual bottlers in 1921 to

narrow the scope of coverage under the bottling contracts. Plaintiffs' Proposed Findings of Fact and Conclusions of Law ¶¶ 257–58 at 71.

162. Plaintiffs ignore the fact that limitation of the sweetening ingredient in the syrup to sugar would not necessarily have been viewed in 1921 as disadvantageous to the bottlers. Given the dissatisfaction with the use of other sweeteners during World War I, a requirement that sugar be used in the syrup could easily have been seen as an advantage for the bottlers, who were required to purchase and market the syrup. The dual purpose of paragraph 10 of the Consent Decrees—to protect the quality of the syrup and to prevent the Company from evading the pricing provisions—lends support to the thesis that the bottlers would view the requirement of 5.32 pounds of sugar per gallon of syrup as an *advantageous* check upon the Company's ability to dilute the strength of the syrup and evade the pricing provisions.

*The Unamenders' Claim that the Company Breached Alleged Fiduciary Duties Owed to Them When It Introduced diet Coke Without Making It Available to the Bottlers Under the Terms of the Unamended Contracts*

163. Plaintiffs assert that even if they are not entitled to diet Coke pursuant to the terms of their unamended contracts, the Company breached a fiduciary duty arising from the contracts when it introduced diet Coke without making diet Coke syrup available to plaintiffs under the terms of the unamended contracts. Plaintiffs seek tort damages and punitive damages for this alleged breach of fiduciary duty.

164. In *Coke VI*, Judge Schwartz ruled that the unamended contracts did not give rise to a "general" or "global" fiduciary duty between the Company and the bottlers:

The dominant theme of the case law cited in the margin is that fiduciary relationships arise where one party has the power and opportunity to take advantage of the other, because of that other's susceptibility or vulnerability. The vulnerability of the bottler lies only in the greater economic strength and bargaining power of the Company. This disparity does not rise to a level where the bottlers are powerless; nor does it persuade this Court that the bottlers are equitably entitled to special protection because of their unique ties to the Company.

In sum, the plaintiffs' argument that the relationship between the Company and the bottlers is a fiduciary one is unpersuasive. The Court agrees, as does the Company, that the Company is under an implied duty of good faith and fair dealing. This implied duty, however, does not create the kind of strict fiduciary responsibilities alleged by the plaintiffs. Even accepting the facts as plaintiffs present them, the law simply is that no fiduciary relationship arises from such facts.

*Coke VI* at 75; [10] *see also id.* at 73–74 ("The plaintiffs in this case, despite their long and mutually profitable relationship with the Company are far from reposing in it complete trust and confidence of the sort which engenders a fiduciary relationship.").

165. The ruling of Judge Schwartz in *Coke VI* that the unamended contracts do not give rise to a general fiduciary relationship between the parties, while not law of this case, is entitled to considerable deference under principles of collateral estoppel and *stare decisis*.

166. Upon defendant's motion *in limine* during the trial before Judge Schwartz to exclude evidence of plaintiffs' fiduciary duty claim, Judge Schwartz disallowed the general fiduciary duty claim but allowed plaintiffs to proceed on two narrower theories. This Court, upon renewal of defendant's motion in the 1990 trial,

**10.** Plaintiffs dismissed with prejudice their claims based upon the Company's duty of good faith and fair dealing in order to avoid producing certain financial data in discovery. Order of January 17, 1989 (Dkt. 467); Transcript of first *diet Coke* trial before Judge Schwartz December 21, 1988 at 663–666.

likewise allowed plaintiffs to proceed on the same narrowly circumscribed claims:

At trial, Plaintiffs will be permitted to offer evidence which pertains to:

(i) whether Defendant's ownership of the trademark and Plaintiffs' exclusive right to use the trademark on bottled Coca–Cola beverage in their respective territories created a fiduciary relationship. Plaintiffs may also offer evidence as to whether Defendant breached this alleged fiduciary duty with respect to the trademark when it offered diet Coke in the market but refused to make it available to Plaintiffs under the terms of their existing bottling contracts; and

(ii) whether Defendant's exclusive control over the formulation and ingredients of Coca–Cola Bottlers' Syrup created a fiduciary relationship between Defendant and the Plaintiffs. Plaintiffs may also offer evidence as to whether Defendant breached this alleged fiduciary duty with respect to the formulation of the syrup when it offered diet Coke in the market but refused to make it available to Plaintiffs under the terms of their existing bottling contracts.

Dkt. 497.

167. Taking the trademark-related claim first, plaintiffs analyze the contractual relationship concerning use of the trademark as one in which the Company holds title to the trademark in trust for the benefit of the bottlers. Plaintiffs claim the Company breached its alleged fiduciary duty as "trustee" by using the trademark on another bottled product, thereby leveraging on the goodwill of the trademark and exerting pressure on plaintiffs to sign new contracts. *See* Plaintiffs' Proposed Findings of Fact and Conclusions of Law ¶¶ 1601–09 at 361–63.

168. Plaintiffs' theory that the trademark is the res of a trust held by the Company as trustee for their benefit overreaches. The language dealing with the trademark in the Consent Decrees and the unamended contracts does not express in definite terms an intent on the part of the Company to subject itself to equitable duties as trustee to deal with the trademark for the benefit of plaintiffs. In other words, the language of the Consent Decrees and the unamended contracts does not give rise to an express trust. *Restatement (Second) of Trusts,* § 23 at 66; *id.* § 2 at 6.

169. Rather, the language of the Consent Decrees and unamended contracts reveals an intention that the Company and the bottlers to bilaterally profit from their respective interests in the trademarks. For example, an individual bottler pursuant to his unamended contract may not use the trademark outside his territory. *See* paragraph FOURTH(g) of the unamended contracts. Further, paragraph SEVENTH provides for termination of the contract by the Company in the event the bottler persists in failing to meet its obligations. Thus, it cannot be said that the unamended contracts created an express trust in the trademark for the exclusive benefit of the bottlers. If the plaintiffs' argument is to succeed, therefore, the Court must find a resulting trust or impose a constructive trust on the trademark.

170. The Court may find a resulting trust where the language of and/or the circumstances surrounding the making of a contract, though not expressly creating a trust, infer an intent to create a trust, as where there is an inference that the party taking and holding the property is not intended to have a beneficial interest in it. *Restatement (Second) of Trusts* § 404 at 326; 5 A.W. Scott, *Scott on Trusts* § 404.1 at 3213 (3d ed. 1967).

171. For the same reasons the Court found no express trust, the Court also finds that no resulting trust in the trademark arises from the Consent Decrees and the unamended contracts. The Court finds that the rights created in and the obligations imposed upon the Company and the bottlers with respect to the trademark were conferred in the context of compromise and negotiation and were intended to create a bilateral business relationship with respect to the mark. There is no inferred intent that the Company hold title to the trademark as a trust res for plaintiffs' benefit. Consequently, the Court finds the

Consent Decrees and unamended contracts do not give rise to a resulting trust in the trademark for the sole benefit of the bottlers.

172. Furthermore, the negotiations leading to the Consent Decrees evince no intent on the part of the Company to hold the trademark in trust for the sole benefit of the bottlers. For example, the Company stated repeatedly in its Answer to the bottlers' 1920 Complaint that the Company alone possessed full right, title, and ownership interest in the trademark to the exclusion of the parent bottlers and everyone else. CX1, Vol. 1 Answer of Defendant ¶ 26 ("This defendant denies that the complainant was or is jointly interested in the trademark 'Coca–Cola'...."); *id.* ¶¶ 27, 29–30; *id.* ¶ 36 ("Defendant specifically denies that it was ever parted with its title and right to the trademark Coca–Cola"); *id.* ¶ 46.

173. During the negotiations, the Company insisted that the bottlers recognize its exclusive ownership of the trademark. PX563 at BY1785; PX569; PX576.

174. Paragraphs 8 and 9 of the Consent Decrees, whereby the parent bottlers conveyed to the Company whatever interest in the trademark they might have acquired, including the right to control and initiate litigation, in return for a perpetual and exclusive right of use, appear to be the result of the usual give-and-take bargain associated with any contract. They do not indicate a conveyance of sole equitable ownership of the trademark to the bottlers. Such a construction would render the conveyance of the parent bottlers' rights to the Company superfluous and nonsensical.

175. Consequently, the Court finds no inference that the parties to the Consent Decrees or the unamended contracts intended to create a trust whereby the Company undertook fiduciary duties and held legal title in the trademarks for the sole benefit of the bottlers.

176. Plaintiffs' trust theory also overreaches because it overstates plaintiffs' interest in the trademark. Plaintiffs' interest in the trademark is limited to the context of the use of the trademark on Bottled Coca–Cola—not on "bottled soft drinks" as asserted by plaintiffs. *See* Plaintiffs' Proposed Findings of Fact and Conclusions of Law ¶ 1603 at 361. Any duty the Company may or may not owe to the bottlers because of the bottlers' interest in the trademark is therefore limited to use of the trademark on Bottled Coca–Cola. For example, a particular bottler may find distasteful the sale of "Coca–Cola t-shirts" or sponsorship by The Coca–Cola Company of a heavy metal rock-and-roll concert. The bottler whose sensibilities had been so offended would not, however, based upon his unamended contract, have a cause of action against the Company arising from the use of the trademark on the t-shirts or on posters for the concert.

177. Likewise, because diet Coke is not "Bottled Coca–Cola" for purposes of the unamended contract, the Company did not breach a fiduciary duty by applying to the trademark to a beverage not covered by the contract, especially in light of the lack of evidence in the record as to whether introduction of diet Coke has harmed plaintiffs' sales of Coca–Cola. For instance, the Court doubts the bottlers could assert a fiduciary duty claim against the Company for introducing "Coca–Cola Milk" without making it available under their current contracts.

178. Even if the Court finds no express or resulting trust in the trademark, plaintiffs assert the Court should impose a constructive trust upon the trademark due to an alleged "confidential relationship" between the parties.

179. A "confidential relationship" which would warrant imposition of a constructive trust occurs where, "because of family relationship or otherwise, the transferor is *in fact* accustomed to be guided by the judgment of the transferee or is justified in placing confidence in the belief that the transferee will act in the interest of the transferor." *Restatement (Second) of Trusts* § 44 comment c at 116. A "confidential relationship" may also arise between two persons where one has gained the confidence of the other and purports to

act or advise with the other's interest in mind. *Id.*

180. The Court agrees with Judge Schwartz' assessment that the bottlers and the Company are arms-length bargaining parties and that the plaintiffs are "far from reposing in [the Company] complete trust and confidence...." *Coke VI* at 74.

181. Even if a confidential relationship at one time existed between the bottlers and the Company, the history of negotiations leading to the 1978 and 1983 Amendments, where these plaintiffs in particular questioned the Company's good faith at every turn, indicate that such a confidential relationship no longer existed in 1978. The bottlers were certainly not in a confidential relationship with the Company when diet Coke was introduced in 1982, by which time the parties were adversaries in the *Elizabethtown* litigation.

182. Plaintiffs likewise attempt to characterize the Company's ownership of the formula for the syrup for Bottled Coca-Cola as legal ownership of a trust res for the benefit of plaintiffs, who possess equitable ownership.

183. As with the trademark, the Consent Decrees and unamended contracts impose obligations upon plaintiffs as well as the Company with respect to the syrup. For example, paragraph FOURTH(a) prohibits the bottler from manufacturing or selling a substitute or imitation of Coca-Cola and paragraph FOURTH(c) instructs the bottler to use one ounce of syrup in each standard Coca-Cola bottle.

184. As with the trademark, the imposition of bilateral obligations regarding the syrup shows that the parties intended not to create a trust but to create a bilaterally profitable relationship. Consequently, the Court finds no express trust nor any inferred intent to create a trust with respect to the syrup formula.

185. The Court will not impose a constructive trust because it finds that the parties are not in a confidential relationship with respect to the formulation of the syrup. Any confidential relationship with respect to the sweetener would arise from paragraphs FIRST, SECOND and FOURTH(a) of the unamended contracts.

186. Paragraph FIRST requires the Company to supply the bottlers with their requirements of Coca-Cola bottle syrup. In paragraph SECOND, the Company selects the bottler as its exclusive customer and licensee for the territory. In paragraph FOURTH(a), the bottler agrees "[n]ot to manufacture, deal in, sell, offer for sale, use or handle ..." any product that is a substitute for or imitation of Coca-Cola.

187. As with the provisions dealing with the trademark, the contract provisions which concern the syrup create bilateral obligations and benefits.

188. The Court notes that at least one bottler has seen fit to manufacture diet colas other than diet Coke. Tr. 556, 560–62 (W. Schmidt). The manufacture of another diet cola by a bottler would violate the unamended contracts if the Court interpreted the contracts to cover diet Coke.

189. Moreover, the Court found in *Elizabethtown* that the Company cannot unilaterally change the sweetener in syrup for Bottled Coca-Cola without the consent of the bottlers. *See Elizabethtown* Opinion issued this date at Count I ¶ 93.

190. Many bottlers have contracts to sell products not manufactured by the Company. *E.g.,* DX2458 at 38–40 (Wolslager) (Barq's Root Beer); DX2430 at 56–61 (Decora) (Orange Crush). Thus, the bottlers are not entirely dependent upon the Company for their livelihood. The unamended contracts prevent the bottlers only from bottling or selling a product which would compete directly with Coca-Cola. Otherwise the unamended contract allows bottlers to do business and to make a profit that is unrelated to the Company's obligation to supply syrup.

191. In this respect, the relationship between the Company and the bottlers vis-a-vis the syrup is nothing more than the usual relationship of a major supplier to its purchasers. The plaintiffs own bottling businesses that are distinct from the Company. Except for the fact that they may not sell products which compete with Coca-

Cola Bottle Syrup, plaintiffs are free to sell whatever they wish—apparently including products which compete with the allied brands.[11] The Company, on the other hand, cannot sell Coca–Cola Bottle Syrup to any bottler other than plaintiffs and has informally agreed to distribute syrups, such as diet Coke, which the Company does not consider covered by the contracts, exclusively through the bottlers. If anything, the Company is dependent upon the bottlers to generate its profit, while the bottlers have outside sources of income.

192. The Company may well have played hard ball by introducing diet Coke and pressing its advantage to persuade the bottlers to sign the 1983 Amendment. Such are the dynamics of long-term business relationships. In so doing, however, the Company breached no confidential relationship with the bottlers, and, therefore, the Court will not impose a constructive trust.

## CONCLUSIONS OF LAW

### Law of the Case

193. The law of the case doctrine provides that "judges of coordinate jurisdiction sitting the same court and in the same case should not overrule the decisions of each other." *TCF Film Corp. v. Gourley*, 240 F.2d 711, 713 (3d Cir.1957); *Rose Hall, Ltd. v. Chase Manhattan Overseas Banking*, 576 F.Supp. 107, 125 (D.Del. 1983), *aff'd without op.*, 740 F.2d 958 (3d Cir.1984), *cert. denied*, 469 U.S. 1159, 105 S.Ct. 909, 83 L.Ed.2d 923 (1985).

194. There is an exception to this general rule for situations wherein the original judge is unavailable to reconsider his decisions due to death, resignation, or disability. *Hayman Cash Register Co. v. Sarokin*, 669 F.2d 162, 168 (3d Cir.1982); *TCF Film Corp.*, 240 F.2d at 714; *Rose Hall, Ltd.*, 576 F.Supp. at 126. The retrial of these cases before me due to Judge Schwartz' illness may be viewed as an exceptional circumstance within the parameters of the exception to the general rule. As a consequence, I have the ability to reconsider Judge Schwartz' previous rulings; however, I should do so sparingly, keeping in mind the intent behind the law of the case doctrine, which is to provide judicial comity so as to preserve the orderly functioning of the judicial process. *Hayman Cash Register Co.*, 669 F.2d at 168; *TCF Film Corp.*, 240 F.2d at 714; *Rose Hall, Ltd.*, 576 F.Supp. at 125–26.

195. The law of the case doctrine applies only to "decisions" or "rulings" of the predecessor judge. The successor judge is not bound by dicta. At the outset, therefore, the Court will define the decisions of Judge Schwartz which are binding upon the Court and the parties in this litigation.

196. First, the Court and the parties are bound by Judge Schwartz' holding in *Coke III* that the term "sugar" as it is used in paragraph 10 of the 1921 Consent Decrees means "granulated sugar from cane or beet" and excludes non-sucrose sweeteners, such as high fructose corn syrup. *Coke III* at 1391. Judge Schwartz issued this decision after an extensive bench trial on the merits and adhered to it upon defendant's motion to amend the judgment. Neither party requested that I reconsider Judge Schwartz' *Coke III* sugar ruling in this litigation or in the *Elizabethtown* litigation, and in fact, both parties declined my offer to reconsider the *Coke III* rulings or to certify *Coke III* for immediate appeal. Transcript of conference (October 31, 1989), *Coca–Cola Bottling Co. of Elizabethtown, Inc. v. The Coca–Cola Co.*, C.A. Nos. 81–48/87–398 JJF (Consolidated) (Dkt. 882). Although *Coke III* was decided as part of the *Elizabethtown* litigation, it involved the same parties, the same Consent Decrees, and essentially the same evidence as the *diet Coke* cases. On the issue of the meaning of the term "sugar," principles of collateral estoppel prevent the parties from asserting a definition other than the one set forth in *Coke III*. *See diet Coke V* at 110.

197. The Court and the parties are also bound by the Preclusion Order entered in

---

**11.** At least one bottler sells Orange Crush—a product which presumably competes directly with Fanta Orange and Minute Maid Orange sodas—two allied brands. DX2430 at 56–61.

*diet Coke IV* as a result of the Company's refusal to produce the secret formula of Coca–Cola in discovery. Various provisions of the Preclusion Order are set forth where relevant in the Findings of Fact.

198. The defendant is also bound by its responses to plaintiffs' Requests for Admissions served November 19, 1986. *diet Coke VI.* The requests for admission and the Company's responses thereto are set out where relevant in the Findings of Fact.

■ 199. In *diet Coke I,* Judge Schwartz denied the bottler's motion for a preliminary injunction to allow them to purchase diet Coke syrup under the Temporary Amendment without waiving their interim rights. Judge Schwartz' reasoning in *diet Coke I* is not binding on the Court. To give Judge Schwartz' statements in *diet Coke I* law of the case effect would be to "[i]mproperly equate 'likelihood of success' with 'success'" on the merits. *University of Texas v. Camenisch,* 451 U.S. 390, 394, 101 S.Ct. 1830, 1833, 68 L.Ed.2d 175 (1981). "A party ... is not required to prove his case in full at a preliminary-injunction hearing, and the findings and fact and conclusions of law made by a court [at the preliminary injunction stage] are not binding at trial on the merits." *Id.* at 395, 101 S.Ct. at 1834.

200. In *diet Coke V,* Judge Schwartz granted defendant's motion for summary judgment on Counts Three, Four, and Five of the unamenders' complaint and Counts Four, Five, and Six of the amenders' complaint. Plaintiffs have not requested that I reconsider the grants of summary judgment, and they will not be permitted to raise these claims again directly or indirectly.

■ 201. In *diet Coke II,* Judge Schwartz denied a motion for summary judgment brought by the amenders based upon the terms of the 1978 Amendment. In *diet Coke V,* Judge Schwartz denied the parties' cross-motions for summary judgment on the contract claims of both the amenders and the unamenders based upon the unamended contracts. Judge Schwartz' comments on the issues on which he denied summary judgment are not "deci-sions" within the meaning of the law of the case doctrine and are not binding on the Court. *Kutner Buick, Inc. v. American Motors Corp.,* 868 F.2d 614, 619 (3d Cir. 1989) (holding that a statement by the district court in the course of denying summary judgment that there existed a material issue of fact as to the duration of an oral exclusivity term in a contract did not establish the existence of the oral exclusivity term for purposes of trial). Plaintiffs' arguments that the relative completeness of the factual record before Judge Schwartz should make his comments on the contract issues binding is unavailing. The only findings made when a court denies a summary judgment motion are whether factual issues are material and whether there are disputes of fact. Judge Schwartz himself believed that a trial was necessary to decide the contract issues. It would be anomalous to find statements made by Judge Schwartz in the course of deciding he needed a trial to decide the contract issues binding at trial on the contract issues. The task of making dispositive findings and conclusions is the work of this Opinion.

202. The decisions of Judge Schwartz in the *Elizabethtown* litigation are not the law of this case. To the extent, however, that there is identity of parties and issues, principles of collateral estoppel are applicable with respect to the *Elizabethtown* decisions. Judge Schwartz' reasoning in the *Elizabethtown* decisions, while persuasive, is not binding.

### Jurisdiction and Governing Law

203. The Company is a corporation organized and existing under the laws of the State of Delaware, and having its principal place of business in the State of Georgia. Each of the plaintiffs is a corporation that is incorporated in and has its principal place of business in a state other than Delaware or Georgia. The amount in controversy between each plaintiff and the Company exceeds $10,000, exclusive of costs and interest. The Court has subject matter jurisdiction pursuant to 28 U.S.C.A. § 1332(a)(1).

204. Despite the size and longevity of this litigation, Judge Schwartz' grant of partial summary judgment in *diet Coke V* has turned these actions into contract disputes between the bottlers and the Company. Delaware applies the principle stated in the *Restatement (Second) Conflicts of Law* § 188 (1971) that the law of the state with the most significant relationship to the transaction governs. *Coke V* at 918.

205. The state with the most significant relationship to the subject of each transaction is the state in which the principal place of business of each plaintiff is located. *See Coke V* at 918.

206. Interpretation of each plaintiff's contract will be governed by the law of the state in which that plaintiff's principal place of business is located.

207. The Consent Decrees bear a close nexus to the plaintiffs' bottle contracts. *Coke V* at 915. The Consent Decrees' delineation of the agreements between the Company and the parent bottlers informs the interpretation of the plaintiffs' bottling contracts. *Id.* at 916. For example, the syrup received by the actual bottlers cannot be different from that which the Company was bound by the Consent Decrees to deliver to the parent bottlers. *Id.*

208. In *United States v. Armour & Co.*, 402 U.S. 673, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971), the United States Supreme Court set forth the "four corners" test for interpreting a consent decree:

Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms. The parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation. Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation. Thus the *decree* itself cannot be said to have a purpose; rather the *parties* have purposes, generally opposed to each other, the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve. For these reasons, the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of on of the parties to it. . . . [T]he instrument must be construed as it is written, and not as it might have been written. . . .

*Id.* at 681–82, 91 S.Ct. at 1757. Thus, when construing the Consent Decrees, the first resort is to the "four corners" of the decrees, or in other words, to the words themselves. *See Halderman v. Pennhurst State School and Hospital*, 901 F.2d 311, 319 (3d Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 140, 112 L.Ed.2d 107 (1990). This does not mean, however, that the Court is limited to the words of the Consent Decrees. The Court may turn to certain aids in construction, such as the circumstances surrounding the formation of the consent order, any technical meaning words used may have had to the parties, and any other documents expressly incorporated in the decree. Such reliance does not in any way depart from the "four corners" rule of *United States v. Armour & Co. See United States v. ITT Continental Baking Co.*, 420 U.S. 223, 236–37 n. 10, 95 S.Ct. 926, 934–35 n. 10, 43 L.Ed.2d 148 (1975); *Allen–Myland, Inc. v. International Bus. Machines Corp.*, 746 F.Supp. 520, 542 (E.D.Pa. 1990); *Coke III* at 1397. However, the Court must keep in mind that both parties compromise to avoid litigation and the Court must take care not to upset the balance of interest reached through the compromise of the parties under the guise of interpreting the Consent Decrees.

### General Principles of Contract Interpretation

209. When interpreting a contract, the primary function of the Court is to ascertain the intention of the parties. 4 *Williston on Contracts* § 601 at 303–05.

210. The Court should give effect to the mutual intention of the parties at the time the contract is executed. The

Court should put itself in the position of the parties, looking forward from the time they entered into the contract. The Court should not view the contract from a position of hindsight. *Generally,* 4 *Williston on Contracts* § 607. This is especially true when interpreting perpetual contracts long after they were entered into. When interpreting perpetual contracts after a considerable period of time has passed since the time they were entered into, the Court resists the temptation to conform the contract to modern circumstances by adding contract terms not assented to originally. "Judicial construction of a contract requires a determination of the meaning of the language used, not the ascertainment of some possible but unexpressed intent of the parties." *Id.* § 600A at 287 (quoting *Hunt v. Triplex Safety Glass Co. of North America,* 60 F.2d 92, 94 (6th Cir.1932)).

 211. The Court should give the greatest weight to the express language of the contract itself, *Restatement (Second) of Contracts* § 203(b) at 93; *see also United States v. Armour & Co.,* 402 U.S. 673, 678, 91 S.Ct. 1752, 1755–56, 29 L.Ed.2d 256 (1971), as the words themselves are the best and most important evidence of the intention of the parties. 4 *Williston on Contracts* § 610A at 514. The meaning of words is dependent upon their context, and the contract should be interpreted as a whole. 4 *Williston on Contracts* § 618 at 710–11. An interpretation wherein the whole can be read so as to give significance to each part is preferred. *Restatement (Second) of Contracts* § 202(2) & comment d. Where possible, the meaning of a term should be consistent throughout the contract.

 212. While the Court may look to course of performance, prior course of dealing, and the circumstances surrounding the transaction, primary importance should be placed upon the words of the contract. 2 E.A. Farnsworth, *Farnsworth on Contracts* § 7.13 at 292–93 (1990). Extrinsic indicia of the intent of the contracting parties are secondary to the actual contract language. *Generally, Restatement (Second) of Contracts* § 202; *id.* § 203(b) at 92

("[E]xpress terms are given greater weight than course of performance, course of dealing, and usage of trade. . . .").

213. Although Judge Schwartz believed that in this case it was best to begin interpretation of the contracts by examining, in order, the course of dealing, the negotiations, and the course of performance, prior to examining the language of the contracts, *diet Coke V* at 114 n. 19, this Court does not agree. The evidence of the parties' dealings, especially their course of performance, is so replete with examples of arbitrary conduct and self-contradiction that the Court believes the soundest course is to follow traditional principles of contract interpretation and begin with the language itself.

 214. If the language of the contract is ambiguous, the Court may turn to extrinsic evidence. A contract term is ambiguous if it is subject to reasonable alternative interpretations. *Taylor v. The Continental Group Change in Control Severance Pay Plan,* 933 F.2d 1227 (3d Cir.1991) (citing *Mellon Bank, N.A. v. Aetna Business Credit, Inc.,* 619 F.2d 1001, 1011 (3d Cir.1980)). "In making the ambiguity determination, a court must consider the words of the agreement, alternative meanings suggested by counsel, and extrinsic evidence offered in support of those meanings." *International Union, U.A.W. v. Mack Trucks, Inc.,* 917 F.2d 107, 111 (3d Cir.1990) (quoting *Kroblin Refrigerated Xpress, Inc. v. Pitterich,* 805 F.2d 96, 101 (3d Cir.1986)).

215. The Court should not rewrite the contract for the parties. It is not the Court's function to change the obligations of the parties under a contract that they saw fit to make. 4 *Williston on Contracts* § 610A at 513. In applying the principles of contract interpretation, the Court "must guard against inadvertently reforming a contract 'under the guise of construction' by 'looking too intently for means of bringing about some ultimate good, thwarting an apparent wrong, or preventing hardship. . . .' " *Coke III* at 1397; *Coke 1920* at 805.

216. Courts do not rewrite contracts to include terms not assented to by the parties. *E.g., Levy v. Levy,* 130 Wis.2d 523, 388 N.W.2d 170, 174–75 (1986) ("In the guise of construing a contract, courts cannot insert what has been omitted or rewrite a contract made by the parties"); *E.E.E., Inc. v. Hanson,* 318 N.W.2d 101, 104 (N.D.1982) ("Normally, parties to a contract are allowed to write the terms of the contract themselves. A court may be called upon to interpret a contract written by the parties thereto but the court's authority to interpret a contract does not give a court the authority to modify it") (citation omitted); *Glantz Contracting Co. v. General Electric Co.,* 379 So.2d 912, 916 (Miss. 1980) ("Courts do not have the power to make contracts where none exist, nor to modify, add to, or subtract from the terms of one in existence") (quoting *Citizens National Bank of Meridian v. Glascock, Inc.,* 243 So.2d 67, 70 (Miss.1971)); *Stull v. Hicks,* 59 Ill.App.3d 665, 16 Ill.Dec. 874, 876, 375 N.E.2d 981, 983 (1978) ("We are mindful of the fundamental principle that a court may not make a new contract for the parties or rewrite their contract under the guise of construction.").

217. Absent illegality, mistake, fraud, duress or unconscionability, it is not within the Court's power to revise, modify, alter, extend, or remake the parties' contract to include terms not agreed upon by the parties. *Glantz Contracting Co. v. General Elec. Co.,* 379 So.2d 912 (Miss. 1980); *St. Joseph Data Service, Inc. v. Thomas Jefferson Life Ins. Co. of America,* 73 Ill.App.3d 935, 30 Ill.Dec. 575, 393 N.E.2d 611 (1979); *Stull v. Hicks,* 59 Ill. App.3d 665, 16 Ill.Dec. 874, 375 N.E.2d 981 (1978); *Low v. Davidson Manufacturing Co.,* 113 F.2d 364 (7th Cir.1940); *Texas Co. v. Todd,* 19 Cal.App.2d 174, 64 P.2d 1180 (1937).

218. The Court may reform a contract only when there is a mutual mistake of integration, *Restatement (Second) of Contracts* § 155 & comment a, unilateral mistake induced by fraudulent misrepresentation, *id.* § 166, or impossibility of performance, H. Hunter, *Modern Law of Con-tracts: Breach and Remedies* ¶ 12.03 & 12.04[2], [3] (1986). "If, however, the parties make a written agreement that they would not otherwise have made because of a mistake other than one as to expression, the Court will not reform a writing to reflect the agreement that it thinks they would have made." *Restatement (Second) of Contracts* § 155 comment b.

219. If there is a reasonable way to uphold the contracts despite changes in the business, the Court must give consideration to it. *See Coke VI* at 59. It is the task of the parties, not of this Court, to refashion the agreement to reflect new developments. *Id.* at 49–50. With these principles in mind, the Court turns to the language of the unamended contracts and Consent Decrees.

### Language of the Contract

220. As stated above, the evidence entitled to the greatest weight when interpreting a contract is the language of the contract itself.

221. Paragraph FIRST of the unamended contracts requires the Company to provide plaintiffs with their requirements of syrup for "Bottled Coca–Cola." In the same paragraph, the plaintiffs receive exclusive right to use the trademark on "Bottled Coca–Cola".

222. The unamended contracts do not define "Bottled Coca–Cola." Paragraph 10 of the 1921 Consent Decrees describes the syrup that the Company was to provide to the parent bottlers and which the parent bottlers would in turn provide to the actual bottlers under paragraph FIRST "to be high grade standard Bottlers Coca–Cola Syrup and shall contain not less than five and thirty two one-hundredths (5.32) pounds of sugar to each gallon of syrup." Because the actual bottlers obviously contracted to receive from the parent bottlers the same syrup which the parent bottlers received from the Company, the description of Bottlers' Coca–Cola Syrup in paragraph 10 of the Consent Decrees may be viewed as incorporated into the unamended con-

tracts as the description of the syrup for "Bottled Coca–Cola."

223. The fact that 5.32 pounds of sugar is the only ingredient of Bottled Coca–Cola specified in either the unamended contracts or the Consent Decrees gives the specification special importance.

224. Although plaintiffs assert that the unamended contracts evidence no intent to limit the meaning of the term Bottled Coca–Cola, this argument ignores the fact that the parties clearly specified that the syrup *"shall* contain" not less than 5.32 pounds of sugar per gallon. The argument also ignores that the lack of a more specific description of the syrup indicates that the unamended contracts and Consent Decrees clearly refer to a single sugar-sweetened product known to both parties.

225. As stated in the Findings of Fact, the scope of plaintiffs' trademark rights as conferred by paragraph FIRST of the unamended contracts—whatever those rights may be—is limited to the use of the trademark on "Bottled Coca–Cola." In other words, the scope of the term "Bottled Coca–Cola" determines the scope of plaintiffs' trademark rights, not vice-versa. Consequently, the fact that plaintiffs have an interest in using the trademark on "Bottled Coca–Cola" does not mean that diet Coke is "Bottled Coca–Cola" within the meaning of the unamended contracts or the Consent Decrees.

226. It is clear that diet Coke has never contained the only ingredient specified in the unamended contracts or the Consent Decrees—5.32 pounds of sugar per gallon. Consequently, the Court concludes the plain language of the contract weighs against finding the Company is required to supply diet Coke to plaintiffs under the pricing provisions of the unamended contracts.

227. Because the syrup to be provided pursuant to the unamended contracts is not described in great detail either in the contracts themselves or in the Consent Decrees, reasonable minds may differ as to the import of the plain language of the contracts and Consent Decrees. Consequently, the Court will turn to the extrinsic evidence offered by the parties in support of their respective positions to determine whether the plain language of the contracts is ambiguous. *International Union, U.A.W. v. Mack Trucks, Inc.,* 917 F.2d 107, 111 (3d Cir.1990). The Court concludes that the extrinsic evidence supports the conclusion that the unamended bottlers are not entitled to purchase diet Coke syrup from the Company under the pricing terms of the unamended contracts.

### Course of Performance

228. The most important extrinsic evidence of the parties' intent is the course of performance. 2 E.A. Farnsworth, *Farnsworth on Contracts* § 7.13 at 292–93 (1985); *Restatement (Second) of Contracts* § 203 at 92.

229. Plaintiffs argue strenuously that the course of performance evidence establishes that the scope of the unamended contracts extends to a "family" of Coca–Cola syrups of which diet Coke is a member and that the Company is required to supply them under the terms of their unamended contracts with every syrup which is called a "Coca–Cola."

230. Plaintiffs point to the evidence showing that from 1921 until diet Coke was introduced in 1982, the Company supplied them with each new formulation of Coca–Cola under the terms of the unamended contracts.

231. Until the introduction of caffeine-free Coca–Cola in 1983, however, each new formulation of syrup supplied by the Company under the terms of the unamended contracts was intended as a replacement for the previous version and not as an additional syrup. In other words, prior to introducing caffeine-free Coke, the Company did not offer multiple syrups under the unamended contracts. Consequently, the Company's treatment of diet Coke in 1982—before the introduction of caffeine-free Coca–Cola—as an additional syrup not covered by the unamended contracts was consistent with its prior course of performance of offering only one version of syrup for Bottled Coca–Cola at any time.

232. Plaintiffs also point to the evidence that, from 1980–1987, the Company supplied them with syrup sweetened with HFCS and which contained less than 5.32 pounds of sugar per gallon as syrup for Bottled Coca–Cola pursuant to the unamended contracts as proof of the proposition that the unamended contracts cover syrups which contain less than 5.32 pounds of sugar per gallon.

233. Plaintiffs neglect the fact that they initially contended this conduct was a breach of their contracts with the Company, arguing that the use of HFCS was contrary to the parameters of the unamended contracts and that they obtained a ruling from Judge Schwartz in *Coke III* that the Company could not substitute HFCS for sugar as the sweetener in the syrup without their consent. As of this date, there has been no such consent by the unamended bottlers, and the contracts and Consent Decrees have not been amended to provide for use of HFCS as a substitute sweetener.

234. In order for the terms of a contract to be amended, both parties must manifest assent to the changed terms. If one party alters its performance, such alteration may be considered as an offer to amend the contract, and acquiescence or assent by the other party with respect to the altered performance may be treated as an acceptance of the offer to substitute the changed terms. *Restatement (Second) of Contracts* § 287 & comment a.

235. The Company's provision to the plaintiffs of HFCS-sweetened syrup at a price based upon the price of sugar amounted to an offer to amend the scope of paragraph FIRST of the unamended contracts to include HFCS-sweetened syrup sold at a sugar-based price. The Court found in the *Elizabethtown* Opinion issued this date that plaintiffs have not accepted this offer. *See Elizabethtown* Opinion issued this date at Count I ¶ 94. The Court also held in its *Elizabethtown* opinion that Count II of plaintiffs' *Elizabethtown* complaint seeking to receive HFCS-sweetened syrup was not consent to the use of HFCS in place of sugar, but rather a counter-offer to amend the contract to cover provision of HFCS-sweetened syrup at a price based upon the price of HFCS. The Company has not accepted the counter-offer. *See Elizabethtown* Opinion issued this date at Count II ¶ 65.

236. Plaintiffs' argument also neglects the fact that after Judge Schwartz' ruling in *Coke III* and his adherence to that ruling in *Coke IV*, the Company began supplying the unamended bottlers who would not waive damages for overcharge during the pendency of the *Elizabethtown* litigation with syrup sweetened with at least 5.32 pounds of sugar per gallon.

237. The plaintiffs rely upon the Company's response to plaintiffs' Second Request for Admissions, wherein the Company agreed to stipulate that the syrup which it provided to plaintiffs pursuant to the unamended contracts, and which was sweetened with HFCS instead of sugar, is syrup for Bottled Coca–Cola within the meaning of the unamended contracts. According to plaintiffs, the Company's response forecloses it from asserting that the scope of the unamended contracts is limited to syrups containing at least 5.32 pounds of sugar per gallon. The admission, however, is only one piece of the course of performance evidence, and is consistent with the Company's contentions in the *Elizabethtown* litigation. Of course, Judge Schwartz reached a conclusion that rejected the Company's position and adopted the position of plaintiffs, who have since attempted to abandon it. The Court finds that the admission does not outweigh the other course of performance evidence, including the fact that the Company has supplied plaintiffs with sugar-sweetened syrup since 1987. Consequently, the course of performance evidence regarding treatment of HFCS-sweetened syrups does not prove by a preponderance of the evidence that plaintiffs are entitled to syrup sweetened with saccharin or aspartame pursuant to their unamended contracts.

238. As part of their course of performance argument, plaintiffs also argue that the Company's response to their Second

Requests for Admissions Nos. 22, 23, 24, 25 and 61, stipulating for purposes of this litigation that the syrups for new Coke, Coca–Cola Classic, caffeine-free Coca–Cola, and Cherry Coke are covered by the unamended contracts establishes that the phrase "syrup for Bottled Coca–Cola" in the unamended contracts encompasses a "family" of syrups.

239. Plaintiffs assign too much significance to the admissions. First, the Company's stipulations regarding Coca–Cola Classic, Cherry Coke, and caffeine-free Coke are perfectly in keeping with the letter agreements entered into by the parties regarding these syrups. Since the Company had already entered into agreements, modifying the unamended contracts to treat these three syrups as though they were covered by the unamended contracts, the Company had no reason not to stipulate that they were covered by the contract.

■ 240. The Company's decision to offer Coca–Cola Classic, Cherry Coke, and caffeine-free Coke according to the same terms as the unamended contract, like its offer of HFCS-sweetened syrup at a sugar-based price, amounts to nothing more than an offer by the Company, accepted by those plaintiffs who carry the soft drinks, to amend the unamended contracts to include Coca–Cola Classic, Cherry Coke, and caffeine-free Coke. The scope of the Consent Decrees and unamended contracts did not originally cover drinks like Cherry Coke and caffeine-free Coke. These drinks are currently treated as within the unamended contracts because those contracts have since been amended to include them. Just as the plaintiffs' acquiescence to the use of beet sugar did not throw open the door to HFCS–55, the Company's willingness to amend the contracts to cover Coca–Cola Classic, Cherry Coke and caffeine-free Coke did not throw open the door to diet Coke.

241. Plaintiffs' theory of a "family" of syrups covered by the unamended contracts is also negated by the evidence demonstrating plaintiffs' own course of performance.

242. Paragraph FIRST of the unamended contracts is in part a requirements contract obligating the Company to supply plaintiffs with their requirements of syrup for Bottled Coca–Cola.

243. Implicit in such a requirements contract is consideration given by a purchaser (here, the bottlers) of a reciprocal promise to purchase in good faith. 2 A.E. Farnsworth, *Farnsworth on Contracts* § 2.15 at 119 (1985) (citing § 2–306(a) of the Uniform Commercial Code). The promise to purchase in good faith means that a failure to purchase any goods would be an extreme case. *Id.* § 7.17 at 312–13.

244. In addition to the implicit consideration of good faith purchasing in paragraph FIRST, paragraph SIXTH specifically provides that failure on the part of the bottlers "to properly and vigorously push the sale of bottled Coca–Cola" results in a breach by the bottler of the unamended contract giving the Company the right to terminate.

245. Following the principle of contract interpretation that a term should be given the same meaning throughout a contract, it follows that the term "bottled Coca–Cola" must refer to the same syrup or syrups in paragraph FIRST as it does when used in paragraph SIXTH.

246. As noted in the Findings of Fact, many of the plaintiffs disagree with a construction of the unamended contracts which would place on them an obligation to push vigorously any soft drinks other than Coca–Cola Classic.

247. Moreover, numerous plaintiffs do not carry one or more of the seven syrups they assert comprise the "family" of Coca–Cola. At least three plaintiffs have never carried diet Cherry Coke.

248. Taken to its logical conclusion, plaintiffs' "family" of Coca–Cola theory would enable the Company to terminate pursuant to paragraph SIXTH the unamended contracts of those plaintiffs who do not carry, and particularly of those who have *never* carried, one or more of the products bearing the trademark "Coca–Cola" (especially if the product in question

were one of the syrups made available under the terms of the unamended contracts).

249. Given their obligations under paragraph SIXTH and the results which could spring therefrom if plaintiffs' theory were followed, the Court doubts that plaintiffs seriously contend that all seven syrups— new Coke, Coca–Cola Classic, caffeine-free Coca–Cola, Cherry Coke, diet Coke, caffeine-free diet Coke, and diet Cherry Coke—are syrups for Bottled Coca–Cola covered by the unamended contracts, including paragraph SIXTH.

250. Consequently, the Court concludes that the Company has offered to amend the unamended contracts to cover Coca–Cola Classic, caffeine-free Coke and Cherry Coke. The Company's offer has been accepted by plaintiffs to varying degrees. The offer has not thrown the door open to inclusion in the contract of diet Coke, nor has the Company ever made an offer to include diet Coke within the scope of the unamended contracts.

251. The Court concludes the course of performance evidence weighted equally. On the one hand, the Company has admitted that syrups other than new Coke, such as Coca–Cola Classic, Cherry Coke, and caffeine-free Coca–Cola, and syrups which are sweetened with HFCS and contain no sugar are syrups for Bottled Coca–Cola within the coverage of the unamended contracts. On the other hand, the admission came only after the unamended contracts of many plaintiffs had been amended by letter agreement between the Company and individual bottlers to include some of those syrups, namely Coca–Cola Classic, Cherry Coke, and caffeine-free Coke. In addition, after Judge Schwartz' sugar ruling in *Coke III*, the Company began to provide plaintiffs with syrup sweetened 100% with sugar. Further, assuming that all seven syrups currently bearing the trademark are within the coverage of the unamended contracts, the plaintiffs have not uniformly performed their obligations pursuant to paragraph SIXTH. Because the evidence is equally weighted, the course of performance evidence does not show by a preponderance of the evidence that the unamended contracts cover a "family" of Coca–Cola syrups which includes diet Coke.

Course of Dealing and Negotiations Leading to the 1921 Consent Decrees and Unamended Contracts

252. The Court finds, as it found in the *Elizabethtown* case, that sugar is a definitional characteristic of syrup for Bottled Coca–Cola. *See Elizabethtown* Opinion issued this date at Count II ¶ 117. The Court also finds that the requirement of 5.32 pounds of sugar per gallon of Coca–Cola Bottlers' Syrup in paragraph 10 of the Consent Decrees is "inextricably linked" to the use of the market price of sugar as the basis for the pricing provisions of the Consent Decrees and unamended contracts.

253. The evidence of course of dealing and negotiations leading to the Consent Decrees supports the express language of paragraph 10 defining syrup for Bottled Coca–Cola as syrup which contains 5.32 pounds of sugar per gallon.

254. The fact that the parties in 1920 were aware of the existence of alternative sweeteners means that they could have provided for use of sweeteners other than sugar in the Consent Decrees and unamended contracts if they so desired.

255. The fact that the parties did not provide for use of another sweetener and the fact that they based the pricing provisions on the use of sugar shows that they intended that the syrup for Bottled Coca–Cola for which they contracted contain 5.32 pounds of sugar.

256. The fact that 5.32 pounds of sugar per gallon is the *only* ingredient specified in the contracts between the Company and the bottlers gives the express language of paragraph 10 additional weight.

257. In light of the parties' course of dealing prior to entry of the Consent Decrees, it is likely that the requirement that the syrup contain 5.32 pounds of sugar per gallon would be viewed by the bottlers *in 1920* as advantageous to their interests and not as a limitation of their rights.

258. The evidence of the parties' course of dealing prior to entry of the Consent

Decrees and of the negotiations leading to the Consent Decrees does not support plaintiffs' assertion that they are entitled to compel the Company to provide them with syrup for diet Coke under the terms of their unamended contracts.

### *Plaintiffs' Fiduciary Duty Claims*

259. An express trust is created "only if the settlor properly manifests an intention to create a trust." *Restatement (Second) of Trusts* § 23 at 66; 5 A.W. Scott, *Scott on Trusts* § 404.1 at 3213 (3d ed. 1967). In order to do so, the settlor must express in definite terms his intention to subject himself to equitable duties to deal with the trust res for the benefit of the beneficiary. *Id.* § 2 at 6.

260. The language of the unamended contracts does not create an express trust in the trademark for plaintiffs' benefit because it fails to manifest in definite terms an intent to create a trust.

261. The terminology "implied trust" may refer to either a resulting trust or a constructive trust. A resulting trust exists because of inferred or presumed, rather than express, intent on the part of the property owner. Bogert, *Trusts* § 71 at 261 (6th ed. 1987). A resulting trust arises where a person disposes of property under circumstances which raise an inference that he does not intend the person taking title to have a beneficial interest in the property. 5 A.W. Scott, *Scott on Trusts* § 404.1 at 3213 (3d ed. 1967).

262. The three situations wherein a resulting trust arises are: (1) where an express trust fails in whole or in part; (2) where an express trust is fully performed without exhausting the entire trust res; and (3) where property is purchased and the person paying the purchase price directs that the property be conveyed to another. *Id.* § 404.1 at 3214; *Restatement (Second) of Trusts* § 404 comment a at 326.

263. The Court finds that the rights created in and the obligations imposed upon the Company and the bottlers with respect to the trademark were conferred in the context of compromise and negotiation and were intended to create a bilateral business relationship with respect to the mark. There is no inferred intent that the Company hold title to the trademark as a trust res for plaintiffs' benefit. Consequently, the Court concludes the Consent Decrees and unamended contracts do not give rise to a resulting trust in the trademark for the bottlers' benefit.

264. A constructive trust may be imposed by the Court to achieve equity. It may be imposed if one party abuses a "confidential relationship" to the detriment of the other party. *Restatement (Second) of Trusts* § 44 at 113.

265. A "confidential relationship" arises where one party reposes its trust and confidence in another party purporting to act in its interest. *Id.* § 44 comment c at 116.

266. No confidential relationship with respect to the trademark existed between the parties sufficient to warrant imposition of a constructive trust on the trademark.

267. Likewise, the obligations and rights set forth with regard to the syrup in the Consent Decrees and unamended contracts demonstrate an intent to create a bilateral business relationship and not a fiduciary or trust relationship. As a consequence, the Court concludes there is no express or implied trust in the formula for the syrup.

268. The Court finds persuasive on the fiduciary duty claims the case of *Worldvision Enterprises, Inc. v. American Broadcasting Companies, Inc.,* 142 Cal.App.3d 589, 191 Cal.Rptr. 148 (1983). The plaintiff in *Worldvision* was formed by former employees of the defendant's subsidiary to take over syndication of programs broadcast by the American Broadcast Companies, Inc. The evidence showed that:

Worldvision has continued to carry on the business of [the former syndication subsidiary] using the same key personnel and same worldwide sales organization with a few changes which occurred after 1975.... ABC recognized that its own

properties would be entrusted for syndication to persons with a business track record, to wit, their own employees of long standing.... In other words, a substantial selling point which I expressed to Rule was the mutual trust between ABC and their former employees—they could trust us with their properties and we could trust them with respect to fair dealings with these properties.... There was a very definite ongoing relationship which required confidence between the parties.... Worldvision ... reposed trust and confidence in ABC in that ABC would not do any act which would diminish the value of the syndication rights vested in Worldvision.

269. In *Worldvision,* defendant owned the network broadcast rights for the series "The Rookies" for five broadcast seasons beginning in fall 1972. Plaintiff was the owner of the syndication rights to "The Rookies," that is, the right to distribute the series to independent broadcasters and network affiliates for broadcast during hours not pledged to network programming beginning in the fall of 1977.

270. In May 1975, the president of defendant made certain remarks at the annual meeting of defendant's network affiliates to the effect that "The Rookies" occasionally dealt with violent themes and might not always be appropriate for family viewing. Plaintiff claimed that after these remarks, its customers were no longer interested in broadcasting "The Rookies" in syndication and plaintiff's syndication rights were rendered valueless.

271. The court found that the parties' respective ownerships of the network broadcast and syndication rights in the same product did not create a fiduciary relationship.

272. Despite plaintiff's claim that "[d]ue to the fact that properties syndicated by Worldvision are first possessed and broadcast by ABC on network television, ABC possesses great power to control, protect, advance, or destroy the syndication

rights in the properties in which Worldvision has a vested interest. Accordingly, ABC has great power to control the economic life of the properties they show," the court in *Worldvision* found that the same power existed between any important supplier of a business and his customer and that there was no fiduciary relationship.

273. The unamended bottlers have failed even to allege damage beyond pressure to sign a new contract. They have not alleged damages to either the trademark [12] or the formula. In terms other words, plaintiffs have failed to allege or prove damage to the res of any alleged trust.

274. The Court also finds there is no confidential relationship sufficient to justify imposing a constructive trust on either the trademark or the syrup formula. The contractual rights and obligations involving the syrup are bilateral. Moreover, plaintiffs do sell only syrups produced by the Company and have an opportunity to earn nonmutual profits, or profits unconnected to their contractual relationship with the Company. *Rickel v. Schwinn Bicycle Co.,* 144 Cal.App.3d 648, 192 Cal.Rptr. 732 (1983).

275. The Court may only invoke its equity powers when there is no adequate remedy at law. The plaintiffs assert that the Court should use its equity powers because the Company played hard ball by using the introduction of diet Coke as leverage to persuade them to enter into contracts which would require them to pay more for syrups.

276. Plaintiffs have an adequate remedy at law, however, because their contracts imply a duty on the part of the Company to deal with them in good faith. If the Company has acted in bad faith toward the bottlers, they have a cause of action at law for breach of contract. The bottlers for tactical reasons dismissed with prejudice their claim against the Company for breach of its duty of good faith and fair dealing. The Court will not create a fiduciary duty or confidential relationship where none exists so that plaintiffs, who for their own

---

**12.** Judge Schwartz granted summary judgment against plaintiffs on their trademark dilution claim in *diet Coke V.* Plaintiffs voluntarily dismissed with prejudice their cannibalization claims to avoid discovery of their finances.

**714**

reasons chose not to pursue their legal claims, can revive their good faith and fair dealing claim under the guise of equitable claims.

\* \* \* \* \* \*

In summary, the Court has noted that this case boils down to a contract dispute, albeit one of large proportions. Plaintiffs, as the party asserting breach, must show by a preponderance of the evidence that the Company's refusal to sell them the syrup for diet Coke under the terms of their unamended contracts breached those contracts. Plaintiffs have failed to satisfy this burden.

As has been stated, the Consent Decrees inform the unamended contracts. The Decrees require the Company to supply the bottlers with a syrup which contains 5.32 pounds of sugar per gallon of syrup. Sugar is the only ingredient of the syrup specified in either the unamended contracts or the Consent Decrees. Judge Schwartz, at plaintiffs' behest, ruled in *Coke III* that "sugar" as used in the Consent Decrees meant granulated sugar from cane or beet. Plaintiffs have not contested this ruling. Nobody argues that aspartame or saccharin, the two sweeteners used in diet Coke, are "sugar" for purposes of the unamended contracts and Consent Decrees.

diet Coke has never contained 5.32 pounds of sugar per gallon. The fact that diet Coke has never contained the one and only ingredient specified by the plain language of the Consent Decrees and unamended contracts is powerful evidence that diet Coke does not come within the scope of "Bottlers' Coca–Cola Syrup" covered by the unamended contracts and Consent Decrees.

So convincing is the plain language of the unamended contracts and the Consent Decrees, that the Court might have ended its analysis there. However, the fact that the description of the syrup covered was limited to only one ingredient plus the words "high grade" and "standard" persuaded the Court to examine the extrinsic evidence. The evidence of prior course of dealing and of the negotiations in 1920–21 support the inference arising from the language of the unamended contracts and

Consent Decrees that 5.32 pounds of sugar per gallon is a definitional characteristic of the syrup covered by the unamended contracts.

Much of plaintiffs' course of performance evidence is derived from actions taken by the Company during pendency of this and the related *Elizabethtown* litigations. Neither party's actions over the course of performance and especially over the course of this litigation withstands scrutiny. The course of performance and the positions with respect to the contracts taken by both sides may be charitably described as arbitrary, self-contradictory, and self-serving. Consequently, the Court's decision derives nothing from the fact that both sides have asserted contradicting and frequently changing positions during this and the *Elizabethtown* litigations.

In sum, based upon the evidence presented, the Court concludes that plaintiffs have not shown by a preponderance of the evidence that the Company breached the unamended contracts or the Consent Decrees when it refused to supply plaintiffs with diet Coke syrup under the pricing provisions of the unamended contracts.

The Court also finds that plaintiffs have failed to prove the existence of a fiduciary duty in relation to the trademark or syrup formula created by the unamended contracts. Despite plaintiffs' best efforts to characterize themselves as victims at the mercy of the Company's whims, the fact is that the plaintiffs are independent and for the most part very successful businesses. The evidence of the negotiations leading to the 1978 and 1983 Amendments and these plaintiffs' refusal to sign those amendments shows that plaintiffs do not repose a blind trust in the Company when it comes to matters affecting their bottom lines. The relationship between the parties is not that of trustee and beneficiary, but rather that of a mutually profitable business relationship.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW RELATED TO C.A. No. 83–120

FINDINGS OF FACT

1. The plaintiffs in C.A. No. 83–120 are bottlers who have amended their contracts

by signing what has become known as the "1978 Amendment." The 1978 Amendment amended the unamended contracts based upon the 1921 Consent Decrees and the Pre–Mix Agreements entered into by the Company and the bottlers during the 1950's. The following bottlers are plaintiffs in C.A. No. 83–120:

| COMPANY | PRINCIPAL PLACE OF BUSINESS AND STATE OF INCORPORATION |
|---|---|
| Martin Beverage Co., Inc. | Macomb, Ill. |
| Northern Neck Coca–Cola Bottling Co., Inc. | Montross, Va. |
| Rock Springs–Casper Coca–Cola Bottling, Inc. | Rock Springs, Wyo. |
| Coca–Cola Bottling Co. of Santa Fe | Santa Fe, N.M. |
| Wisconsin Dells Coca–Cola Bottling Co. | Wisconsin Dells, Wisc. |

---

Dkt. 317 at 17.[13]

2. The complaint in C.A. 83–120 is essentially identical to that filed by the unamenders in C.A. No. 83–95, except that it contains an additional count based upon the provisions of the 1978 Amendment. Those claims based upon the unamended portions of the bottling contracts and the 1921 Consent Decrees have been treated in the portion of this Opinion dealing with the unamended bottlers' claims and will not be repeated here.

3. Briefly, the 1978 Amendment modified the pricing of the syrup and created a pricing scheme consisting of a Base Element, a Sugar Element and an escalator tied to the Consumer Price Index. It also brought pre-mix within the parameters of the contracts for bottle syrup and gave amenders the option of receiving concentrate instead of syrup when and if the Company made concentrate available. In addition, the 1978 Amendment obligated the Company to provide greater marketing and advertising support to the bottlers in their territories, and it created a procedure for arbitration of disputes between the Company and the bottlers.

*The Language of the 1978 Amendment*

4. The amenders base their claims on a provision of paragraph 1(c) of the 1978 Amendment, which deals with establishing the price of the "Sugar Element" of the syrup and which states in relevant part:

In the event that the formula for Bottle Syrup is modified to replace sugar, in whole or in part, with another sweetening ingredient, the Company will modify the method for computing the Sugar Element in such a way as to give the Bottler the savings realized as a result of such modification through an appropriate objective quarterly measure of the market price of any such sweetening ingredient.

5. The Company asserts that paragraph 1(c) does not change the relationship between itself and the bottlers except to change the pricing provisions of the unamended contract. The Company is incorrect. The 1978 Amendment is the result of a bargaining process wherein the bottlers gave up significant rights they possessed under the unamended contract in exchange for benefits offered by the 1978 Amendment. In so doing, the bottlers who executed the 1978 Amendment changed the nature of their business relationship with the Company.

6. First, the bottlers gave up the syrup pricing formula of paragraphs 6 and 7 of the Consent Decrees and paragraph FOURTH(d) of the unamended contracts and agreed to the flexible pricing scheme of the 1978 Amendment whereby the price charged for syrup is comprised of a flexibly priced Base Element and a Sugar Element calculated by a formula.

**13.** Plaintiff Bunkie Coca–Cola Bottling Co., which is listed as a plaintiff in the Consolidated Pretrial Order, has since filed a dismissal with prejudice. Dkt. 340.

7. In addition to amending the pricing provisions, paragraph 1(c) amended paragraph FIRST of the unamended contracts to the extent it incorporated paragraph 10 of the Consent Decrees. As previously stated when it decided the claims of the unamenders, paragraph 10's requirement that the syrup for Bottled Coca–Cola contain no less than 5.32 pounds of sugar per gallon of syrup and its inextricable link to the pricing provisions meant that the Company was required to obtain the consent of the unamended bottlers before it could change the sweetener used in the syrup.

8. Paragraph 1(c) of the 1978 Amendment both removes the requirement of 5.32 pounds of sugar per gallon and disengages the use of sugar from the price of the syrup by providing for a pass through to the bottlers of any savings derived from use of an alternative sweetener.

9. By entering into the 1978 Amendment, the Company and the bottlers exchanged the bottlers' right to consent to any change in the sweetener for the Company's promise to pass through the savings derived from use of another sweetener.

10. As a result of the language in paragraph 1(c) of the 1978 Amendment, the Company can be required pursuant to paragraph FIRST of the amenders' bottling contracts as amended by the 1978 Amendment to supply the amended plaintiffs with their requirements of syrup for Bottled Coca–Cola which does not contain *any* sugar.

11. The 1978 Amendment worked other changes in the relationship between the Company and the amended bottlers. The parties knew prior to entering into the 1978 Amendment that the changed syrup pricing scheme would likely result in a higher price paid by the bottlers for a gallon of syrup. *See* PX876 (sheet used by the Company and distributed to the bottlers comparing reasons to sign the 1978 Amendment with reasons not to sign and listing as one of the reasons not to sign as "Price increases in the future").

12. In fact, even after the Company began sweetening the syrup with lower-priced HFCS and passing the savings to the amenders, the bottlers who signed the 1978 Amendment have consistently paid a higher price for a gallon of syrup than the unamended bottlers. DX647; DX649.

13. In return for giving up formula syrup pricing and the right to consent to changes in the sweetener, the amended bottlers received certain benefits in addition to the pass through of any sweetener savings.

14. In paragraph 3 of the 1978 Amendment, the Company promised to give the amended bottlers the option to purchase concentrate instead of syrup when and if the Company made concentrate available. *See also* PX876.

15. The Company in paragraph 4 pledged to use its best efforts to maintain national demand for Coca–Cola. The Company also promised to contribute at least 8¢ per gallon of syrup, to be matched by the bottler, to each bottler for local advertising and another 8¢ per gallon for local marketing and merchandising promotions. *See also* PX876.

16. Paragraph 4 thus created a much higher degree of cooperation between the Company and the bottler for generating demand for the product, and went far beyond the 5¢ per gallon of advertising material provided by the Company at cost under the unamended contracts. The 1978 Amendment involved the Company in the individual territories by creating cooperative efforts in local advertising and merchandising.

17. Consequently, the 1978 Amendment changed the nature of the business relationship between the Company and the bottlers from what it had been under the unamended contracts.

18. Under the Preclusion Order entered by Judge Schwartz in *diet Coke IV*, the Court must find that the formula for diet Coke is identical, except for the sweetener, to the formulae sold by the Company as Coca–Cola Bottlers Syrup both before and after the introduction of new Coke in 1985. Preclusion Order, *diet Coke IV* at 374 ¶ 2(c) ("the formula for diet Coke is significantly more like the formula for old Coke than the formula for any other version of Coca–

Cola, including new Coke and caffeine-free coke is like the formula for old Coke"); *id.* at 374 ¶ 2(f) ("99% of the total number of ingredients in diet Coke and old Coke, and in diet Coke and new Coke, are the same"); *id.* at 374 P 2(i) ("the ingredient differences between diet Coke syrup and Coca–Cola Classic syrup are less significant between the two syrups as a whole, involve fewer ingredients and less significant ingredients from the standpoint of the ingredient composition, chemical composition, and formulae than the ingredient differences which exist between the syrup for Coca–Cola Classic and the syrup for new Coca–Cola, which was introduced by defendant on August 25, 1985, and has been sold by defendant as 'Coca–Cola Bottler's Syrup' within the meaning of its contracts with plaintiffs since that date"); *id.* at 375 ¶ 2(1)(1) ("diet Coca–Cola syrup contains the identical quantities of Merchandise 7X, Merchandise No. 5, extract of vanilla, and caffeine as the syrup which defendant formulated and sold to plaintiffs and other bottlers as 'Coca–Cola Bottler's Syrup' during the period from January 27, 1980 through the end of April 1985 (which is the same syrup that defendant is now selling to plaintiffs under the name 'Coca–Cola Classic' syrup").

19. Pursuant to the Preclusion Order, the Court must also find that defendant formulated diet Coke to match the taste, aroma, mouthfeel, and all other organoleptic properties of the bottled Coca–Cola as it existed during that period. *Id.* at 375 ¶ 2(i)(1); *id.* at 375 ¶ 2(1)(3) ("differences in formula, chemical composition, ingredient composition, taste, and other physical organoleptic properties between diet Coke syrup and the syrup which defendant sold as Coca–Cola Bottler's Syrup between 1980 and April 1985 (and which defendant is now selling as Coca–Cola Classic syrup) are much less significant, much fewer in number, and much less noticeable to the consumer than: (i) those differences between Coca–Cola Classic syrup and the earlier versions of 'Coca–Cola Bottler's Syrup' that the defendant had formulated and sold to bottlers under their contracts between 1899 and the current date; (ii) those differ-

ences between the syrup for new Coca–Cola which was introduced by defendant in April 1985 and all previous syrups which the defendant has sold to bottlers as 'Coca–Cola Bottler's Syrup' under their contracts; (iii) those differences (except taste and physical organoleptic properties) between the syrup for caffeine-free Coca–Cola and the syrup for Coca–Cola Classic; and (iv) those differences between some of the versions of Coca–Cola Bottler's syrup manufactured and sold by defendant between 1899 and 1980, and other versions of Coca-cola Bottler's Syrup sold by defendant to bottlers as 'Coca–Cola Bottler's Syrup' during that period"); *id.* at 376 ¶ 2(n) ("except for the different sweeteners, the bottle syrup sold by defendant to the bottlers in the United States for the production of bottled diet Coke contains precisely the same ingredients, in identity, number, and quantity, as the bottle syrup sold by defendant to the bottlers in the United States for the production of: (1) Coca–Cola (made according to the new formula introduced in April, 1985); *and/or* (2) Coca–Cola Classic (made according to the original formula); *and/or* (3) caffeine-free Coca–Cola"); *id.* at 376 ¶ 2(p) ("the secret ingredients in Coca–Cola *and/or* Coca–Cola Classic are identical to the secret ingredients in diet Coke and are used in the same relative quantities").

20. Based upon the findings compelled by the Preclusion Order, the Court finds that the Company has produced diet Coke by replacing sugar in the syrup for Bottled Coca–Cola with saccharin, aspartame or a saccharin-aspartame blend.

21. The Company has admitted that neither saccharin nor aspartame are "sugars." Additional Admitted Facts ¶ 59 at 128.

22. Both saccharin and aspartame are sweeteners.

23. Consequently, in terms of formula, diet Coke is a modified version of Bottle Syrup wherein sugar has been replaced by another sweetening ingredient within the express language of paragraph 1(c) of the 1978 Amendment.

24. Whether the 1978 Amendment so changed the previous relationship between

the Company and the bottlers that it entitles the amended bottlers to receive diet Coke under the pricing terms of paragraph 1 depends upon the meaning of the terms "Bottle Syrup" and "another sweetening ingredient" as they are used in paragraph 1(c) of the 1978 Amendment.

25. It is clear that the term "Bottle Syrup" does not have exactly the same meaning as the term "Coca–Cola Bottlers' Syrup" used in the Consent Decrees. "Coca–Cola Bottlers' Syrup" as used in the Consent Decrees means a syrup containing not less than 5.32 pounds of sugar per gallon. As stated above, the "Bottle Syrup" referenced in paragraph 1(c) of the 1978 Amendment need not contain 5.32 pounds of sugar per gallon.

26. The Company argues that the syrup for diet Coke is not "Bottle Syrup" within the meaning of the 1978 Amendment because the syrup referred to as "Bottle Syrup" in the contracts appeals to the high calorie soft drink market, an entirely different market than the low calorie or diet soft drink market to which the Company alleges diet Coke appeals.

27. The express language of the 1978 Amendment nowhere indicates a distinction between high calorie and low calorie soft drink markets nor any intent that the syrup covered by the Amendment be limited to syrup for high calorie soft drinks.

28. It is unclear from the face of the 1978 Amendment, however, whether the term "Bottle Syrup" includes more than a single syrup at any given time, or in other words, encompasses "additional" syrups.

29. The Company argues that the term "another sweetening ingredient," as used in paragraph 1(c) of the 1978 Amendment, should be limited to nutritive sweeteners developed for use in soft drinks. The Company also argues that the term "another sweetening ingredient" should be limited to "new" sweeteners developed after 1978.

30. diet Coke has always been sweetened with saccharin, aspartame, or a blend of the two.

31. The Company argues saccharin is not "another sweetening ingredient" within the meaning of paragraph 1(c) because it is not a "new" sweetening ingredient and was used in diet soft drinks, including TaB, prior to and during the 1978 negotiations.

32. The Company also argues that aspartame, though not produced for use in soft drinks until 1983, Admitted Facts ¶ 195 at 93, is not "another sweetening ingredient" because it is not a "nutritive sweetener," which the Company defines as a sweetener "having greater than 2 percent of the caloric value of sucrose per equivalent amount of sweetening capacity." *See* 21 C.F.R. § 170.3(*o*)(21) (1990). The Company applies the same "nutritive sweetener" argument to saccharin.

33. The express language of the 1978 Amendment does not limit the term "another sweetening ingredient" to either a "new" sweetener or a "nutritive" one.

34. It remains unclear, however, from the face of the 1978 Amendment whether it amended paragraph FIRST of the unamended contracts to bring diet Coke within the scope of the term "syrup for Bottled Coca–Cola." Consequently, the Court must look beyond the words of the 1978 Amendment to determine whether the amended bottlers are entitled to purchase their requirements of diet Coke pursuant to the terms of the 1978 Amendment.

*Course of Performance, 1978–present*

35. Although much of the course of performance evidence in this case is the same as that in C.A. No. 83–95, the post–1978 course of performance evidence will be reviewed here from the perspective of the amended bottlers.

Replacement of Sugar by HFCS–55 as the Sweetener in the Syrup Supplied by the Company as Syrup for Bottled Coca–Cola

36. In January 1980, the Company reformulated the syrup received by the bottlers. For the first time since the 1978 Amendment was entered into, the Company changed the sweetener used in the syrup. In January 1980, the Company began to substitute HFCS–55, a high fructose corn sweetener which contains no sugar from cane or beet, for 50% of the sugar in the

syrup received by the bottler. This reduced the amount of sugar in the syrup to less than 5.32 pounds per gallon. Admitted Facts ¶ 171 at 89.

37. The syrup sweetened in part with HFCS–55 was intended by the Company to replace the previous version of the syrup. The Company stipulated in response to plaintiffs' Second Requests For Admissions No. 61(a) that this syrup was Coca–Cola Bottler's syrup covered by the unamended contract and the 1978 Amendment. *diet Coke VI* at 99.

38. Pursuant to paragraph 1(c) of the 1978 Amendment, the Company passed through to the amended bottlers the savings resulting from the use of cheaper HFCS in place of some of the sugar. The Company continued to charge the unamended bottlers a syrup price based upon the market price of sugar.

39. The percentage of HFCS–55 to sugar in the syrup was increased to 75%–25% in February 1984. PX1807. The Company stipulated in response to plaintiffs' Second Requests For Admissions No. 61(b) that this syrup was Coca–Cola Bottler's syrup covered by the unamended contract and the 1978 Amendment. *diet Coke VI* at 99. The Company passed the additional savings through to the unamended bottlers pursuant to paragraph 1(c) of the 1978 Amendment, and continued to charge the unamended bottlers a price based upon the market price of sugar.

40. In November 1984, the Company began sweetening the syrup with 100% HFCS–55 and no "sugar." The Company stipulated in response to plaintiffs' Second Requests For Admissions No. 61(c) that this syrup is Coca–Cola Bottler's syrup covered by the unamended contract and the 1978 Amendment. The Company passed the additional savings through to the unamended bottlers pursuant to paragraph 1(c) of the 1978 Amendment, and continued to charge the unamended bottlers a price based upon the market price of sugar.

41. The Company continues to supply the amended bottlers with syrup sweetened by HFCS and continues to pass through the resultant savings in accordance with the 1978 Amendment.

### Introducing diet Coke

42. The Company introduced diet Coke on July 8, 1982.

43. Diet Coke was sweetened with saccharin when it was introduced. When aspartame was approved for use in soft drinks, the Company began to sweeten diet Coke with aspartame instead of saccharin.

44. Pursuant to the Preclusion Order entered by Judge Schwartz in *diet Coke IV,* the Court must find that the formula for diet Coke, except for the sweetener, is identical to the formulae for both the syrup offered to the bottlers as Bottled Coca–Cola pursuant to their contracts as amended prior to April 1985 (which is now marketed as "Coca–Cola Classic") and to the syrup offered since April 1985 under their contracts as Bottled Coca–Cola ("new Coke"). Preclusion Order, *diet Coke IV; see supra* C.A. 83–120 at ¶¶ 18–23.

45. The Court must also find pursuant to the Preclusion Order that defendant formulated diet Coke to match the taste, aroma, mouthfeel, and all other organoleptic properties of the bottled Coca–Cola offered by the Company both before and after April 1985. *See supra* C.A. 83–120 at ¶¶ 18–23.

46. In light of the findings which the Court must make under the Preclusion Order, diet Coke fits within the literal wording of Paragraph 1(c) of the Temporary Amendment describing a scenario in which "the formula ... is modified to replace sugar, in whole or in part, with another sweetening ingredient...." *See supra* C.A. 83–120 at ¶¶ 18–23.

47. Unlike the reformulation of the syrup to use HFCS–55 in place of sugar, the Company intended to offer diet Coke as an additional syrup. The Company did not offer diet Coke to the amended bottlers under the terms of the 1978 Amendment. Rather, the Company offered diet Coke under terms similar to the flexibly-priced TaB. Admitted Summary Judgment Facts ¶ 132 at 151. Tr. 1462–65; Tr. 1199; Tr. 1205–06.

48. The Bottlers Association, of which all plaintiffs were members, formed an Ad Hoc Committee to negotiate the contractual issues related to diet Coke. Tr. 659; Tr. 1200; DX1623 at 1–2. The Ad Hoc Committee included large and small bottlers, urban and rural bottlers, and unamended and amended bottlers. DX1623 at 1–2; Tr. 1202; Tr. 745.

49. Although the Ad Hoc Committee negotiated on behalf of the bottlers, both the Company and the bottlers recognized that each bottler individually would have to reach agreement with the Company as to the terms under which he would receive diet Coke. DX2416 at SH000706; Tr. 658; Tr. 749–50.

50. The Company offered to negotiate diet Coke pricing terms in two phases. Phase I involved a so-called "Temporary Amendment" which would govern until a permanent pricing scheme could be negotiated. The Temporary Amendment established a formula pricing mechanism for diet Coke tied to the existing "base element" of TaB plus sweetener costs and an escalator based on the Consumer Price Index. DX166(b).

51. The Temporary Amendment contains the following language:

9. It being the intent and purpose of the Bottler and the Company that this Agreement shall in no way prejudice nor otherwise affect their respective rights and obligations under the Bottle Contract or from any other source nor their respective legal or equitable claims, the Bottler and the Company expressly stipulate that this Agreement shall have no such effect. It is further agreed, however, that during the period this Agreement is in effect, the price of diet Coca–Cola shall be determined solely under this agreement.

DX166(b).

52. Plaintiffs at first refused to sign the Temporary Amendment, Admitted Summary Judgment Facts ¶ 51 at 150, and filed suit in this Court in 1983 in part seeking an injunction allowing them to receive diet Coke under an amended version of the Temporary Amendment deleting paragraph 9 quoted above.

53. Judge Schwartz denied the motion for a preliminary injunction in *diet Coke I.*

54. After Judge Schwartz denied the preliminary injunction motion, plaintiffs signed the Temporary Amendment. Admitted Summary Judgment Facts ¶ 54 at 140.

55. Phase II of the negotiations resulted in the 1983 Amendment, which covers the sale and pricing of sugar-free colas, caffeine-free Coca–Cola, diet Coke and TaB, other cola syrups, and existing and unknown future bottle syrups sold under the Coca–Cola trademark. Admitted Summary Judgment Facts ¶ 50 at 140.

56. The 1983 Amendment was withdrawn in 1987 after four months' notice that the Company intended to withdraw the amendment. Those bottlers who have not signed the 1983 Amendment continue to receive diet Coke syrup under the terms of the Temporary Amendment.

### Introduction of Caffeine–Free Coca–Cola and Caffeine–Free diet Coca–Cola

57. The Company introduced caffeine-free Coca–Cola and caffeine-free diet Coke in April 1983. Admitted Facts ¶ 186 at 92. Neither product was foreseen in 1978. Admitted Facts ¶¶ 187–88 at 92. Caffeine-free Coca–Cola and caffeine-free diet Coke were not intended to replace the existing versions of Coca–Cola and diet Coke. Rather, like diet Coke, they were offered as additional syrups.

58. Pursuant to the Preclusion Order, the Court must find that the formula for diet Coke is more like the formula for the syrup being sold to plaintiffs under the unamended contracts in April 1983 (now sold as "Classic Coca–Cola") and the formula for new Coke (sold to plaintiffs as Bottled Coca–Cola since 1985) than is the formula for caffeine-free Coca–Cola. Preclusion Order *Diet Coke IV* at 374 ¶ 2(c) & (d).

59. "[C]affeine-free Coca–Cola syrup is the same from the standpoint of chemical composition, ingredient composition, and formulae as the syrup which the defen-

dant was selling as "Coca–Cola Bottler's Syrup" during the period 1980 through April 1985 (and which defendant is now selling as Coca–Cola Classic syrup), notwithstanding the fact that the caffeine-free Coca–Cola syrup does not contain (1) kola nut extract, (2) caffeine, (3) extract of vanilla, all of which have been ingredients in every previous version of Coca–Cola Bottler's syrup" manufactured and sold by defendant to the bottlers under their contracts from 1899 to the current date, and (4) that caffeine-free Coke uses a modified form of Merchandise 7X."

*Id.* at 375 ¶ 2(k).

60. Except for different sweeteners, diet Coke is exactly the same as caffeine-free Coca–Cola. *Id.* at 376 ¶ 2(n)(3). Diet Coke was intended to duplicate the taste and appearance of caffeine-free Coca–Cola. *Id.* at 376 ¶ 2(*o*)(3).

61. The Company entered into letter agreements with the bottlers providing that:

> The terms of the BOTTLER'S BOTTLE CONTRACT [either the unamended contracts of the 1978 Amendment] ... shall be applicable to the sale by the Company to the Bottler of syrup for the manufacture of Caffeine Free Coca–Cola, and the bottler and the Company will be entitled to all the rights and subject to all the obligations contained in the Bottler's Contract, as hereby amended, as if Caffeine Free Coca–Cola were included in the Bottler's Contract.

CX35C. The Company sells the syrup for caffeine-free Coca–Cola to the amended bottlers at the same price as the syrup for Bottled Coca–Cola.

62. The letter agreement applies to caffeine-free Coca–Cola, but not to caffeine-free diet Coke.

63. The letter agreement also contains a waiver clause similar to that in the TaB contract:

> It being the intent and purpose of the Bottler and the Company that this letter and the agreement set out herein shall in no way prejudice or otherwise affect their respective rights and obligations

under the Bottler's Contract ... or from any other source, or the respective legal or equitable claims, the Bottler and the Company expressly stipulate that this letter and the agreement contained herein shall have no such effect.

CX35C

64. In response to plaintiffs' Second Requests for Admissions No. 24 served on defendant November 19, 1986, the Company replied:

> [T]he Company is willing to stipulate solely for purposes of this litigation if the plaintiffs so desire, that the bottle syrup for caffeine-free Coca–Cola is Coca–Cola Bottle Syrup within the meaning of the unamended Coca–Cola Bottle Contract and the 1978 Amendment.

*diet Coke VI* at 100.

### Introduction of Cherry Coke

65. The Company introduced Cherry Coca–Cola and diet Cherry Coke in 1985. Additional Admitted Facts ¶ 70 at 129. These products were not foreseen 1978. Additional Admitted Facts ¶ 41 at 125.

66. As with caffeine-free Coca–Cola, the parties entered into separate letter agreements governing Cherry Coke, but not diet Cherry Coke. The letter agreements for Cherry Coke likewise provided that Cherry Coke would be supplied pursuant to the unamended contract or 1978 Amendment (whichever the particular bottler operated under) and contained the same reservation of rights paragraph quoted above in association with the caffeine-free Coca–Cola letter agreements. CX35E. Consequently, the amended bottlers receive Cherry Coke syrup at the same price as they receive syrup for Bottled Coca–Cola and syrup for caffeine-free Coca–Cola.

67. In response to plaintiffs' Second Requests for Admissions No. 25 served on defendant November 19, 1986, the Company replied:

> [T]he Company is willing to stipulate solely for the purposes of this litigation, if the plaintiffs so desire, that the bottle syrup for Cherry Coke is Coca–Cola Bottle Syrup within the meaning of the un-

amended Coca–Cola Bottle Contract and the 1978 Amendment.

*diet Coke VI* at 100.

### Introduction of new Coke

68. The Company introduced new Coke in April 1985. Like the pre–1980 formula changes and the substitution of HFCS–55 for sugar in the syrup, new Coke was not originally intended as an additional syrup, but rather was intended to replace the previous version of Bottled Coca–Cola syrup sold to plaintiffs pursuant to the unamended contracts and the 1978 Amendment. Additional Admitted Facts ¶ 70 at 129; Admitted Summary Judgment Facts ¶¶ 234–35 at 172.

69. New Coke has always been sweetened with HFCS, and the Company offered new Coke to the amended bottlers at a price calculated pursuant to paragraph 1(c) of the 1978 Amendment.

70. Pursuant to the Preclusion Order, the Court must find:

[T]he syrup for "new Coca–Cola," which was introduced by the defendant in April, 1985, is "Coca–Cola Bottler's Syrup" and is encompassed by plaintiffs' contracts with the defendant, despite the fact that the syrup for new Coca–Cola is produced by an entirely new and different formula, with materially different ingredients (including secret ingredients), a materially different flavor profile, and a materially different taste than the version of "Coca–Cola Bottler's Syrup" that was being produced by the defendant and supplied to the plaintiffs under their contracts immediately prior to the introduction of new Coca–Cola syrup; and that the syrup for new Coca–Cola also materially differs in all of the respects enumerated above from any earlier version of Coca–Cola bottler's Syrup" which defendant has ever produced and is materially different from an ingredient standpoint from any of those earlier syrups. The ingredient differences between new Coca–Cola syrup and the version of Coca–Cola bottler's syrup which the defendant was selling to plaintiffs as "Coca–Cola Bottler's Syrup" from 1980 through April 1985, and which was replaced by new Coca–Cola, are major and material and include the following:

(1) new Coca–Cola syrup is produced according to a new formula that is not a modification, extension, or improvement of the original Coca–Cola formula;

(2) new Coca–Cola does not use Merchandise 7X, the emulsion of secret ingredients which is the core of and the most significant part of the original Coca–Cola formula, and which was used without change by defendant in every previous syrup produced by defendant that has used the Coca–Cola or Coke trademarks since the formula for Coca–Cola was first developed in 1886, including diet Coca–Cola, but excluding caffeine-free Coca–Cola, which contains a modified form of Merchandise 7X;

(3) none of the secret ingredients in new Coca–Cola are common with the secret ingredients in Merchandise 7X or Merchandise No. 5; and

(4) the use of different secret ingredients in new Coca–Cola gives new Coca–Cola a flavor complex, "flavor profile," and taste that is materially different from the flavor complex, profile and taste of the version of Coca–Cola Bottler's Syrup" which [was] sold to bottlers from 1980 through April 1985 (and now sells as the syrup for "Coca–Cola Classic"), and all of which are major, significant, and give new Coke a significantly different taste.

*diet Coke IV* at 376 ¶ 2(m).

71. New Coke is distinguishable by taste from the previous version of Coca–Cola. *Id.* at 376 ¶ 2(m).

72. Because of unfavorable market reaction to the formula change, the Company reintroduced the previous version of the formula under the name "Coca–Cola Classic" or "Classic Coke." Admitted Summary Judgment Facts ¶ 234 at 172. Admitted Summary Judgment Facts ¶ 234 at 172.

73. Coca–Cola Classic did not replace the version of syrup (new Coke) then being sold to the bottlers pursuant to their contracts as syrup for Bottled Coca–Cola.

Rather, the syrup for Coca–Cola Classic was offered as an additional syrup.

74. The Company by letter informed the amended bottlers that it would make syrup for Coca–Cola Classic available to them pursuant to the terms of the 1978 Amendment. The Company did so with the understanding that the contract rights of all parties would be reserved:

[T]he Company will fill orders for Coca–Cola [C]lassic from any Coca–Cola Bottler without additional contractual agreement or exchange of correspondence at this time. We may well take the position in the future that some clarification of our respective rights and obligations is appropriate. Your purchase of syrup from us under this letter, however, will not be claimed by us to have prejudiced in any way your right to assert any contractual position you think is appropriate in the future, nor do we intend to be prejudiced by such sales in our right to assert any contractual position we think appropriate.

DX651.

75. In response to plaintiffs' Second Requests for Admissions Nos. 23 and 61(d), the Company admitted that the syrup for new Coke was Coca–Cola Bottler's Syrup covered by the unamended contracts even though it was sweetened 100% with HFCS and contained no "sugar." The Company also admitted that the syrup for new Coke was covered by the 1978 Amendment. *diet Coke VI* at 99.

76. In response to plaintiffs' Second Requests for Admissions No. 61(e), the Company admitted that the syrup for Coca–Cola Classic was Coca–Cola Bottler's Syrup covered by the unamended contracts and the 1978 Amendment. *Id.*

77. Plaintiffs assert that the syrups for new Coke, Coca–Cola Classic, caffeine-free Coca–Cola, Cherry Coke, diet Coke, caffeine-free diet Coke, and diet Cherry Coke comprise a "family" of Coca–Cola syrups which the Company is required to provide to plaintiffs under the terms of the 1978 Amendment.

78. Plaintiffs assert that the Company's responses to their Second Requests for Admissions that the syrups for new Coke, Coca–Cola Classic, caffeine-free Coca–Cola and Cherry Coke are all Coca–Cola Bottler's Syrup covered by the 1978 Amendment establishes that the scope of the 1978 Amendment includes more than a single syrup and syrups sweetened with sweeteners other than 5.32 pounds of sugar per gallon.

79. The 1978 Amendment did not amend paragraph SIXTH of the unamended contracts. Like their unamended counterparts, the amenders believe that paragraph SIXTH does not require them to push vigorously the entire alleged "family" of syrups. It appears the Martin Bottler did not carry caffeine-free Coca–Cola in 1986–87, DX255, and the Rock Springs Bottler did not carry caffeine-free Coca–Cola in 1987. DX255.

80. A representative of the Martin Bottler testified that his contract as amended by the 1978 Amendment required the Company to offer to sell to him any new product bearing the trademark, but the same contract gave him an option whether or not to purchase a particular Coca–Cola product based upon demand in his territory. DX2442 at 83–86 (deposition of Everett Martin).

81. A representative of the Rock Springs Bottler testified in response to a question describing the hypothetical introduction of a product called "Orange Coca–Cola" that he would have the *right* to purchase it under the pricing provisions of the 1978 Amendment but was not under any *obligation* to purchase it. He testified that his contract as amended by the 1978 Amendment gives him the right to accept or refuse a new brand introduction bearing the "Coca–Cola" trademark. He interprets paragraph SIXTH of the unamended contract, which continues to apply to the amended bottlers, as requiring that he properly and vigorously push a syrup only if he chooses to accept that syrup for sale in his territory. In other words, according to this bottler, there is no obligation to push a syrup he refuses to take even if that syrup bears the trademark "Coca–

Cola." DX2430 at 60–61 (deposition of Joe Decora).

### Negotiations Leading to the 1978 Amendment

82. Preliminary discussions regarding an amendment to the actual bottlers' contracts were first held in 1975. DX59. These discussions were terminated because the parties were concerned they might jeopardize their defense against a pending FTC challenge to the exclusive bottling territories. PX1873 at 13–14 (Blanchard dep.).

83. In July 1977, the Company prepared an internal draft contract amendment which was never circulated outside the Company. Admitted Facts ¶ 146 at 83. Like the eventual 1978 Amendment, the July 1977 draft included pricing for a "Base Element" and a "Sugar Element." Regarding the Sugar Element, the 1977 draft included the following language:

> COMPANY reserves the right to substitute for sugar in Coca–Cola Syrup a non-sucrose sweetener in an amount to be determined by COMPANY at an average price per pound to be determined by a process identical or substantially similar to the process described in this subparagraph (2) with respect to sugar.

PX1034.

84. The Company in 1977 initiated the discussions which would lead to the 1978 Amendment. The Company's intention was to gain relief from the fixed pricing provisions of the unamended contracts. PX1928 at 2035–36 (Blanchard); Tr. 1136 (Cowart).

85. A "Headquarters Team," consisting of Luke Smith (then-President of the Coca–Cola Company), Donald Keough (then-Vice President of the Americas Group), Robert Keller (then-Associate General Counsel for the Company), Lawrence Cowart (then-Vice President for Research of Coca–Cola USA), Augustus "Gus" Blanchard (then-Vice President in charge of the Contractual Department), and Marion Glover (then-head of the Planning Department) was formed to draft an amendment and to negotiate with the bottlers. Admitted Facts ¶ 147 at 83.

86. The Company representatives met on at least six occasions between late 1977 and April 1978 with a group of bottlers called the "Original Bottler Discussion Group." The Original Bottler Discussion Group included the Elizabethtown bottler, a representative of the Jamestown, La-Crosse, and Wisconsin–Dells bottlers, and the Sacramento bottler—all plaintiffs in the *diet Coke* cases.

87. Members of the Original Bottler Discussion Group met with Company officials on April 20, 1978 to discuss a proposed draft amendment. DX657(a); DX657(b).

88. After receiving comments from the Original Bottler Discussion Group, the Company mailed a draft amendment ("April 1978 draft") to all bottlers. The draft was accompanied by a letter from Luke Smith inviting the bottlers to a meeting in Atlanta on May 8, 1978. PX1271 at CW0136–147. This was the first general notice to the bottlers that the Company desired to amend to their contracts. Admitted Facts ¶ 150 at 84.

89. The April 1978 draft proposed giving the Company "flexible" or "at will" pricing. Admitted Facts ¶¶ 148–49 at 83–84; PX1271. Flexible pricing is the norm in the soft drink industry and is the pricing method used by competitors of Coca–Cola, including Pepsico and Royal Crown. Tr. 1136 (Cowart); Tr. 671 (Schmidt).

90. Because the April 1978 draft provided for flexible pricing, it did not include a sweetener pass through provision.

91. At the meeting in Atlanta, the Company officials explained the proposed amendment and their reasons for seeking it. Even as early as May 1978, the Company was offering marketing and advertising support as a carrot to get the bottlers to agree to the stick of increased syrup prices. *Generally* PX1040 (presentation by Company officials emphasizing that the fixed syrup prices were hurting the Company's ability to spend money on advertising and marketing); *e.g. id.* at 832196 ("Realistically, if we keep the current pricing clause for bottle Coca–Cola, gross profits will decline and

Coca–Cola USA will be forced to reduce its marketing investment").

92. After the May 8, 1978 meeting, members of the Headquarters Team plus Brian Dyson, the new President of Coca–Cola USA, conducted six regional meetings with the bottlers on May 15–22, 1978.

93. Esther Sokol, a Company secretary, travelled with the Headquarters Group and took notes detailing comments made by the bottlers at each meeting. DX1608–14.

94. Ms. Sokol's notes reflect that the bottlers' main focus was the draft amendment's potential effect upon the ongoing FTC litigation, the Company's need for greater revenue to plow back into advertising, flexible pricing, and the need for greater cooperation between the Company and the bottlers. DX1608–14.

95. The only mention of a diet product reflected in the notes was the following exchange, which occurred at the May 16, 1978 meeting at the Dallas Airport Marina Hotel:

Jim Brim [the Bartlesville bottler]: two areas of concern to him:

1) growth of Fountain Syrup

2) growth of Sugar–Free products

[Luke] Smith: Regarding Sugar–Free Coke ... I am sure no one in the room wants to discuss this issue until the saccharin issue is cleared up.

Admitted Facts ¶ 164 at 86; PX1273 at CW0030.[14]

96. Most bottlers reacted negatively to flexible pricing. Admitted Facts ¶ 152 at 84.

97. In a letter dated May 21, 1978, Bill Schmidt, the Elizabethtown bottler and a member of the Original Bottler Discussion Group, proposed an alternative contract amendment. Schmidt's proposal called for a temporary amendment which allowed the Company to increase the syrup price by a fixed amount each year through 1982. Schmidt's proposal contemplated ongoing negotiations which would result in a permanent contractual agreement by 1982. DX88(c).

98. In a letter to Luke Smith dated May 24, 1978, Bob Delauter of the Coca–Cola Bottling Company of Portland, Indiana listed among his concerns that "the bottlers participat[e] in or share[e] the benefits from any new found savings from some future technical advancement in sugar or concentrate." Additional Admitted Facts ¶ 45 at 125–26; DX517(d). The Court notes that Delauter's statement was not a suggestion that such a provision be added, but rather a concern. This concern could be addressed in a flexible pricing scheme as well as in the formula pricing scheme which eventually emerged.

99. Ferd Bellingrath, a bottler in South Arkansas, stated in a letter to Luke Smith dated May 29, 1978 that, among his reasons for favoring giving the Company temporary relief through a term contract in which the Company could raise syrup prices within limits rather than by amendment to the contract, was the fact that "Other Coke bottlers feel that the Company and bottlers have yet to resolve anything about ... (b) the use of corn syrup blend...." DX89.

100. Following the six regional meetings, the Company invited the Original Bottler Discussion Group to a meeting in Atlanta on June 5, 1978. In an outline of the topics to be discussed, next to the initials LS appears the phrase "[c]omparable formula for sugar substitute." Admitted Facts ¶ 153 at 84.

101. In a memo from Bill Schmidt to "Fellow Bottlers" dated June 9, 1978 and reporting on the June 5, 1978 meeting in Atlanta, William Schmidt, the Elizabethtown bottler, referred to discussion of "the high fructose issue." DX93; DX524.

102. The Company invited other bottlers, who have become known as the Additional Bottler Discussion Group, to meet

---

14. The "saccharine issue" to which Smith referred was presumably a study then being conducted by the FDA of the health risks associated with saccharine. 42 Fed.Reg. 19,996 (1977); DX120; Pub.L. No. 95–203, 91 Stat. 1451 (1977) (codified at 21 U.S.C.A. §§ 321, 343, 343(a), 348). Company officials believed there was a possibility that the FDA would ban saccharine. PX1873 at 72, 135 (Blanchard dep.).

with Company officials on June 14–15, 1978 in Atlanta.

103. Following the June 14–15 meeting with the Additional Bottler Discussion Group, the Company prepared a working draft amendment which was not distributed to the bottlers. PX1928 at 2056 (Blanchard); PX1035. This working draft ("June 24 draft") proposed a pricing scheme consisting of a Base Element and a Sugar Element. The Company would use flexible pricing for the Base Element and formula pricing for the Sugar Element. PX1035.

104. The June 24 draft also contained the following provision:

> In the event that the formula for Bottle Syrup is modified to replace sugar, in whole or in part, the Company will modify the method for computing the Sugar Element in such a way as to give the bottler the savings realized as a result of such modification [in a manner which will reflect the relationship which the price of such sweetening ingredient bears to the price of a finished gallon of Bottle syrup] [... in an appropriate manner] [in a manner not inconsistent with that described above for sugar].

PX1035 (bracketing in original).

105. Six independent bottlers on the Board of Governors of the Coca–Cola Bottlers' Association and their counsel W.B. Hames drafted their own proposed amendment. DX94(a).

106. The first draft of the bottlers' proposal, dated July 11, 1978 ("bottlers' July 11 draft"), provided for a limited syrup price increase by the Company for an initial term ending December 31, 1982. Upon expiration of the initial term, the bottler could elect to have his syrup price determined by a modified "Base Formula Syrup Price" or he could waive the price provisions of his contract and allow the Company flexible pricing for four years. DX94(a).

107. The bottlers' July 11 draft also contained the following language in a separate section under the heading "Technological Developments":

> Company agrees that in the event it desires at some future date to substitute another sweetening agent *such as fructose* for sugar (sucrose) in the preparation of Coca–Cola Bottle Syrup that the price charged Bottler for Coca–Cola Bottle Syrup shall be reduced by the actual savings to Company in costs resulting from such substitution.

DX94(a) (emphasis added). In addition, the draft provided commitments by the Company to contribute to local advertising and marketing in the bottlers' territories and to commit to maintenance of a national demand.

108. A modified simple version of the bottlers' July 11 draft ("bottlers' July 14 draft") was presented to the Headquarters Group on July 19, 1978. DX514; Additional Admitted Facts ¶ 49. The only change from the bottlers' July 11 draft relevant to this case was that the paragraph entitled "Technological Developments" was modified to provide a pass through of only 90% of the savings resulting from a sweetener change. DX94(b).

109. The Company scheduled a meeting with the Original and Additional Bottler Discussion Groups to negotiate the final version of the amendment on July 26–27, 1978. PX1928 at 2047–48 (Blanchard); PX1279.

110. The Company's proposed outline for the meeting does not mention the sweetener pass through. PX1279. It does describe the Company's planned presentation on the changes which would take place in its marketing/advertising organization, changes which included greater decentralization of advertising decisionmaking.

111. Either at the July 26–27 meeting, or shortly before, the Company distributed a proposed draft amendment. This draft contained a pricing scheme similar to that of the June 24 draft using flexible pricing for the Base Element and formula pricing for the Sugar Element. Included with the pricing provisions was the following:

> In the event that the formula for Bottle Syrup is modified to replace sugar, in whole or in part, the Company will modify the method for computing the Sugar Element in such a way as to give the bottler the savings realized as a result of

such modification in such a way as to give the Bottler the savings realized as a result of such modification through an appropriate objective quarterly measure of the market price of any such sweetening ingredient.

PX1036. Unlike the bottlers' proposal, the Company's version of the sweetener pass-through did not name fructose as an example of a substitute sweetener.

112. The Company prepared Bottler Response Profiles summarizing the positions taken by the various members of the Original and Additional Bottler Discussion Groups at the July 26–27 meeting. DX95. Of particular interest to this litigation is the profile of James Brim:

James Brim Pricing Formula. Wants concentrate, perhaps high fructose corn syrup. Concerned with sugar-free products growth, Company help if walls go down, fountain growth.

DX95 at 832003 (emphasis in original deleted, emphasis added).

113. In a letter to Luke Smith dated July 28, 1978, Bill Schmidt listed issues of concern to him about the amendment proposals. He noted in the letter "TECHNOLOGY OR HIGH FRUCTOSE SWEETENER: This item has been very adequately covered in the proposed amendment." DX96.

114. On August 29, 1978, J. Paul Austin, Chairman of the Board of The Coca-Cola Company, and Luke Smith sent a letter to all Coca-Cola bottlers accompanied by the printed final version of the 1978 Amendment and a booklet prepared by the Company entitled "Explanation of Amendment." Admitted Facts ¶ 168; PX880–882.

115. The 1978 Amendment contained basically the same syrup pricing scheme as the June 24, 1978 draft; that is, it provided for a Base Element and a Sugar Element and utilized flexible pricing with a ceiling for the Base Element and formula pricing for the Sugar Element. PX880.

116. Paragraph 1(c) of the final version of the 1978 Amendment bears repeating here:

In the event that the formula for Bottle Syrup is modified to replace sugar, in whole or in part, with another sweetening ingredient, the Company will modify the method for computing the Sugar Element in such a way as to give the Bottler the savings realized as a result of such modification through an appropriate objective quarterly measure of the market price of any such sweetening ingredient.

117. The letter from Austin and Smith summarized some of the recommendations made by bottlers attending the July 26–27 meeting, including:

—Bottlers should receive any savings that might result in the future if an alternative sweetener to sucrose is used in the manufacture of Coca–Cola syrup.

PX882.

118. The letter described the enclosed "Explanation of Amendment" as "an expression of how the Company intends to operate under [the 1978 Amendment]" and "[o]ur comments on various paragraphs and in several instances, our current plans for operating under the Amendment." PX882.

119. As to the sweetener pass-through clause in paragraph 1(c) the Explanation of Amendment stated:

A sentence was added to address the future possibility that the sugar component of Bottle Syrup might be changed to take advantage of an equally satisfactory, but lower cost, sweetener. Without now knowing what such a sweetener might be, nor how it might relate to the present use of sugar in the syrup formula, it is not possible to state with precision exactly how the Sugar Element of the syrup price would be computed. It is the intent, however, that the method of determining the Sugar Element in the Amendment would be adapted to the new sweetening ingredient so that the new sweetening element would affect the syrup price as sugar does now, thus passing on to the Bottler the objectively determined savings from such change.

PX881.

120. Following the mailing of the final version of the 1978 Amendment, Company officials met with bottlers individually and

in groups to discuss the Amendment. PX882; PX1283; Admitted Summary Judgment Facts ¶ 57.

121. To aid its area managers in persuading the bottlers to sign the 1978 Amendment, the Company provided documents detailing different approaches.

122. A "script" for a presentation by Marion Glover dated 9/29/78 reminds the bottlers that the unamended contracts do not obligate the Company to advertise or assist the bottler in selling Coca–Cola in his individual territory. PX1283.

123. In the same document, under the headnote "Further Savings?" appears the statement: "If any new sweetener is developed any savings resulting from the adoption of the new sweetener will be given to amending Bottler by revising sugar formula in Amendment." PX1283.

124. The area managers were provided with a balance sheet comparing the unamended contracts to the 1978 Amendment. The balance sheet, entitled "Guaranteed Values to Bottlers" stated under the subheading "Improved Sugar Formula": "Pass through to Bottler of any savings resulting from future use of non-sucrose sweetener." PX884.

125. The "Guaranteed Values to Bottlers" balance sheet also contained a section on "Contractual Obligations on Company re marketing" explaining the Company's obligations under the 1978 Amendment to participate in national and local advertising. PX884.

126. A similar balance sheet entitled "Legal Obligations of the Company" superseded "Guaranteed Values to Bottlers." PX1928 at 70 (Blanchard).

127. The Coca–Cola Bottlers' Association mailed to all bottlers on September 16, 1978 individual statements by the members of the Board of Governors concerning the 1978 Amendment. DX698; Additional Admitted Facts ¶¶ 47–48 at 126.

128. None of the statements mention the pass through provision. Most were concerned with the flexible pricing provisions and the effect of the Amendment on the pending FTC case. DX698.

129. Many of the Board members conceded that there was a need for more vigorous advertising to meet the current competitive situation.

130. Charles Brightwell of Montgomery Coca–Cola Bottling Company, whose company executed the 1978 Amendment, listed some of the ways he thought the 1978 Amendment benefitted the bottlers in return for the bottlers' concession of flexible pricing, including:

use of bottle syrup for pre-mix, a severability clause, an arbitration clause, direct input from the Bottler to the Company on our problems, an option to use concentrate or syrup, a definite commitment about Company expenditure for advertising in the Bottler's home area.

DX698 at SAC000597.

131. Arthur L. Rivkin of Coca–Cola Bottling Company of San Diego, who opposed the 1978 Amendment, noted that the Amendment would "significantly and permanently change" the traditional relationship between the Company and the bottlers. DX698 at SAC000616.

132. A letter from Associated Coca–Cola Bottling Company to the Company dated May 30, 1979 contained the following provision:

7. The Company has maintained publicly and hereby agrees as a basic principle that the 1979 Amendment is intended and shall be construed and applied to permit the Company to change the price of Coca–Cola Bottlers' Syrup under an altered pricing formula subject to a ceiling tied to the cost of living (Section 1 of the 1979 Amendment), to provide arbitration procedures in lieu of the arbitration procedures under the existing Bottlers' Contracts (Sections 8 and 9 of the 1979 Amendment), and to grant the Amending bottlers certain additional rights as expressed in the 1979 Amendment (§§ 2, 3, 4, 5, 6, 7, 10 and 11 of the 1979 Amendment). The 1979 Amendment is not intended to, and shall be construed and applied so as not to, modify or limit the existing rights of Associated or the Company under existing Bottler's Contracts

as previously amended, except as described in this paragraph.

PX890. The letter refers to the "1979 Amendment" because Associated signed the 1978 Amendment in 1979.

133. The Company tries to use the "Associated Letter" as evidence that the 1978 Amendment changed only the pricing provisions of the unamended contracts. Defendant's Proposed Findings of Fact and Conclusions of Law ¶¶ 739–744 at 189–90. The Associated Letter, however, supplemented the 1978 Amendment and was intended to be interpreted with the 1978 Amendment as a single document. PX890 at ¶ 2. Consequently, the letter does *not explain* the 1978 Amendment; rather it *alters* the 1978 Amendment as executed by Associated Coca–Cola Bottling Company.

134. Moreover, in the Associated Letter, the bottler and the Company agreed to continue to disagree over certain rights claimed by the bottler, including whether the bottler "has the right to prohibit any alteration in the formula for Coca–Cola Bottlers' Syrup from that being purchased in 1916 ..." PX890.

135. The bottlers admit that the meaning of the term "Coca–Cola Bottle Syrup" was not discussed during the 1978 negotiations. PX1939 at 82 (Allison dep.); DX2423 at 56 (Bernabucci dep.); DX2424 at 21–22 (Carvel dep.); DX2431 at 56–57 (Denney dep.); DX2432 at 52 (Glasgow dep.); PX1941 at 67 (Hart dep.); DX2435 at 47 (Holloway dep.); DX2450 at 99–100 (W. Schmidt dep.); PX1942 at 94 (Thomas dep.); DX2453 at 69–74 (Tiernan dep.); DX2453 at 43 (Troup dep.); DX2455 at 81 (Williams dep.).

136. The Company points to testimony by the bottlers that the 1978 Amendment was not intended to entitle amended bottlers to receive different end products than unamended bottlers. *See* citation to the record at Defendant's Proposed Findings of Fact and Conclusions of Law ¶ 748 at 191–92. The Company ignores, however, the fact that the unamenders and amenders have received different end products since 1987: the amenders receive syrups sweetened with HFCS while the unamenders receive syrup sweetened with sucrose. Consequently, events subsequent to the 1978 negotiations have shown that the 1978 Amendment may result in receipt of an end product different from the end product received under the unamended contracts.

137. The Company also notes that the majority of bottlers have testified that neither party considered or discussed diet products during the 1978 Amendment negotiations. *See* citations to the record at Defendant's Proposed Findings of Fact and Conclusions of Law ¶ 751 at 193; *see also* DX2450 at 99–100, 111 (W. Schmidt dep.) (Elizabethtown bottler who was active participant in the negotiations never inquired about diet products).

138. While the Company claims the only discussion of a diet product occurred at the May 16, 1978 meeting at the Dallas Airport Marina Hotel, *see supra* C.A. 83–120 at ¶ 95, the Company's assertion is contradicted by its own exhibit—the bottler profiles prepared after the July 26–27, 1978 meeting—which indicates that Jim Brim was still concerned about sugar-free products. DX95 at 8320003.

139. Three bottlers claim to have discussed sugar-free products with Company officials in the context of the 1978 Amendment.

140. Robert Lee Hart of the plaintiff Santa Fe bottler produced notes he took at the September 18–19, 1978 meeting between a group of bottlers and Company officials in New Mexico. Hart's notes include the handwritten words: "Luke—can use sac or low-cal." PX1941 at Exh. 8 (Hart dep.).

141. Hart testified that the notes reflect a question by one of the bottlers as to whether the pass-through clause included non-caloric or low-calorie sweeteners, to which Luke Smith responded in the affirmative. PX1941 at 64–68 (Hart dep.).

142. One of the Company officials present at that meeting denies the exchange attested to by Hart took place. Tr. 1172–73 (Cowart). Another does not recall the exchange having occurred. DX2456 at 41–43, 48–49, 51–53 (Keough dep.). Two

other Company representatives who were present insist that they always discussed the pass through clause with reference to fructose only. DX1871 at 124–25, 155–62, 165–66, 170, 172 (Blanchard); Tr. 1430, 1473, 1612 (Dyson).

143. Ira Lee Thomas, III, President of Alexandria Coca–Cola Bottling Co., a former plaintiff bottler, testified that at a meeting in Dallas after the 1978 Amendment had been distributed in final form, PX1942 at 35 (Thomas dep.), one of the bottlers asked a question about the use of cyclamates, to which the Company representative responded that "there is a world of artificial sweeteners out there. We intend to utilize them and make a savings available to the bottler group." PX1942 at 36 (Thomas dep.).

144. Thomas states that at the same meeting he privately spoke with Luke Smith and Don Keough and asked about the use of saccharin. Thomas asserts that they informed him that "their interpretation of the contractual issues was that the savings of any artificial sweeteners would be passed on to the bottler organization in return for the concession of the '78 Amendment." PX1942 at 36 (Thomas dep.).

145. The Company responds that the only regional bottler meeting in Dallas occurred on May 16, 1978 and that the notes of that meeting reveal no questions about cyclamates. PX1273.

146. Thomas indicated, however, that the meeting to which he refers occurred *after* the final version of the 1978 Amendment was distributed on August 29, 1978. PX1942 at 35 (Thomas dep.).

147. The Company acknowledges that its officials met formally and informally with bottlers many times after the 1978 Amendment was distributed. Admitted Facts ¶ 159 at 85, Admitted Summary Judgment Facts ¶ 37; *see also* Defendant's Proposed Findings of Fact and Conclusions of Law at 184. Although Thomas could not pinpoint the date of the alleged discussion, it could have occurred during one of these post-August 29, 1978 meetings.

148. Don Keough, who according to Thomas participated in the private conversation about the use of saccharin, denies that he stated or heard any other Company official state, that saccharin or other diet sweetener would be included in the pass-through clause. DX2459 at 115, 118, 120–23, 129, 146–49 (Keough dep.); DX2460 at 199 (Keough dep.).

149. John Allison, the manager at Alexandria, accompanied Thomas to most meetings and testified that he understood that saccharin was not a satisfactory substitute for sucrose. PX1939 at 94–95 (Allison dep.).

150. Richard Freeman, former President of Louisiana Coca–Cola Company, a non-plaintiff, states that he discussed with Luke Smith the development of a diet product bearing the Coca–Cola trademark as early as 1975–1978. PX1940 at 18 (Freeman dep.).

151. Freeman recalled a conversation late in the 1978 negotiations which he described as follows:

> Luke was moving rapidly, we were speaking in shorthand, we had been discussing these issues with him for years, the formulation of Coca–Cola was discussed, the formulation of sugar-free products was discussed, technology for syrup making and beverage base making—the word beverage base wasn't used by us at that time, but the word has now come into use—was discussed, the whole question of whether or not Louisiana Coca–Cola Bottling Company would consider a change in both the sugar and non-sugar formulation, as well as names were discussed. . . .

PX1940 at 28 (Freeman dep.).

152. Freeman's statements to the effect that Smith assured him that his contract covered diet products are irrelevant to this litigation because the contract amendment entered into by the Louisiana bottler is different from the 1978 Amendment at issue here. For example, the Louisiana amendment provided for complete flexible pricing and contained no sweetener pass-through clause. PX1940 Exh. 3 (Freeman dep.).

153. The Court notes, however, that the Company purchased Louisiana Coca–Cola Bottling Company to resolve a contractual dispute over coverage of diet Coke.

154. The Court finds that the preponderance of the evidence shows that the parties to the 1978 Amendment negotiations simply failed to focus on the issue of whether a diet product would be covered by the Amendment. This fact weighs against the Company in light of the knowledge possessed by the Company, but not by the bottlers, with respect to the Company's previous exploration of a line extension to a sugar-free Coca–Cola and the possibility that the Company might develop such a product in the future.

### The Company's Previous Exploration of the Possibility of Introducing a Sugar–Free Coca–Cola

155. "[D]efendant had developed several formulae for a low-calorie cola product sweetened with saccharin and aspartame in 1978 at the time defendant was drafting the 1978 Amendment." Preclusion Order ¶ 2(r); *diet Coke IV* at 377.

156. The Company's planning department, including Marion Glover, who was later part of the Headquarters Group which negotiated the 1978 Amendment, began examining the feasibility of line extensions of brand Coca–Cola, including introduction of "sugar-free" or "sugar-less" Coca–Cola as early as 1975.. The name for the evaluation project was "Project Triangle." *See* PX1233 (memo from Dickinson to Glover dated November 10, 1975, re: New Cola Product Options); PX1234 (memo from Glover to Georgas dated November 11, 1975 attaching PX1233 and recommending that line extension of brand Coke should be seriously considered); PX1235 (memo from Glover to Georgas dated December 8, 1975 re: Project Triangle); PX1236 (report by Glover dated December 8, 1975 entitled "Project Triangle: Product Strategy for Coca–Cola USA"); PX1237 (Project Triangle report by Grant Curtis dated December 11, 1975 and copied to Glover); PX1239 (memo from Glover to Georgas dated December 18, 1976 re:

Project Triangle); CX103 (memo from Keough to Georgas dated January 23, 1976 re: Project Triangle).

157. A report by Marion Glover, dated December 8, 1975 and titled "Project Triangle: Product Strategy for Coca–Cola USA," explored, among other possibilities, the potential for introduction of a "sugarless Coke." PX1236 at 842284 & 842294. The report noted that "[t]he introduction of a 'sugar-free' (or 'sugar-less') Coke could expand our total share of this market segment (although Coke and TAB share leadership may suffer)." PX1236 at 842294.

158. Glover recommended in the report:

V. *Recommendations*

A. The following are options that should be aggressively explored on a *priority* basis:

. 1. Determine the market potential for a "sugar-less Coke."

PX1236 at 842296 (emphasis in the original).

159. A report on Project Triangle dated December 11, 1975 and copied to Marion Glover "set forth a strategic rationale for the development, introduction, and marketing of a sugar-free version of Coca–Cola." PX1237 at 842229.

160. Don Keough, another member of the Headquarters Group, was aware of Project Triangle as well. A December 18, 1976 memorandum from Glover to Georgas states that Don Keough wanted to pursue developing a presentation for Project Triangle. PX1239.

161. Keough himself apparently investigated the potential of a sugar-free version of brand Coca–Cola. In a memorandum from Keough to Georgas dated January 23, 1976 and copied to Marion Glover, Keough reports on an investigation conducted into trends in the sugar/low calorie soft drink market and notes "[s]everal brand options were examined—including Sugarfree Coke ..." CX103 at 842216.

162. The Keough memorandum concluded:

. [P]lans must be made to assure that Tab will be the Company's best entry over

the long term to maximize the opportunities in the low calorie cola segment. If such plans fail to convince us that Tab can at least hold share of this growing segment, then a decision must be made regarding turning the job over to Sugarfree Coke.... The Triangle task force will make a recommendation regarding Tab/Sugarfree Coke at a later date.

CX103 at 842217.

163. The Court finds that at least two members of the Company's Headquarters Team who negotiated the 1978 Amendment—Don Keough and Marion Glover—were aware that the Company had considered in the recent past the possibility of introducing a sugar-free version of brand Coca–Cola.

164. Although plaintiffs assert that Brian Dyson was also aware of Project Triangle at the time of the 1978 Amendment negotiations, PX1320 shows that Dyson received copies of the Project Triangle memoranda on April 21, 1980—after the conclusion of the 1978 Amendment negotiations.

165. Although the Company did not attempt to develop a sugar-free Coca–Cola during the 1978 negotiations, the fact remains that at least two Company officials who participated in the 1978 Amendment negotiations were aware that such a possibility had been explored and could be resurrected again.

166. Consequently, members of the Headquarters Team were in a position to be aware of potential uncertainties with regard to application of the phrase "in the event the formula for Bottle Syrup is modified to replace sugar, in whole or in part, with another sweetening ingredient" to a version of Bottle Syrup sweetened with saccharin or aspartame. This awareness put the Company in the best position to avoid the uncertainties by limiting the meaning of the term "another sweetening ingredient." The fact that the Company did not do so weighs in favor of the amended bottlers' position that diet Coke is covered by the 1978 Amendment.

*Plaintiffs' Request for Monetary Damages*

167. Plaintiffs assert they are entitled to monetary damages to compensate them for the higher price at which they purchased diet Coke under the terms of the Temporary Amendment.

168. The Company asserts that paragraph 9 of the Temporary Amendment forecloses plaintiffs from receiving monetary damages for the price paid for diet Coke syrup while the Temporary Amendment was in effect:

> 9. It being the intent and purpose of the Bottler and the Company that this Agreement shall in no way prejudice nor otherwise affect their respective rights and obligations under the Bottle Contract or from any other source nor their respective legal or equitable claims, the Bottler and the Company expressly stipulate that this Agreement shall have no such effect. It is further agreed, however, that during the period this Agreement is in effect, the price of diet Coca–Cola shall be determined solely under this agreement.

DX166(b).

169. Plaintiffs seek to avoid the effect of paragraph 9, asserting (i) that the Temporary Amendment is unenforceable for lack of consideration; or alternatively, (ii) the Temporary Amendment is voidable because they were compelled to sign it under economic duress.

170. The Court finds there is adequate consideration to support the Temporary Amendment.

171. At the time these plaintiffs entered into the Temporary Amendment, there was a bona fide dispute between the parties as to whether the contracts as amended by the 1978 Amendment covered diet Coke.

172. The Company has always maintained that diet Coke was not a "Coca–Cola," but rather a separate product appealing to a separate market and not covered by the bottling contracts. Company officials testified that this belief sprang from the fact that the Company's other diet product—TaB—was sold to the bottlers un-

der a separate bottling contract.[15] Tr. 1451 (Dyson). Diet Coke was the first additional syrup bearing the trademark to be offered by the Company. Consequently, in 1983, there was no precedent for the treatment of additional syrups bearing the trademark.

173. The Company's position has consistently been that additional syrups, such as diet Coke, caffeine-free Coke, and Cherry Coke, are not covered by the bottling contracts absent an amendment to the bottling contracts. *See supra* C.A. 83–120 at ¶¶ 61–63 & 66 (discussing the letter agreements covering caffeine-free Coke and Cherry Coke amended the bottling contracts to cover those beverages).

174. The Court finds that in 1983 the Company honestly believed that diet Coke was not covered by the actual bottlers' contracts. The Court also finds that this belief, although ultimately incorrect, was reasonable in light of the parties' prior course of performance.

175. At the time plaintiffs signed the Temporary Amendment, the Company had been in litigation with the unamended bottlers in the *Elizabethtown* case for three years. Consequently, all parties were aware that litigation of the contract coverage could be protracted and lengthy.

176. Plaintiffs do not deny that they sell diet Coke at a profit even under the terms of the Temporary Amendment.[16] As a consequence, the *real* dispute between plaintiffs and the Company at the time they entered into the Temporary Amendment was who would receive the incremental profit from the sale of diet Coke.

177. Plaintiffs in 1983–84 could either (i) forego offering diet Coke in their territories for the duration of what could be lengthy litigation and seek lost profits if they prevailed, or (ii) market diet Coke under the terms of the Temporary Amendment and forego the incremental profit. Plaintiffs chose the latter option.

178. In light of the options confronted by plaintiffs, the Company's offer to provide plaintiffs with diet Coke syrup, albeit on the Company's pricing terms, during the pendency of the litigation was sufficient consideration to render the Temporary Amendment, including paragraph 9, enforceable.

179. The Company lists other provisions of the Temporary Amendment as additional consideration. These provisions, however, were incidental to the purpose of the Temporary Amendment, which was to supply diet Coke to these bottlers on a temporary basis under terms which both sides could live with. Absent the provision of diet Coke, the bottlers would not have signed the Temporary Amendment. Consequently, the only consideration supporting the Temporary Amendment is the Company's promise to supply diet Coke until the parties' contractual dispute could be resolved.

180. Plaintiffs contend that even if there was sufficient consideration, the Temporary Amendment is voidable by them because they signed it under economic duress.

181. Essentially, plaintiffs assert the Company attempted to coerce them to amend their contracts by failing to inform plaintiffs about diet Coke until very shortly before its introduction, and then introducing diet Coke with a great deal of fanfare and lavish advertising so as to create an immediate demand for the product and leave plaintiffs little choice but to obtain diet Coke for their territories on the Company's terms. They allege that the Company created such a large and immediate

---

**15.** This finding does not conflict with the reservation of rights clause in the TaB contract. The finding is made not for the purpose of determining the coverage of plaintiffs' bottling contracts. Rather, the treatment of TaB gives context to the actions of Company officials and is relevant to the reasonableness of the their position in 1983 that diet Coke was not covered by the bottling contracts.

**16.** This finding does not transgress the order entered in this case preventing argument based upon plaintiffs' profitability. In order to determine adequacy of consideration, the Court must look to the situation as it existed in 1983–84. When Judge Schwartz decided plaintiffs' preliminary injunction motion—which was close in time to when these plaintiffs signed the Temporary Amendment—he noted "All agree that the bottlers sell diet Coke at a profit even without the pass through...." *diet Coke I* at 1128.

demand that their inability to market diet Coke in their territories resulted in significant loss of good will from customers anxious to purchase the product. According to plaintiffs, the pressure increased as surrounding bottlers signed the Temporary or 1983 Amendments and began marketing the product, leaving plaintiffs "islands in a sea of diet Coke."

182. Even accepting plaintiffs' version of the events surrounding the introduction of diet Coke as presented, plaintiffs have failed to allege duress sufficient to void paragraph 9 of the Temporary Amendment.

183. While adamant about the voidability of paragraph 9 of the Temporary Amendment, the plaintiffs have generally been quite selective about the effect they choose to give certain clauses in their various contracts with the Company. For example, plaintiffs insist that the Court honor the reservation of rights clauses in the TaB and pre-mix contracts and not consider the contractual treatment of those products as evidence of their contractual rights. On the other hand, plaintiffs ignore the similar reservation of rights clauses in the caffeine-free and Cherry Coke letter agreements when they argue that the course of performance concerning those products is relevant to their claims. Paragraph 9, like the reservation of rights clauses, was drafted with an eye towards litigation. The Court cannot help but suspect that plaintiffs' assertion of duress is another example of their selective contract interpretation.

184. The Court finds the Temporary Amendment was a compromise designed to allow the parties to reap the profits from marketing diet Coke while continuing to negotiate (in the case of bottlers who signed the 1983 Amendment) or litigate (in the case of plaintiffs) their contractual rights. It is the result of business decisions by and negotiations between the parties. Although the Company may have been in a better bargaining position, the Court finds that the Company's refusal to provide plaintiffs with diet Coke under the terms of their bottling contracts during the pendency of this litigation was not an improper threat which would render the Temporary Amendment voidable. Additionally and in the alternative, the Court finds that plaintiffs' fear of loss of good will due to the unavailability of diet Coke in their territories does not rise to the kind of economic duress necessary to render the Temporary Amendment voidable.

## CONCLUSIONS OF LAW

### *Language of the 1978 Amendment*

██ 185. The Court concludes that the 1978 Amendment clearly reflects a bargain wherein each side gave up certain rights and received certain benefits in return. The amended bottlers gave up the formula sugar pricing and their right, pursuant to paragraph 10 of the Consent Decrees, to consent to a change in the sweetener used in syrup for Bottled Coca–Cola. In return, the bottlers received a promise that the Company would pass through to them any savings resulting from the use of a different sweetener. The amended bottlers also agreed to pay a higher price for the syrup and in return received additional advertising support and cooperation from the Company, including the Company's promise to provide funds for local advertising and marketing. In return, the Company obtained relief from the fixed price provisions of the unamended contracts and a likelihood that it could charge a higher price for the syrup.

186. The 1978 Amendment amended paragraph FIRST of the unamended contracts to the extent it incorporates paragraph 10 of the Consent Decrees. As a consequence, the Company may be required pursuant to paragraph FIRST of the contracts as amended by the 1978 Amendment to sell to the amended plaintiffs their requirements of syrup for Bottled Coca–Cola which does not contain any sugar.

187. The Court concludes the effect of the 1978 Amendment was to change the nature of the business relationship between the Company and the amended bottlers.

188. Unlike the claim of the unamenders, however, the amenders' claim is bolstered by several of the findings in the Preclusion Order which lead to the finding by the Court that the formula for diet Coke

is identical to that of Bottled Coca–Cola except for the sweetener. The amenders' claim is also bolstered by the finding—again necessitated by the Preclusion Order—that the Company intentionally formulated diet Coke to resemble Coca–Cola as closely as possible. These findings bring diet Coke within the express language of the 1978 Amendment and weigh in favor of finding that the amended bottlers are entitled to diet Coke under the terms of the 1978 Amendment.

189. Diet Coke is a modified version of "Bottle Syrup" wherein sugar has been replaced with another sweetening ingredient. Thus, the Court concludes that diet Coke fits squarely within the express language of paragraph 1(c) of the 1978 Amendment.

190. Whether plaintiffs are entitled to diet Coke under the terms of the 1978 Amendment depends on the meaning of the terms "Bottle Syrup" and "another sweetening ingredient."

191. The words of the 1978 Amendment, however, do not shed light on whether the term "Bottle Syrup" as used in the 1978 Amendment includes syrup for diet Coke. Consequently, the Court must look beyond the face of the 1978 Amendment to determine whether it amends paragraph FIRST of the unamended contract so as to entitle the amended bottlers to purchase their requirements of diet Coke pursuant to the terms of the 1978 Amendment.

192. The amended bottlers' claim that they are entitled to the "family" of syrups based upon their rights in the trademark is identical to that of the unamenders and is treated in the portion of this Opinion dealing with C.A. 83–95. Plaintiffs' "family of syrups" argument is undermined by their own course of performance and their statements interpreting their contracts as putting them under no obligation to push vigorously pursuant to paragraph SIXTH the "family" of syrups. The Court concludes that plaintiffs' interest in the trademark—whatever it might be—does not by itself entitle them to purchase diet Coke under the terms of the 1978 Amendment.

### Course of Performance

193. When the words of a contract are ambiguous, the Court may look to extrinsic evidence to ascertain the intent of the contracting parties. The most important extrinsic evidence of the parties' intent is course of performance. 2 E.A. Farnsworth, *Farnsworth on Contracts* § 7.13 at 292–93 (1985); *Restatement (Second) of Contracts* § 203 at 92.

194. The fact that the Company passed through the savings realized from the substitution of HFCS–55 for sugar in the syrup demonstrates that paragraph 1(c) was intended to operate when a different version of syrup for Bottled Coca–Cola is substituted for a prior version. However, the substitution of HFCS for sugar sheds no light on whether paragraph 1(c) was intended to apply to the situation in which a syrup which is identical to the syrup for Bottled Coca–Cola except for the sweetener is offered *in addition to* the original version of the syrup.

195. The Company's treatment of the syrups for caffeine-free Coca–Cola, Cherry Coke and Coca–Cola Classic does not prove that the term "Bottle Syrup" in paragraph 1(c) can cover multiple syrups. The letter agreements covering these syrups are really amendments to the 1978 Amendment including these syrups within its terms. They in no way open the door to diet Coke.

### The 1978 Amendment Negotiations

196. The Company argues that the evidence of the negotiations leading to execution of the 1978 Amendment by the bottlers shows that the term "another sweetening ingredient" in paragraph 1(c) should be limited to nutritive sweeteners developed after the 1978 Amendment negotiations which are "satisfactory."

197. The Company would have the Court read the language "an equally satisfactory, but lower cost, sweetener" from the Explanation of Amendment sent to the bottlers, PX881, into paragraph 1(c) of the 1978 Amendment. The Company interprets "satisfactory" to mean that the sweetener does not change the flavor of

high calorie Coca–Cola Bottle Syrup when substituted for sugar in the syrup.

198. The Company asserts that aspartame and sucrose are not "satisfactory" sweeteners because Coca–Cola syrup sweetened with aspartame or saccharin is distinguishable by taste from Coca–Cola syrup sweetened with sugar.

199. The Court concludes, however, that taste is not a definitional characteristic of the syrup to which plaintiffs are entitled under the terms of their bottle contracts. If taste were a definitional characteristic, then the Company could not, as it has done since 1985, supply syrup for new Coke as syrup for "Bottled Coca–Cola" pursuant to the bottling contracts because new Coke tastes significantly different, and in fact was formulated to taste significantly different than, the version of syrup for Bottled Coca–Cola which preceded it. Preclusion Order, *diet Coke IV* at 376 ¶ 2(m) (New Coke has "a materially different flavor profile, and a materially different taste than the version of 'Coca–Cola Bottler's Syrup' that was being produced by the defendant and supplied to the plaintiffs under their contracts immediately prior to the introduction of new Coca–Cola syrup.... the use of different secret ingredients in new Coca–Cola gives new Coca–Cola a flavor complex, 'flavor profile,' and taste that is materially different from the flavor complex, profile and taste of the version of 'Coca–Cola Bottler's Syrup' which [was] sold to bottlers from 1980 through April 1985 (and now sells as the syrup for "Coca–Cola Classic"), and all of which are major, significant, and give new Coke a significantly different taste").

200. As a consequence, even if the Court were to incorporate the term "satisfactory" into paragraph 1(c) to describe the sweetener pass through clause, the fact that aspartame and saccharin cause the syrup to taste different would not render them "unsatisfactory."

201. The Company also asserts the Court should incorporate into paragraph 1(c) the concept of a "new" sweetener, which the Company derives from the script dated September 29, 1978 for a presentation by Marion Glover. PX1283.

202. The Company's selectivity in the explanatory language it chooses to incorporate into paragraph 1(c) undermines its argument. For example, the Company does not urge the incorporation of the broader language of the "Guaranteed Values to Bottlers," which explains the sweetener provision as "[p]ass through to Bottler of *any savings* resulting from future use of *non-sucrose sweetener.*" PX884.

203. The Company also argues that diet Coke does not fall within the coverage of the 1978 Amendment because it appeals to a different market segment. There is nothing in the contract language limiting coverage to market appeal. Further, although defendant makes much of the notion of different "markets" for high calorie and diet soft drinks, one of the memoranda from Project Triangle to some extent contradicts this dichotomy. One of the considerations taken into account in Project Triangle was that a line extension to a sugar-free Coca–Cola might cannibalize Coke. *See* PX1236 at 842294 ("The introduction of a 'sugar-free' (or 'sugar-less') Coke could expand our total share of [the cola] market segment (although *Coke* and TAB share leadership may suffer)") (emphasis added). A concern about possible cannibalization would indicate the possibility that the diet and sugar cola markets overlap to some degree.

*Course of Negotiations Leading to the 1978 Amendment*

204. The evidence shows that a diet or sugar-free Coca–Cola was not considered during the 1978 Amendment negotiations by a majority of the bottlers, who were thinking primarily in terms of fructose as a possible substitute sweetener.

205. The Company asserts that the term "another sweetening ingredient" first appeared in the bottlers' July 14 draft, making the bottlers the drafter of the term. Invoking the rule of construction that ambiguous contract terms should be construed against the drafter, the Company argues that the term "another sweeten-

ing ingredient" should be construed in favor of the Company and against the bottlers.

206. Even if the Court agreed that the term "another sweetening ingredient" should be construed against the bottlers, it would not be the case that the term has whatever meaning the Company chooses to assign to it, especially if that meaning is in no way reflected by the contract language.

207. While the Company argues that the bottlers always discussed sweetener pass through clause in the context of fructose, the fact remains that the Company itself removed the language limiting the pass through to fructose. The bottlers' July 14 draft contained the language "Company agrees that in the event it desires at some future date to substitute another sweetening agent *such as fructose* for sugar (sucrose) in the preparation of Coca-Cola Bottle Syrup...." (emphasis added). When it sent the final version of the 1978 Amendment, however, the Company used the phrase "another sweetening ingredient" but deleted the phrase "such as fructose."

208. Further, the Court construes the term "another sweetening ingredient" against the Company because the Company was the party in the better position during the negotiations to be aware of the potential ambiguity of the phrase "replace sugar, in whole or in part, with another sweetening ingredient...."

209. The reasoning behind the rule of construction in which ambiguous contract terms are construed "against the party who supplies the words or from whom a writing otherwise proceeds," *Restatement (Second) of Contracts* § 206 at 105, is because the drafter is usually in a better position to prevent ambiguity. *Id.* § 206 comment a at 105 ("Where one party chooses the terms of a contract, he is likely to provide more carefully for the protection of his own interests than for those of the other party. He is also more likely than the other party to have reason to know of

uncertainties of meaning. Indeed, he may leave meaning deliberately obscure, intending to decide at a later date what meaning to assert."). Contract language should, therefore, also be construed against the party in a position to be aware of the potential ambiguity.

210. In this case, at least two of the Company officials on the Headquarters Team, who had responsibility for negotiating and drafting the 1978 Amendment, had reason to know that development of a sugar-free product bearing the Coca-Cola trademark was a possibility. The Company has offered no evidence that the bottlers were aware of Project Triangle or of the Company's previous consideration of a line extension of brand Coke to a sugar-free product. Consequently, the Company, as both the initiator of the 1978 Amendment and because of its knowledge regarding possible development of a sugar-free Coca-Cola, was in the better position to prevent ambiguity in the sugar pass through clause by expressly limiting its applicability to high-calorie sweeteners.

211. The Court concludes that the phrase "another sweetening ingredient" is not limited to nutritive sweeteners developed after 1978 which do not change the taste of high-calorie Coca-Cola Bottle Syrup when substituted for sugar.

212. The amended plaintiffs are entitled to declaratory and injunctive relief. The Court concludes that the amended plaintiffs who have not signed the 1983 Amendment are entitled by their bottling contracts as amended by the 1978 Amendment to receive the syrup for diet Coca-Cola from the Company under the pricing terms of the 1978 Amendment.[17]

213. The Court further concludes that plaintiffs are not entitled to monetary damages to compensate them for the difference between what they paid for diet Coke syrup under the Temporary Amendment and what they would have paid pur-

---

**17.** Because the Court concludes that the unamended bottlers' contracts entitle them to receive diet Coke syrup under the pricing terms of the 1978 Amendment, it does not reach the issue of whether the Company breached a fiduciary duty arising out of the contracts.

suant to the pricing provisions of the 1978 Amendment.

214. The Court concludes that plaintiffs waived monetary damages when they signed the Temporary Amendment. The Company bears the burden of showing waiver. It met this burden when it produced the Temporary Amendment's waiver clause. It is undisputed that plaintiffs signed the Temporary Amendment.

215. Where a contractual obligation is disputed in good faith, performance is sufficient consideration to create a valid contract. *See Restatement (Second) of Contracts* § 73 at 179 ("Performance of a legal duty ... which is *neither doubtful nor the subject of honest dispute* is not consideration."); *id.* § 73 comment b ("[T]he requirement of consideration is satisfied if the duty is doubtful or is the subject of honest dispute"); 1 *Corbin on Contracts* § 187 at 164–65 ("[W]here a claim is disputed in good faith, payment or other performance ... is held to be sufficient consideration...."). *See also Hammel v. Ziegler Financing Corp.*, 113 Wis.2d 73, 334 N.W.2d 913, 917 (App.1983); *Burt v. Horn*, 97 N.M. 515, 641 P.2d 546 (App.1982); *Pierce v. Plogger*, 223 Va. 116, 286 S.E.2d 207 (1982); *Kinnison v. Kinnison*, 627 P.2d 594, 596 (Wyo.1981); 1 *Williston on Contracts* § 135A at 569.

216. Performance of a disputed duty may be adequate consideration even if it is ultimately determined that the duty was pre-existing. *See Kinnison*, 627 P.2d at 596; *Restatement (Second) of Contracts* § 74 comment b.

217. The Court concludes that the Temporary Amendment is supported by adequate consideration, the consideration being the Company's promise to supply plaintiffs with diet Coke syrup until the contractual dispute regarding their bottling contracts could be resolved either by negotiation or by the Court.

218. Since the Company produced a valid contract containing a waiver provision, plaintiffs as the party seeking to avoid the contract bear the burden of proving duress.

219. According to the *Restatement (Second) of Contracts*, a contract is voidable "[i]f a party's manifestation of assent is induced by an improper threat by the other party that leaves the victim no reasonable alternative." *Restatement (Second) of Contracts* § 175(1) at 475. Plaintiffs contend the Company improperly threatened to withhold diet Coke syrup unless they assented to the terms of the Temporary Amendment. They assert that the large demand for diet Coke generated by the Company and their position as "islands in a sea of diet Coke" left them with no alternative but to acquiesce.

220. "(1) A threat is improper if

\* \* \* \* \* \*

(d) the threat is a breach of the duty of good faith and fair dealing under a contract with the recipient.

(2) A threat is improper if the resulting exchange is not on fair terms, and

(a) the threatened act would harm the recipient and would not significantly benefit the party making the threat,

(b) the effectiveness of the threat in inducing the manifestation of assent is significantly increased by prior unfair dealing by the party making the threat, or

(c) what is threatened is otherwise a use of power for illegitimate ends."

*Restatement (Second) of Contracts* § 176.

221. Plaintiffs withdrew with prejudice their claims against the Company for breach of good faith and fair dealing. The Court will not allow plaintiffs to reintroduce their good faith and fair dealing claim through the back door of the Temporary Amendment. The Court concludes that the Company's position in 1983 that it would not supply diet Coke to the bottlers under the terms of their existing bottling contracts is not a breach of the duty of good faith and fair dealing.

222. In every contract negotiation there is an implied threat that the party will not perform unless his terms are accepted. This type of implied threat is a necessary part of the bargaining process. *Restatement (Second) of Contracts* § 176 com-

ment a at 482; *see also Azalea Drive–In Theatre, Inc. v. Sargoy,* 394 F.Supp. 568, 575 (E.D.Va.1975) ("the words 'threat' and 'duress' cannot be equated").

 223. While the Company may have driven a hard bargain when it refused to supply plaintiffs with diet Coke unless they signed the Temporary Amendment, mere hard bargaining is insufficient to constitute duress, even when one of the parties is in financial difficulty. *Sheehan v. Atlanta Int'l Ins. Co.,* 812 F.2d 465, 469 (9th Cir.1987); *Stillwell v. Linda,* 110 Wis.2d 388, 329 N.W.2d 257, 258 (App. 1982); *Alexander v. Standard Oil Co.,* 97 Ill.App.3d 809, 53 Ill.Dec. 194, 423 N.E.2d 578, 582–83 (1981); *Wurtz v. Fleischman,* 97 Wis.2d 100, 293 N.W.2d 155, 160 (1980); 1 E. Farnsworth, *Farnsworth on Contracts* § 4.17 at 437–38 (1990).

224. Likewise, where contract obligations are reasonably and honestly in dispute, the threat not to perform is not an improper threat, even if the position of the party threatening nonperformance is eventually proven incorrect. *Jamestown Farmers Elevator, Inc. v. General Mills, Inc.,* 552 F.2d 1285, 1290 (8th Cir.1977); *Restatement (Second) of Contracts* § 176 comment e at 485.

225. If the Company's sole motivation had been to coerce the bottlers to amend their contracts, the Company could have done so more effectively by refusing to supply bottlers with diet Coke under *any* terms other than the 1983 Amendment.

226. Any pressure exerted upon plaintiffs by the fact that bottlers in surrounding territories were marketing diet Coke originated in actions of third parties and cannot be attributed to the Company. The fact that some plaintiffs' territories may be been "islands in a sea of diet Coke" does not support their claim that paragraph 9 of the Temporary Amendments should be voided. 1 E. Farnsworth, *Farnsworth on Contracts* § 4.17 at 437–38 (1990) ("A party will ordinarily be held to an agreement even though that party's adversity has been taken advantage of, as long as the contract has been shaped by prevailing market forces.").

227. The Court concludes that, when they signed the Temporary Amendment, plaintiffs made a business decision to offer diet Coke in their territories during the pendency of this litigation. The same policy which favors settlement of claims supports allowing contracting parties to continue to do business while resolving their contractual differences. Although plaintiffs' business decision may have been prompted by plaintiffs' fear that they might lose good will if they did not offer diet Coke, plaintiffs have not demonstrated the kind of economic duress necessary to void a contract.

An order will be entered granting judgment for defendant in C.A. No. 83–95 and granting partial judgment in the form of declaratory and injunctive relief only for plaintiffs in C.A. No. 83–120.